Filed 6/24/22  P. v. Molina CA1/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>LANCE MOLINA,<br><br>　　　　Defendant and Appellant. | A147875<br><br>(San Francisco County<br>Super. Ct. No. 217223) |
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>WILLIAM JONES,<br><br>　　　　Defendant and Appellant. | A147925<br><br>(San Francisco County<br>Super. Ct. No. 217223) |

　　　　In the early morning of Sunday, October 4, 2009, three men, Kedric Green, Michael Bailey and Kevin Harrell, all in their 20's, agreed to drive two women home from a San Francisco nightclub upon learning that one of them, Ariael Kittles, had lost her car keys.  The driver, Green, was visiting the Bay Area from Baton Rouge, Louisiana with his friend, Bailey, and they were staying with Bailey's cousin, Harrell.  At the end of the drive, the three would be assaulted and robbed by a group of strangers, and Bailey would be fatally shot.

1

Four defendants—appellants William Jones and Lance Molina (defendants), and two other defendants who are not parties to this appeal, Maurice Lige and Kittles—were arrested and charged in December 2009 with crimes related to this incident.[1]  After a 2014 trial, Jones and Molina were convicted of all the counts against them that were presented to the jury and some, but not all, of the accompanying enhancement allegations were found to be true.  Kittles was acquitted, and Lige, besides receiving an acquittal on one count, was the beneficiary of a hung jury.  In 2016, the trial court sentenced Jones to 57 years to life and Molina to 44 years and 4 months to life in state prison.

Jones and Molina each appealed on numerous grounds.[2]  During the pendency of this appeal, the parties, with our permission, filed supplemental briefing on several subjects, most of which involve legislative changes enacted after trial that apply retroactively to defendants' cases.  This has resulted in voluminous briefing and this unusually long opinion, in which we address the following:

First, defendants claim we must reverse all their convictions because the trial court violated their confrontation rights under *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*) by admitting the perjured preliminary hearing testimony of Arnold Biggins, a purported eyewitness to the incident and to the perpetrators' actions immediately afterward. Relatedly, they contend the trial court erroneously instructed the jury about

---

[1]  Kenya Moore was also charged as an accessory after the fact, but she was not tried and testified at trial under a grant of immunity.

[2]  Jones and Molina have filed separate appeals, but they were tried together below, and they make overlapping arguments and/or join in certain appellate claims.  Therefore, we have consolidated these cases for purposes of this opinion.

Biggins's perjury in the preliminary hearing and contend the prosecutor committed misconduct by withdrawing Biggins's immunity and charging him with unprovable crimes so he would decline to testify at trial. We conclude these arguments are without merit.

Second, defendants contend we must reverse their first degree murder convictions (count I) based on the retroactive application of post-trial legislative amendments to Penal Code sections 188 and 189,[3] which as of January 1, 2022, defendants could raise on direct appeal rather than by petition to the superior court as previously required. These legislative amendments eliminate the imposition of murder liability under the natural and probable causes doctrine and limit it under the felony-murder doctrine. We reject defendants' claims that their first degree murder convictions are improperly based on the natural and probable consequence doctrine because the trial court's instructions permitted them only to convict defendants of *second* degree murder under that theory. The jury instead convicted them of *first* degree murder, indicating it did not rely on a natural and probable consequences theory. However, we vacate defendants' first degree murder convictions and remand the case based on the retroactive application of the felony-murder doctrine as revised by Senate Bill No. 1437. (2017-2018 Reg. Sess.) (Senate Bill No. 1437). We also reject defendants' claim that the People are barred from retrying them for first degree murder under the felony-murder doctrine.

Third, Molina contends the trial court prejudicially erred by failing sua sponte to instruct the jury on two lesser included offenses to the conspiracy to commit robbery count (count II). We conclude this argument has no merit.

---

[3] Statutory references are to the Penal Code unless otherwise stated.

3

Fourth, defendants claim we must reverse the jury's findings that certain criminal street gang allegations made against them were true and that they committed certain criminal street gang crimes. Defendants base their claims on the retroactive application of post-trial legislative changes to section 186.22 and the erroneous admission of inadmissible hearsay and testimonial hearsay under *Crawford* and *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*). We conclude that the retroactive application of section 186.22 and the admission of significant amounts of inadmissible hearsay and testimonial hearsay in violation of *Crawford* and *Sanchez* constitute error that prejudiced defendants. Therefore, we vacate the jury's gang-related findings and convictions as specified in part IV of the Discussion section, *post*. We conclude the People are not barred from retrying defendants on these gang-related charges.

Fifth, regarding the firearm enhancement allegation the jury found true as part of Jones's conviction for participation in a conspiracy to commit robbery (count II), we reject Jones's claim that this allegation cannot as a matter of law be included in a conspiracy count. We agree with him that we should remand his case, based on the retroactive application of a post-trial amendment of section 12022.5, for the trial court to exercise its recently authorized discretion to strike or dismiss this firearm enhancement; we need not address his claims regarding other firearm enhancements that we have vacated as a result of our felony murder and gang-related rulings.

Sixth, we agree with Molina and the People that we must vacate the upper-term sentences Molina received for counts II (conspiracy to commit robbery), III (the robbery of Bailey) and IV (the robbery of Green) and remand these counts to the trial court for resentencing because of the retroactive application of the Legislature's post-trial amendment of

4

section 1170, subdivision (b), which now requires the trial court to consider certain matters it did not consider at sentencing.

Seventh, Jones claims the trial court imposed certain enhancement sentences on him that were unauthorized by law. To provide guidance for the trial court on resentencing, we address Jones's claim regarding the section 186.22, subdivision (b)(1)(C) 10-year enhancements the court imposed as part of his robbery convictions (counts III, IV and V), even though we have ordered the enhancements vacated as gang-related in part IV of the Discussion section, *post*. We conclude the imposition of the enhancements violated section 12022.53, subdivision (e)(2). We further conclude that the stayed, one-year firearm enhancement the court imposed on Jones as part of his count III robbery conviction must be vacated, and the 10-year enhancement sentence the court imposed under section 186.22 as part of Jones's count VII assault with a pistol conviction must be stricken. We conclude Jones has forfeited his claim regarding section 1385.

We otherwise affirm the two judgments.

## BACKGROUND

### I.

### *The Charges Against the Defendants*

In a second amended information filed in May 2014, Jones, Molina, Kittles and Lige were charged with willful, deliberate and premeditated murder of Bailey (count I; § 187, subd. (a)); conspiracy to rob Bailey, Green and Harrell (count II; § 182, subd. (a)(1), § 211); and the second degree robberies of Bailey, Green and Harrell (counts III, IV and V; § 211). It was alleged regarding counts I, III, IV and V that each defendant was a principal in the offense and that the defendant or another principal was personally armed with a firearm (§ 12022, subd. (a)(1)), that a principal personally used

5

a firearm for the benefit of a criminal street gang (§ 12022.53, subds. (b), (e)(1)), and that each defendant acted for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)). It was also alleged regarding count II that each defendant committed the offense for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(B)). Molina, Jones and Lige were also charged with the offense of active participation in a criminal street gang (count X; § 186.22, subd. (a)).

There were additional special circumstance and sentence enhancement allegations against Jones alone: regarding count I, that he murdered Bailey while engaging in the commission of a robbery in violation of section 211 (§ 190.2, subd. (a)(17)), that he intentionally committed the murder as a member of a criminal street gang to further the activities of the gang (§ 190.2, subd. (a)(22)), that he personally and intentionally discharged a firearm (§ 12022.53, subd. (c)), and that he personally and intentionally discharged a firearm proximately causing great bodily injury and death (§ 12022.53, subd. (d)); regarding count II, that he personally used a firearm (§ 12022.5, subd. (a)); and regarding counts III through V, that he personally and intentionally discharged a firearm causing great bodily injury (§ 12022.53, subd. (d)) and that a principal personally and intentionally discharged a firearm for the benefit of a criminal street gang causing great bodily injury and death to a person other than an accomplice (§ 12022.53, subds. (d), (e)(1)). Jones was also charged with assaulting Bailey with an assault pistol (count VI; § 245, subd. (b)), assaulting Green with a firearm (count VII; § 245, subd. (a)(2)) and possession of a firearm by a felon (count VIII; § 12021, subd. (a)(1),), each accompanied by the allegation that he acted for the benefit of a criminal street gang (§ 186.22, subd. (b)).[4]

---

[4] A count IX was also charged but not pursued at trial.

Regarding count VI, he was also alleged to have committed great bodily injury on Bailey (§ 12022.7, subd. (a)).

A jury trial of the four defendants began in May 2014.

## II.

### *The Evidence Presented at Trial*

After dropping off Kittles's friend, Green, Harrell and Bailey drove Kittles at her direction to a residential cul-de-sac in the Alice Griffith Housing Development, also known as "Double Rock", a gated housing project in the Hunters Point area of San Francisco. The cul-de-sac, Double Rock Court, also called the "Horseshoe," was a common gathering place on weekend nights. Kittles and the men arrived there at approximately 3:20 a.m. Kittles exited the car and the men were soon ordered out of the car at gunpoint and confronted by a group of individuals, which the prosecution contended included Jones and Molina.

#### A. The Victims' Accounts

##### 1. *Green's Trial Testimony*

Green testified that he was 23 years old, a college student and airline employee at the time of the incident. Near closing time at the night club, he saw a young woman walking around who said she was looking for lost keys. He offered her a ride home in exchange for her phone number, which she accepted after checking with her friend who lost the keys, whom Green identified as Kittles. The group got into Green's rental car. Harrell sat in the front passenger seat, and Green was driving when they left the nightclub. Kittles sat directly behind Green in the rear driver's side seat, her friend sat in the rear middle seat and Bailey sat in the rear passenger-side seat.

Before leaving the area, Green had Kittles direct him to where she had parked her car to make sure it had not been stolen. They found the car and

7

drove on. Kittles talked on the phone for a time, but Green could not hear what she said. After stopping at a gas station convenience store, the group dropped off the friend at her home. Green was surprised when Kittles did not also exit and only then realized she did not live with her friend.

The group continued on. Kittles directed Green to drive onto the interstate as she talked on her phone. Green testified, "I hear she is saying, 'Yeah, they're cool' and I kind of—I can hear that it's a male voice so I am talking loud, 'Yeah, yeah, don't worry about us. We're cool.' " Bailey and Harrell also said reassuring things. As they exited the interstate, Green heard Kittles say, " 'We're almost there,' " and she got off the phone. The group exited onto Third Street between 3:00 a.m. and 3:30 a.m. and drove for another three or four minutes. Kittles said they were in Hunters Point and directed them to a housing project she identified as "Double Rock."

The group pulled into the entrance to Double Rock, turned left and soon turned into the Horseshoe. Three to four individuals dressed in black were there. Green, on "red alert," pulled the car only partly up to the curb and left it in neutral in order to leave quickly. Kittles took "a long time" to talk to Bailey in the rear seats and gave him her phone number and a hug before leaving. She left the rear driver's-side door open as a man approached the car with a second man a few steps behind him, both of whom she walked past without saying anything. She then disappeared between two buildings.

The first man who approached the car was dressed in black, wearing a skull cap, had "dreads," was of "average" build and was "[a]round" six feet or six feet one inch tall (a physical description that apparently was consistent with Jones's appearance,[5] as well as that of a prosecution witness we will

---

[5] Darnetta Coleman testified that at the time that she overheard Jones and Molina talking, a few days after the incident, Jones had "dreads" in his

discuss, Quentin Simonton).  He leaned into the car's open door and said, " 'Appreciate you dropping my little sister off,' " got into the car, shook hands with the three men and asked where they were from.  Each man replied.  Green said they were about to go.  The man said, " 'Okay, I'm going to let you guys go,' " then pulled out a gun that looked like a "Tech 9" (described at trial as an assault pistol that fires nine-millimeter bullets), yelled "Double Rock or Devil Rock" and told Green to turn off the car.

Green turned off the car.  The second man, who had followed behind the gunman, opened Green's driver's-side front door, put his hands in Green's front pockets, took a chain from Green's neck and reached across Green to take a phone from the car's console.  Green had a "fairly good look" at the man.  He was dressed in black, was about 5 feet 9 or 10 inches tall and had a short haircut like Green's, perhaps with "a little more hair but low cut," which Green called "a fade or a taper."  His complexion was possibly a little lighter than Green's.  Green did not see any tattoos on him, although it was established at trial that Molina had tattoos on his hands.  Green testified that Molina's hair was braided in a photo shown to him at trial, which style was different than a fade.

Green testified that about 10 people in the area at the Horseshoe surrounded the car.  The gunman, in the backseat, ordered Bailey and Green (who sat in the driver's seat) to get out.  The two exited and stood next to each other a few feet from the car.  Four individuals, including the gunman, stood around them.  Green could not see much and did not get a "good look" at the gunman, who was taller than he was—about six feet tall—and had about the same skin tone as he did.

---

hair and was "[t]all."  She said Molina had "half braids" in his hair, "[a]s if [he] was getting his hair braided or taking it down."

The gunman also ordered Harrell out of the car, where he pointed his gun at Harrell's sternum, checked Harrell's pockets and asked about his phone, which Harrell said he did not have. Four individuals searched the inside of the car. As the gunman stood by Harrell, three others stood by Green and Bailey. Another individual stood by the rear of the car as others told him to "pop" the trunk. Green could not recall much else about the trunk, other than that it contained only alcohol, could only be opened with a key hidden in the car's console and that because of that probably was not opened during the incident. He acknowledged testifying at the preliminary hearing that someone popped the trunk open and two people looked in it.

One of the assailants ordered Bailey and Green to get down on the ground, and the two sat down. Green told his assailants they had everything and should let the three men walk away but was told to " 'shut up.' " The individuals around them "were saying, 'These n---as ain't got shit,' " and someone said to take their clothes. Green and Bailey refused to take off their clothes or get on their stomachs, and three assailants (one attacking Green and two attacking Bailey) pushed, kicked and punched them.

Bailey stood up and started fighting with the two individuals who attacked him. He pushed one away and gave the other "one good licking" before both attacked him again. Green tried to stand up and fight, but he was hit in the back of the head and fell back, momentarily stunned. He assumed he was hit with the butt of a gun because "[i]t hurt pretty hard" and the gunman, the only armed individual Green saw that night, immediately walked around him holding a gun.

Green saw Bailey standing by the gunman and three other individuals, including the two who had fought with him. One "[s]eemed to be a little kid" of perhaps 12 or 13 years old in an oversized red shirt. Another was wearing

10

black, was in his early 20's, stood about 5 feet 10 inches tall and had a dark skin tone, and the third had a similarly dark skin tone. Green did not get a good look at any of them or the other assailants.

The gunman put his gun by Bailey's head and ordered him to get back down on the ground. The two men by Bailey moved away, and they and others said, " 'Take him out. Fuck it. Shoot him. Take him out.' " Bailey backed up, fell backward and started to get back up, and the gunman shot him in the stomach. Bailey again tried to stand up and the gunman shot him two more times, called him a "bitch" and walked away.

Green picked up the bleeding Bailey and put him in the back of the car and Harrell, after picking up their identification cards from the ground, drove the car out of the projects. They found police, Bailey was taken to a hospital, and Green and Harrell returned with police to the scene of the incident. There was no one there.

Green received four stitches in the back of his head at a local hospital. He testified that in the hours after the incident police showed him photographs of possible suspects, but he was unable to identify anyone because he just wanted to go home.

The next morning, Green pointed out Kittles's Honda to police, which led them to Kittles, and Green identified her. That morning, Green was also shown a photo spread that included a photograph of Molina, and in December 2009 he was shown photo lineups that included photographs of Simonton and Biggins, two trial witnesses whose testimony we will discuss. He was not able to positively identify anyone in these lineups.

### 2. *Harrell's Trial Testimony*

Kevin Harrell testified consistent with Green's account about agreeing to drive the two women home from the San Francisco nightclub, where

11

everyone sat in the car, going by Kittles's car as they left the area of the nightclub and dropping the friend off at her home.  He testified that, after dropping off the friend, the group traveled on the freeway for 5 or 10 minutes as Kittles talked to Bailey.  At some point, she said something on the phone like, " 'I'm almost there.  I'll be there shortly.' "  After the group exited the freeway, they discussed their apartment complexes and Harrell saw Kittles glance at her phone, but he did not see her text anyone.

Harrell recalled driving into a gated community with one way in and one way out.  When Kittles opened the door, Bailey said someone was walking to the car and Kittles said it was her brother.  A man approached who was in his early 20's, about six feet or six feet one inch tall and of medium build.  He wore a beanie and had his hair in dreadlocks, his complexion was a little darker than Harrell's and lighter than Green's, and his cheeks were "scruffy."  He was followed by a "shorter, dark-skinned" African-American man in his early 20's wearing what looked like a black pea coat and a beanie.  This second man was "[k]ind of heavy set," had a complexion like Green's dark complexion, and was shorter than Harrell, who was 5 feet 9 or 10 inches tall.

Kittles exited the car, left the car door open, gave the first man who approached the car a hug, "did not pay . . . any mind" to the second man and walked in the direction from which the two men had come.  The first man leaned into the open rear door of the car and said, " 'Thank you for giving my sister a ride.  A lot of crazy people out there.' "  He got in the car, shook everyone's hand and asked where they were from.  When Green said they were from Louisiana's capital city, the man responded, " 'I'm from Double Rock.  You see it?  You see it?' "  He pulled out what looked like an Uzi with an extended clip and ordered Bailey and Green out of the car.  As Harrell sat

in the car, two other individuals took his earrings, watch and phone.  Both were skinny, one was a teenager and one was about Harrell's height.

Harrell saw Bailey and Green "face down" outside the car and resisting as "they were punched and kicked" by three or four individuals.  The gunman ordered Harrell out of the car.  Harrell exited the driver's-side door and stood in its doorway.  The gunman pointed the gun inches from Harrell's face and said, " 'Where's the money?' "  He grabbed Harrell's wallet and searched through it.  Bailey told the gunman to take the car.  Others searched through the car, looking in the glove compartment and middle console, but they were not "as successful as they hoped they'd be."

The gunman told Bailey to shut up.  He and Bailey started "tussling" over the gun.  Harrell went to the passenger side of the car and got down to avoid being shot.  He saw Bailey lose his footing, fall and then be struck by two gunshots.  Harrell did not see who fired the shots but saw the gunman who had first approached the car say, " 'Double Rock, bitch," and walk off.

Bailey was bleeding from the neck.  Harrell scooped up some things off the ground as Green put Bailey into the car.  They drove away and found police.

Police took Harrell to a police station.  There, at about 9:00 a.m., he was shown a six-man photo lineup.  Harrell identified one photo, in the top middle position, as the gunman.  Harrell further testified that he identified another man in the lineup, in the bottom middle position, as having punched and kicked Bailey and Green.  This was Jones.  Harrell testified that he told police this person was " 'with the group.' "

At about 11:00 p.m., Harrell was shown another six-man photo lineup, which included a photograph of Jones in the top middle position (where a

13

photo of Harrell's gunman had been in the first lineup).[6]  He identified the photograph of Jones as being of "[o]ne of the gentlem[e]n kicking my cousin." He also testified that he later called police to say that man was a part of the group at the incident and that he recognized him.[7]

Harrell further testified that about two and a half months later, on December 16, 2009, police showed him additional photographs.  He did not recognize the people in those photographs.  One of the photographs was of Molina.  A police inspector testified that at some point Harrell was shown a photo lineup that included Biggins and Simonton.  He did not identify them.

At trial, Harrell identified a sketch of the gunman drawn from his description that showed a man wearing "a hoody and a beanie" and had hair that "was falling down towards his shoulders."  He described the gunman to the police as "6', 6' 2' " and in his mid-20's, 165 to 170 pounds," "[m]uscular, mustache, beard, medium color" and wearing blue jeans.  Jones's and Molina's attorneys both contended the sketch was of Simonton, who was wearing a hoodie on the night of the incident.

Harrell also identified photographs of two earrings, a cell phone, a cell phone battery and a wallet insert as items that were stolen from him.  He said Green wore a neck chain that night, but Bailey did not.  He identified in two videos the rental car he, Green and Bailey used that night.  One video

_____

[6]  According to a police inspector who showed Harrell the first photo lineup, different police showed Harrell the second lineup.  The inspector "most likely" would have made the decision to include the photo of Jones from the first lineup in the second lineup.

[7]  A police inspector who heard the call testified that Harrell left a message in which he stated, " 'I keep having the middle guy.  I'll have to show you.  I need to see more pictures.  Because every time that—like that he might have been involved."  Harrell continued, " "His face is in my mind as the shooter, but his facial hair wasn't fully grown out.' "  The inspector had Harrell work with a sketch artist to create a depiction of the gunman.

14

showed the car at a time stamp of 3:18:10 turning left inside Double Rock's entrance, and another video showed the car leaving Double Rock at a time stamp of 3:25:06.

## B. The Cause of Bailey's Death

Bailey died from a gunshot wound suffered during the incident. An autopsy of his body identified a gunshot wound on the head, a second on the left flank and a third on the left flange, and numerous lacerations, bruises, scrapes, contusions and abrasions. The gunshot wound to the head broke the skull and went into the brain, causing Bailey's death. The other wounds were survivable.

## C. Evidence Found at the Scene

Police retrieved various items scattered about the scene of the incident, including possessions, business cards and credit cards belonging to the victims. These items and the rental car were tested for fingerprints. Prints belonging to Lige were found on a business card of Bailey's. Prints of Simonton were found on a soda can. There were no fingerprint matches for Molina or Jones.

Three expended cartridge casings and one unfired, all stamped "Remington-Peters Luger" and nine millimeters in diameter, were found at the scene close to pooled blood. The three expended casings were determined to have been fired from the same firearm.

## D. Statements to Police by Molina, Jones and Kittles

Molina, Jones and Kittles made recorded statements to the police in the aftermath of the incident, which were played for the jury. Molina told police on October 15, 2009, that he arrived at the home of his girlfriend, Kittles, on Esquina Street at 2:00 or 3:00 p.m. the afternoon before the incident and stayed there through the night. Kittles and her friend left at about 9 p.m. to

go to a club and he remained in Kittles's room watching television after they left, leaving it only to use the bathroom. Kittles phoned him from the club and said she lost her keys. At around 3 a.m., a cousin who lived in Double Rock called to say he had heard shots outside and asked if Molina was okay. Molina was not at the scene of the incident and knew nothing about it. He did not hang out at Double Rock and went there only to see relatives. He did not know who hung out at Double Rock.

Jones told police, also on October 15, 2009, that on the night of the incident he sat in a car on Nichols Street in Double Rock, seeing no one in particular, from about 11:00 p.m. until he left for his girlfriend's house on George Court, where he arrived no later than 1:00 a.m. He stayed at his girlfriend's house for the rest of the night, watching television until he fell asleep about 3:30 or 4:00 a.m. He was not present at the incident. He sometimes went to the Horseshoe but did not go there that night.

Kittles told police later in the morning of the incident, October 4, 2009, that she and her friend had gone to a San Francisco club, where she had "a lot" to drink. Three men gave her and her friend a ride from the club after she lost her car key. She sat in the back of the car with her friend and "Mike," who was from Louisiana. At different points in the ride, Mike gave her his phone number, she reluctantly gave him hers, and he asked if he could see her later that day before he left for Louisiana. The group stopped at a gas station convenience store and dropped off her friend first, then went to Double Rock. Kittles spoke on the phone to her friend and to Kenya Moore, who had a child with Kittles's brother Deshaun.

Kittles said when the car arrived at Double Rock about 50 people were outside, like always. At the Horseshoe, she told Mike she would call him, said goodbye to the men, exited the car, walked past some people she did not

know and went to Moore's house in the Horseshoe. Moore's daughter answered the door and let her in. Kittles talked on the phone until Moore arrived 30 minutes to an hour later and gave her a ride home. She arrived home at about 4:30 a.m. and called an emergency locksmith to help open her car. She went to sleep and woke up at about 8:00 a.m. to try to get her car opened.[8]

### E. Defendants' Recorded Jail Phone Calls

The prosecution played jail phone call recordings between the defendants for the jury. In an October 2009 call, Jones, in jail, told a woman he had to tell Molina "he didn't see me that night." Molina then got on the line and Jones told him, "You didn't see your lil brother the whole day." Molina responded, "Oh ok . . . yeah . . . yeah . . . yeah . . . yeah . . . yeah." Molina also said he was at "Muck's" house all day (an apparent reference to Kittles's house), so he did not see anyone.

In a couple of calls on October 5, 2009, Kittles, in jail, described to Molina her account to police that she did not want a ride to her home from the club because her boyfriend was there, and did not know what occurred after she exited the car of the men who gave her a ride. Molina replied, "Okay that's your story then. You don't know." Molina also asked Kittles if the police asked or told her what kind of gun was used.

### F. Kenya Moore's Trial Testimony

Kenya Moore testified at trial under a grant of immunity about her actions on the night of the incident, as well as about the inaccuracies in her initial statements to police during a series of interviews that extended over several months. Moore said she lived in a house in the Horseshoe. On the

---

[8] Police held another recorded interrogation of Kittles on December 24, 2009, but she told them she did not remember anything relevant to the investigation.

evening of the incident, at around 9:00 p.m., she saw Molina, Jones, Simonton, who was her boyfriend, and "Bey Wey" hanging out in the Horseshoe. At some point, she also saw a little boy wearing a red hoodie with them, but acknowledged she told police he wore a black hoodie. At Simonton's request, she brought a bottle of Hennessy liquor and gave it to Jones between 10:30 and 11:00 p.m. She did not recall Jones wearing a black hoodie, dark jacket or hat, or having a gun. Simonton told her he had taken two to three Ecstasy pills.

At about 3:00 a.m., Kittles called Moore and said she had lost her car keys and needed a ride home. Moore, outside of Double Rock at the time, did not believe her. About 45 minutes later, Kittles called again and Moore agreed to give her a ride. She drove to Nichols Street in Double Rock, where she found Molina and Jones waiting with Kittles.[9] She dropped Kittles and Molina off on Esquina and dropped Jones off on George Court.

Moore was heading home when Simonton called her for a ride from where Moore had just picked up Kittles, Molina and Jones. Moore picked up Simonton, as well as Lige, dropped off Lige at his home and took Simonton back to her own home in the Horseshoe, which the police had taped off. Simonton said he did not know what had happened.

That morning, Kittles called her. She told Moore that, if anyone asked, she should say that Kittles had been at her house the night before. Moore did not agree to do that. She told police that she figured Kittles told her that because she had been with someone other than her boyfriend.

Moore was arrested by police on December 23, 2009, and charged with being an accessory after the fact. Police interrogated her before that day, on

_____

[9] Moore first testified that she picked them up on Cameron but said she picked them up on Nichols Street after reviewing a transcript of one of her police interrogations.

18

that day and a few months later. She initially did not tell the police the truth. For example, she denied being Simonton's girlfriend and picking up Molina or Simonton the night of the incident, and she denied that Simonton stayed at her house on the night of the incident. She said she stayed at her mother's house in another neighborhood without a phone that night, and that she had not seen Simonton for a long time. She denied lying to protect Simonton.

Moore also acknowledged that she had been convicted of theft multiple times between 2001 and 2008 and had been convicted of giving false information to a police officer in 2002.

### G. Quentin Simonton's Trial Testimony

Quentin Simonton testified at trial after the prosecution granted him immunity, placed him in the witness protection program for a time and paid approximately $63,000 in program expenses for him from November 2009 to August 2011.

At the time of the incident, he lived with his girlfriend, Kenya Moore, and her children in a house on the Horseshoe and worked in the Job Corps program with Jones and Molina. On the night of the incident, he went outside at Jones's urging, where he encountered others talking and drinking. Among them were Jones, Lige, a "young kid" in a red shirt and a "Samoan guy" with a gap between his two front teeth whose name Simonton did not know at the time. Simonton drank a little and bought three Ecstasy pills from one of the men. He took one of the pills, gave another to Jones and gave the third to Lige, whom he knew as "Wink." He wore a camouflage jacket, underneath which he wore a black, red and gold hoodie.

Molina answered a phone call from Kittles, Molina's girlfriend. Molina told her it was " '[h]ella stupid' " for her to lose her keys and said, " 'Stupid

19

bitch.' " He asked her if she was getting a ride and told her to call when she got there. Molina gave the phone to Jones, who spoke on it, and then "they hung up, and then we were standing around still talking." There was no talk about what to do when Molina's girlfriend arrived.

A car came into the Horseshoe about 15 minutes later. Jones told Simonton to stand by a gate, and Jones, followed by Molina, walked up to the car. Kittles exited the car and walked behind a building. Simonton could not recall if she spoke to Molina as she exited but she did not speak to anyone else. Jones pulled out a gun and told the three men to get out of the car. Molina pulled a man out of the front passenger's seat and Lige pulled a man out of the back seat. Simonton walked to the front of the car to join in what he understood was a robbery. The Samoan and the young kid remained on the sidewalk.

The three men who exited the car stood on the driver's side and got down on the ground at Jones's order. Simonton reached inside the car and pushed a button that was supposed to open the trunk but it failed to open. He went to the back of the car and tried to open the trunk but could not. He then retreated to the sidewalk and watched.

Jones told the three men to lie face down on the ground. One of them did not put his face on the ground and Jones "kept slapping [him] with the gun." The man stood up and wrestled with Jones over the gun. As Simonton moved away to find cover, Jones recovered control of his gun, and Molina and Lige started punching and kicking the man to the ground. Jones "went over and shot [the man] three times," after which everyone walked away.

Simonton told police in the weeks after the incident that a man with dye-tipped dreadlocks and holding a phone, whom he eventually identified as Lige, "stomped" on the man. But he testified at trial that he could not recall

20

what Lige looked like on the night of the incident.[10]  He told police that Biggins had "just kind of wavy b[l]ack" hair but testified he did not recall Biggins's hairstyle or having dreadlocks on the night of the incident.

After the incident, Simonton tried unsuccessfully to go inside Moore's house in the Horseshoe, so he went to a nearby house that he saw Jones and the Samoan enter.  He found Jones, Molina, Kittles, Lige and the Samoan sitting on a bed in the Samoan's bedroom.  Jones and the Samoan each had a black gun that looked like a "Mac."  Jones's gun had a black shoestring around it and an extended clip and was bigger than the Samoan's gun.  Shown a photograph of an individual named Terry Franklin holding a gun, Simonton testified it looked like the gun Jones had with him that night.

At the Samoan's house, as the Samoan turned on a video game console, Kittles asked Jones, " 'Why did you have to kill the dude?' "  Jones replied, " 'Can't let nobody take my gun,' " and went to the bathroom.  He returned and gave the Samoan his gun and jacket.  At trial, Simonton identified a jacket Jones wore in a photograph as the one he wore the night of the incident.  Simonton left his army fatigue jacket at the house as well.

The group split up four dollars, and Molina had a phone.  Simonton did not see the Samoan touch anything taken from the robbery.  It looked like no one was keeping anything because " 'it was fake and stuff.' "  Shown a photograph of the neck chain seized from Biggins's bedroom drawer, he said it was Bailey's.  Shown a photograph of a gun, he said it was similar to the one Jones had during the incident.

At Jones's request, Simonton called Moore to pick up Jones.  Simonton called, and Jones, Molina and Kittles left a short time later.  About 10 or 15

---

[10]  Other evidence presented at trial included a photograph (the date of which defendants do not establish) indicating Biggins had dye-tipped dreadlocks at some point in time.

minutes later, Moore picked up Lige and Simonton, dropped off Lige and returned to her house in the Horseshoe with Simonton, and they went to sleep.

Simonton also testified that after the robbery, Lige threw a chain Lige said was fake onto the top of a roof. Other trial testimony indicated a search of the roof several days after the incident did not uncover a chain.

Simonton recounted that the next morning, he looked out the window of Moore's house and saw a soda can at the scene that he knew had his fingerprints on it. (His DNA was later found on a Welch's soda can.) He realized he "[n]eeded to come up with me not being there or alibi or something like that." He used Moore's phone to call Molina and told him they needed to meet. Later that morning, he went to his mother's house and told her and a friend of hers that he had been forced to participate in a robbery, which was not true, and that someone had been shot. They urged him to talk to the police. Simonton did not want to be a "snitch" and fled to the South Bay instead.

A few days later, Simonton's mother told him the police were looking for him. He went to talk with them, worried about being charged with murder because he had been present at the incident, looked like Jones (both were African-American, the same height and had dreadlocks) and had left his fingerprints on the car's trunk. The police interviewed him on October 8, 2009 (four days after the incident), October 30, 2009, and November 5, 2009. In the October 8 interview, he deliberately concealed the identity of Molina but identified Jones; both were his friends. He identified Jones because he did not think the police would let him leave until he identified the shooter, Jones *was* the shooter, and the description of the shooter circulating "pretty much" was a description of Simonton.

22

Simonton identified others in subsequent interviews. He told the police that Wink (meaning Lige) had a phone and "stomped on the person," apparently meaning Bailey. He described the Samoan and showed police what he said was the Samoan's house on Nichols Street (he identified the wrong house).

Simonton testified that he lied to the police at different times about several things. This included saying Jones ordered him to open the car's trunk during the incident; that he did not associate with the people he had identified because they were "shady"; that Kittles was not yet at the Samoan's house when Simonton arrived there; that Jones's gun was a Mac 10, not a Tec 9; and that he had never handled or shot a gun before, when in fact he had handled a .40-caliber gun and fired a .22-caliber gun. (He testified he did not have a gun during the incident.) He lied when he told police he had just happened to see Moore driving around and flagged her down shortly after the incident.

Simonton further testified about his criminal conduct in the period before the trial. He was convicted once in 2012 and twice in 2013 of possession of crack cocaine, including for sale, and in 2012 he beat and robbed a man in a motel room with the help of a prostitute, for which he was arrested and charged. He also had a pending assault with a deadly weapon case and a pending probation violation case, both in Santa Clara County.

## H. Biggins's Preliminary Hearing Testimony and the Events That Followed

Arnold Biggins testified under a grant of immunity at the preliminary hearing in this case. He denied participating in the incident but said that he was present for it, incriminated all the defendants, and said that participants in the incident went to his house immediately afterwards. He said he

initially told the police numerous falsehoods to protect himself and then told them the truth about what he witnessed.

As we will detail further in the Discussion section, *post,* Biggins changed a part of his account in interviews with the prosecution on the eve of trial, leading to the prosecution's withdrawal of immunity and decision to charge him in a separate case with crimes resulting from the incident. The prosecution relied on his preliminary hearing testimony at trial over defense objections. The prosecution in Biggins's case reached a negotiated disposition of his case under which he was found guilty of felony grand theft with a gang enhancement. Subsequently, defendants filed a motion for new trial in this case for purported prosecutorial misconduct.

## I. Texts and Phone Calls Between Molina and Kittles

Expert testimony and phone records were presented at trial regarding texts and phone calls between Molina and Kittles on the night of the incident involving Molina's Sprint and Kittles's Metro PCS phone numbers.

Both Molina and the People indicate in their briefs that Kittles and Molina exchanged texts during the time when Kittles rode in Green's car to Double Rock, but neither indicates where in the record these texts are located, and we have not found them. The People give a fuller account of the texts. According to them, Kittles texted Molina at 2:20 a.m., " 'Wats up babe I am still at da club.' " Molina received this text around the time he was making phone calls using towers that serviced the areas of Double Rock and his home. Between 2:54 a.m. and 2:59 a.m., Kittles texted Molina, " 'U really want me 2,' " and Molina replied, " 'Yea for real kum on.' " Kittles responded, " 'Dnt do nutin stupid ma n---a 4real.' " Molina did not text back and Kittles texted, " 'Lance do u c wat im sayin.' "

24

As for phone calls, expert trial testimony indicated that cell phones continually monitor which cell tower site is the strongest—generally the closest to the caller—and use that tower for phone calls, particularly in low traffic times like late at night. From 11:40 p.m. to 2:47 a.m. on the night of the incident, Kittles's cell phone interacted with Metro PCS towers serving the area of the San Francisco nightclub. Her phone then interacted with towers at 2:50 a.m., 2:52 a.m., 2:55 a.m., 2:56 a.m., 3:14 a.m. and 3:15 a.m. in a manner consistent with her traveling south towards Double Rock. At 3:18 a.m., phone records indicate she made a call via a tower, number 588, that was about four-tenths of a mile from Double Rock. At 3:21 a.m. she made a call via a tower that was about seven-tenths of a mile from Double Rock. From 3:28 a.m. to 4 a.m. she made a series of calls via tower 588 again, and after that time, until approximately 11 a.m. that day, including three times between 4:06 a.m. and 4:10 a.m., the calls she made were from tower 52, which was near her home.

On the night of the incident, Molina's phone interacted with several Sprint cell towers. Sprint cell tower 3139 served the area of the Horseshoe (specifically 18 Double Rock Court), which was on the edge of that cell tower's coverage but would be unlikely to serve the nearby area where Biggins's home was located at a low traffic time and would not serve the area of Kittles's home, which was three-quarters of a mile away. Molina's phone indicated a call via tower 3139 at 1:55 a.m. on the night of the incident. His phone also indicated calls at 3:15 a.m. made via Sprint cell tower 3220, a call two seconds shy of 3:19 a.m. via cell tower 3139 again, and a call at 3:25 a.m. via Sprint cell tower 2127.[11] These calls were consistent with a person being

_____

[11] The reporter's transcript states that the expert witness referred first to tower "2527," but it appears from what follows that he was referring to tower 2127 all along.

25

in the area of the Horseshoe because 18 Double Rock was in the middle of these three towers, and the calls indicated some movement.

### J. The Rocawear Jacket and Jones

Inspector Engler of the San Francisco Police Department testified that he participated in a warranted search of Kittles's home at 12 Esquina Drive soon after the incident. Police seized Molina's Palm phone, from which they obtained certain photographs, including one of Jones wearing a black Rocawear jacket and a horizontally striped shirt. There was evidence that the photograph was taken or was received by Molina's phone at 7:44 p.m. on the night of the incident. In a warranted search of Jones's home soon after the incident, police seized the striped shirt and found many Rocawear jackets but not the one in the photograph.

Engler further testified at trial that, pursuant to another search warrant, he led a search of Biggins's house about five weeks after the incident on November 11, 2009. The search uncovered a neck chain in a drawer in Biggins's bedroom. At the time, Biggins said the chain was his and was not stolen. Police seized the chain, a .45-caliber gun they found on his bed, a black Rocawear jacket from a young man trying to exit the residence (who was Biggins's brother) and a camouflage jacket.

DNA testing indicated the Rocawear jacket had Bailey's blood on it but did not contain a DNA match for any of the suspects. Jones and Molina were excluded as DNA contributors. DNA from an unknown male major contributor and at least one minor contributor was found on the jacket's collar. A police criminalist testified that she could extract DNA from someone who wore a collared garment for a couple of hours as long as the collar touched the skin.

26

The defense presented the testimony of a San Francisco police officer who was assigned to patrol the Double Rock area at the time of the incident. He testified that on October 8, 2009, three days after the incident occurred, he was shown a photograph in which Jones was wearing "a black kind of . . . [z]ipper up sweat jacket." He told another officer that day that he had seen Jones wearing that jacket before. He could not recall when he actually observed Jones wearing it but knew "it was sometime in and around that date," meaning October 8, 2009. He had seen Jones "close to October 4th." He could not recall if it was after October 4 or not.

## K.  Darnetta Coleman's Trial Testimony

Darnetta Coleman testified that she was Lige's aunt, attended middle school with Jones and Molina, saw the two almost every day in the neighborhood and was Molina's neighbor. Several days after the incident, she saw through a window of her second-floor Double Rock home that police were going into a house by the Horseshoe area and some people, including Jones, were coming from that area to a basketball court behind her house. She then heard Jones and Molina talking on the court. Molina said his girlfriend and a friend had gotten a ride, the friend had been dropped off and the girlfriend had been taken to Double Rock, where Molina went "to rob a guy." "[T]he guy was tussling with him" and "he had to pull the banger out," meaning a gun. Jones said, "he tried to get him too, but he thinks he missed." Both said they planned to leave town.

Coleman called the police using a false name and was subsequently located and interviewed by Inspector Engler. Coleman acknowledged making changes to her account over time, saying she had initially lied out of fear. She also testified that some of what she recalled about the basketball court conversation may have been what she "heard off the street." She further

27

testified that she moved out of Double Rock after her windows were broken and "stuff like that," and that the district attorney's office had paid $24,596.40 for such things as her clothing and housing, none of it in cash. She was on probation for a 2011 felony assault conviction.

## L. Gang Evidence

As we will discuss in detail in part V of the Discussion section, *post*, both the People and the defense presented the testimony of experts and other evidence regarding the claims that Jones and Molina, as well as Lige, had committed the charged crimes for the benefit of the Double Rock criminal street gang.

## III.

### *The Jury's Verdicts, Post-Trial Motions, Sentencing and Appeals*

The jury found Jones guilty of the first degree murder of Bailey (count I) and found true the allegations that the murder was committed for the benefit of a criminal street gang, a principal was personally armed with a firearm, and a principal personally used a firearm for the benefit of a criminal street gang. The jury found *not true* the special circumstance allegation that the murder was committed by Jones himself while he was engaged in the commission of a robbery, that the murder was intentional while Jones was an active participant in a criminal street gang to further the gang's activities, that Jones personally and intentionally discharged a firearm and that Jones personally and intentionally discharged a firearm causing great bodily injury.

The jury also found Jones guilty of conspiracy to commit robbery (count II) and three counts of robbery (counts III through V) and found true the allegations that he committed these offenses for the benefit of a criminal street gang, that he personally used a firearm regarding count II, and,

regarding counts III through V, that a principal was armed with a firearm and a principal personally used a firearm to benefit a criminal street gang. Also, regarding counts III through V, the jury found *not true* the allegations that Jones personally and intentionally discharged a firearm causing great bodily injury and that a principal personally and intentionally discharged a firearm for the benefit of a criminal street gang.

Finally, the jury found Jones guilty of counts VI (assault with an assault pistol against Bailey), VII (assault with an assault pistol against Green), and VIII (possession of a firearm by a felon). The jury found true the allegations that he committed these offenses for the benefit of a criminal street gang and found him guilty of count X (active participation in a criminal street gang).

The jury found Molina guilty of first degree murder, conspiracy to commit robbery, three counts of robbery and one count of active participation in a criminal street gang (counts I through V and X) and found true that he committed the murder and robbery offenses for the benefit of a criminal street gang. Regarding the murder and robbery counts, the jury found *not true* that a principal personally used a firearm for the benefit of a criminal street gang and that a principal was personally armed with a firearm.

The jury found Kittles not guilty on all counts (counts I through V). It found Lige not guilty of actively participating in a criminal street gang (count X) and hung, with eight voting guilty and four voting not guilty, on each of counts I through V. The court declared a mistrial as to Lige on counts I through V.

As we will detail further in subpart I.D of the Discussion section, *post*, months after the trial defendants moved for a new trial, in part based on the prosecution's purported misconduct in charging Biggins with murder and

29

robbery in a separate case (allegedly to prevent him from testifying at the trial of this case) and in dropping the charges against Biggins after defendants' trial was completed. The court denied the motion.

In March 2016, the trial court sentenced Jones to a total state prison term of 57 years to life, comprised of (1) 25 years to life for count I, the first degree murder of Bailey, plus a consecutive 10-year term for the allegation that a principal personally used a firearm; (2) a consecutive two-year term for count IV, the robbery of Green, with two consecutive 10-year terms for the criminal street gang and personal use of a firearm allegations; and (3) either concurrent terms or stayed sentences under section 654 for the remaining counts and allegations.

The trial court sentenced Molina to a total state prison term of 44 years and 4 months to life, comprised of (1) 25 years to life for count I, the first degree murder of Bailey; (2)  a consecutive five-year term, for the robbery of Green (count IV), a consecutive 10-year term for the gang enhancement allegation; (3) a consecutive one-year term for the robbery of Harrell (count V), with a consecutive 3 year, 4 month term for the gang enhancement; and (4) either concurrent terms or stayed sentences under section 654 for the remaining counts and allegations.

Jones and Molina timely filed notices of appeal. We have allowed a significant amount of supplemental briefing during the pendency of this appeal to address changes in the law that have taken place since these appeals were filed. Most notably, Molina submitted supplemental briefing regarding the enactment of Senate Bill No. 1437, which modified the Penal Code to limit the application of felony murder and to eliminate natural and probable consequences murder and enacted a procedure by which already convicted defendants could petition the superior courts for resentencing.

Subsequently, on October 18, 2021, as we were preparing to issue our opinion, Molina requested permission to file a supplemental brief based on the recent passage of Senate Bill No. 775 (2021-2022 Reg. Sess.) (Senate Bill No. 775), which further amended the law to allow defendants to address on direct appeal the impact of Senate Bill No. 1437. Molina's brief also addressed the impact on his case of Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Assembly Bill No. 333), which added elements that need to be proven under the criminal street gang statutes. Senate Bill No. 775 and Assembly Bill No. 333 went into effect on January 1, 2022. (Stats. 2021, ch. 551, § 2; Stats. 2021, ch. 666, § 2.) Since our opinion would not become final until after January 1, 2022 (*People v. Vieira* (2005) 35 Cal.4th 264, 306 [a " 'judgment is not final until the time for petitioning for a writ of certiorari in the United States Supreme Court has passed' "]; *People v. Lizarraga* (2020) 56 Cal.App.5th 201, 206 ["a petition for writ of certiorari is timely filed within 90 days after entry of judgment of a state court of last resort"]), we granted the request and established a briefing schedule for all parties who wanted to address the issues raised by Senate Bill No. 1437, Senate Bill No. 775 and Assembly Bill No. 333.

We subsequently also allowed additional supplemental briefing regarding the application of a firearm enhancement to the conspiracy to commit robbery charge brought against Jones; legislative changes to certain sentencing provisions under Senate Bill No. 567 (2021-2022 Reg. Sess.) (Senate Bill No. 567) (Stats. 2021, ch. 731) and Assembly Bill No. 124 (2021-2022 Reg. Sess.) (Assembly Bill No. 124) (Stats. 2021, ch. 695) that became effective on January 1, 2022; and certain enhancement sentences imposed on Jones that he contends were unauthorized by law.

# DISCUSSION

As we have discussed, defendants Jones and/or Molina make several claims of prejudicial error.[12]  We turn now to a discussion of each of these claims.

## I.

### *Defendants' Claims Regarding Biggins's Preliminary Hearing Testimony*

On the eve of trial, Biggins disclosed to the prosecution that he had incorrectly testified at the preliminary hearing that a neck chain police seized from his bedroom drawer belonged to him when it in fact was taken in the incident from one of the victims.  The prosecution, after confirming with Bailey's widow that the chain belonged to Bailey, revoked Biggins's immunity and began the process of charging him with murder, robbery and perjury.  Biggins invoked his Fifth Amendment right not to testify, and the trial court determined that he was unavailable to testify and allowed the presentation of Biggins's preliminary hearing testimony to the jury over defense objections.  Evidence of Biggins's eve-of-trial change in his account about the chain was also presented to the jury.

Jones and Molina argue that the trial court violated their rights to confront witnesses under the confrontation clause of the Sixth Amendment by admitting Biggins's preliminary hearing testimony at trial.  Defendants, relying on *Crawford, supra*, 541 U.S. 36 and its progeny, argue that, because Biggins did not indicate until after the preliminary hearing that he had, as defendants characterize it, perjured himself at that hearing, they did not

---

[12]  The trial court used an opt-out procedure, by which all defendants were deemed to have joined objections and motions by the others unless they opted out.  The People do not contend that either defendant opted out of any of the trial court matters we discuss in this opinion, and we have seen no indication in the record that either did.

32

have a meaningful opportunity to cross-examine him. Additionally, Jones argues the trial court prejudicially erred in its instruction to the jury regarding Biggins's perjury and the prosecution committed prejudicial misconduct that violated his confrontation rights by manipulating events to ensure Biggins's unavailability as a trial witness and present his perjurious preliminary hearing testimony instead.

We begin by discussing Biggins's preliminary hearing testimony and subsequent change of his account.

## A. Biggins's Preliminary Hearing Testimony and Subsequent Change of His Account

After the incident occurred, police inspectors questioned Biggins over many months, during which he repeatedly changed his account of what he knew about the incident and its aftermath. Biggins testified at the preliminary hearing under a grant of use immunity.

At trial, the court told the jury that Biggins "was granted use immunity for his testimony at the preliminary hearing in this case. Prior to this trial the district attorney declined to offer a grant of use immunity to Mr. Biggins's testimony at this trial. As a result, Mr. Biggins is unavailable to testify at this trial." Biggins's preliminary hearing testimony was then read to the jury.

### 1. *Biggins's Preliminary Hearing Testimony*

At the preliminary hearing, Biggins sometimes testified with his hand in front of his mouth and in low tones. He said he was Samoan, five feet eight inches tall, had dreadlocks at the time of the incident and lived on Nichols Way, about 50 yards from the Horseshoe. On the night of the incident, he was in the Horseshoe among a "crowd" of people, talking with his close friend Lige and with Simonton, whom he had known for a long time but

with whom he was not friends.  The crowd included Molina and Jones. Biggins drank and smoked marijuana that day.

A car with three men and a woman came into the Horseshoe and parked in front of the group.  The woman, who was Molina's girlfriend, exited the car as Jones and Molina walked up to it and started talking to the men inside.  Biggins was not sure if the woman talked to anyone when she got out of the car.  As she walked past Biggins, she said to someone sitting by him, "[T]hey have chains and wallets and phones."

As he stood on the sidewalk with Lige and Simonton about 27 feet away from the car, Biggins saw three men exit the car and two of them sit down. He did not see anyone go into the car's trunk or open the trunk.  One of the men fought with Jones over Jones's gun.  Molina and Lige joined in the fight. As Lige went to join in, he tapped Biggins and said, "come on."  Biggins took about five steps forward intending to join in the fight, touching a .380 Mac 12 gun he had hidden on a shoestring around his neck as he stepped, but he stopped, did not take out his gun and retreated to the sidewalk instead.  He saw Jones, Molina and Lige force the resisting man to the ground and, when the man tried to get back up, saw Jones shoot him twice with a "Mac 11 or something like that."  Everyone walked away.

After the shooting, Biggins said, a group of participants in the incident, including Jones, Molina, Lige and Simonton, walked to Biggins's house. Biggins asked Jones, "[W]hy you didn't do the other two?" because Biggins felt "it was going to come back on everybody."  Jones did not answer.  At Biggins's house, a cell phone and wallet taken in the incident were passed around, and Molina "had a chain" from it.  The group played a video game. Kittles arrived about 30 minutes later.  She asked what had happened and no one said anything.  She called for a ride and someone in a green car picked

34

her up, along with Jones and Molina. Soon after, someone driving the same car returned and picked up Lige and Simonton.

Jones left his gun and sweater with Biggins to "watch" them. Biggins took them to prove his loyalty to everyone. Later, Biggins said, Lige picked up the gun from Biggins's house and Biggins put the sweater in the laundry but did not wash it. Police seized the sweater despite Biggins's effort to conceal it. He identified a sweater Jones was wearing in a photograph as the one Jones left at his house. He also said Simonton left an "Army coat" at his house that night.

At his house, Biggins compared Jones's Mac 11 to Biggins's Mac 12 and saw that the Mac 11 was two times bigger than his gun. His Mac 12 was given to him by someone in the neighborhood. He denied firing the gun that killed Bailey and said he did not see anyone else besides Jones with a gun. He knew that, while his gun fired .380-caliber bullets, Jones's Mac 11 did not.

Over the ensuing months, police inspectors repeatedly questioned Biggins and eventually arrested him for possession of stolen property after seizing an illegal gun and a laptop from his house. Biggins acknowledged that he "beat around the bush," "[m]aybe a lot," during this questioning. He told numerous lies to "protect" himself before telling what he knew about the items found in his house and about the incident. For example, he lied that he found the .45-caliber pistol in some bushes behind his house and about who sold him the laptop. He told police that on the night of the incident he only went to the scene of the shooting after everything was over and after he heard shots fired as he was walking to a candy store. He told them that he had never seen Jones with a gun; that the gun Biggins had during the incident was smaller and different than the one he actually had; that he got that smaller gun in Oakland and kept it in his pants pocket during the

35

incident[13]; and that he did not know who left a Rocawear jacket at his house. He also falsely denied recognizing Simonton's photograph when it was first shown to him; omitted Simonton in his first account to the inspectors; lied that Simonton had never been to his house and lied when he later said Simonton was "glorifying" at his house after the incident; lied that he, Biggins, did not have a gun with him the night of the incident; and lied that his only gun was the .45-caliber gun police found in his house.

Much of Biggins's testimony about his lies and his changing account of what happened on the night of the incident was elicited during cross-examination by Jones's counsel, the first among the four defense counsel (the others being counsel for Molina, Lige and Kittles) to cross-examine him. Two hours into the cross-examination, the court made clear that, although it was "only" a preliminary hearing, it was giving Jones's counsel "a lot of leeway" because of "the implications of this witness." The court added, "I'm not going to give all defense attorneys this kind of leeway for cross-examination because we'll be here for a month."

While cross-examining Biggins about his lies to police, Jones's counsel showed Biggins a photograph of the neck chain police had seized from his bedroom. Asked if he recalled the chain being in his room when the police seized it, Biggins indicated he did. This exchange followed:

"Q. Okay. That chain belong to you?

"A. It belong to me.

"Q. I'm sorry?

"A. Yeah.

"Q. It belong to you. Okay. And is that—was that chain stolen?

---

[13] At first, Biggins testified that he told the police inspectors he had a .22 pistol in his pocket that night. Then, after reviewing a transcript of his interview with police, he testified that he told them it was a .380.

36

"A. Chain ain't stolen.

"Q. That chain has nothing to do with this incident?

"A. It don't got nothing to do with this incident.

"Q. Okay. Was that chain taken from anybody?

"A. It wasn't taken from nobody. It was given to me."

This cross-examination by Jones's counsel was followed by cross-examination by Molina's counsel, who questioned Biggins without interruption by the court until he had no more questions. This was followed by cross-examination by counsel for Lige and Kittles and a brief re-direct, after which defense counsel indicated they had no further questions. No one besides Jones's counsel asked Biggins about the neck chain.

Biggins also testified on cross-examination at the preliminary hearing that the police inspectors attempted to coerce him to tell a certain story about the incident. According to Biggins, they said they had no doubt he saw Jones with a gun at the incident and that the Rocawear jacket found at Biggins's house had evidence on it, and they pressured him to identify Jones in a photo lineup as having been at the incident, threatening to bring criminal charges against him if he did not. Over the course of his many months of questioning, the inspectors made clear that his story was not good enough and told him what they believed happened, giving him bits of information as they did so. Also, the prosecutor later told him they had enough to charge him with murder but had decided not to prosecute him.

Biggins also testified that he accused the inspectors of putting words in his mouth and manipulating what he said, and that their repeated indications that he could either be a witness or a suspect in the case made him uncomfortable. He was testifying in part out of a concern that he might otherwise be considered guilty of possessing stolen property or of the alleged

37

crimes. He was worried about his potential liability for robbery or murder for just watching the incident and for being an accessory after the fact because "[e]verybody came to my house."

Biggins acknowledged he had been involved in robberies in the past. He was facing charges for possession of stolen property but denied those charges. He denied stealing anything in the incident and said he received nothing taken from the victims. He said he gave the Mac 12 gun he had that night to a cousin who was jailed because of it. He acknowledged police found bullets in a box in his bedroom. He said he did not want to testify at the hearing because if "[y]ou tell on somebody, it's going to come back on you," but felt he had to testify because otherwise there would be "[a] lot of time" "hanging over [his] head."

### 2. *Biggins's Eve-of-Trial Change in His Account*

Inspector Engler testified that shortly before trial, on April 12, 2014, he and the prosecutor interviewed Biggins in the presence of his lawyer. They asked Biggins about his recollection that Molina came to his house right after the incident and showed the others there a chain taken in the incident. Biggins said something like, " 'Lance brings out a chain. I thought it looked like the one I had.' " Engler thought this was a peculiar statement, so he had a photograph of the chain seized from Biggins's bedroom drawer emailed to Bailey's widow. She recognized the chain's unique characteristics and said it had belonged to Bailey, later testifying that it had distinctive yellow stones and small holes.

In his pre-trial meeting with the prosecutor and Engler, Biggins also said for the first time that, in addition to the people he had already identified, 12-year-old Terry Franklin and Franklin's uncle, Lonnell Britton, also known as "Bey Wey," had come to his house immediately after the incident.

Engler further testified that on April 29, 2017, he and the prosecutor again interviewed Biggins in the presence of Biggins's lawyer. Biggins asked to examine the chain, which Engler had not shown him before. Upon examining it, Biggins said it did not belong to him because its clasp worked and his did not, that it belonged to the victim in the incident and that he did not know how it got into his bedroom drawer. The prosecutor immediately ended the interview.

Engler said the prosecutor instructed him to draft an arrest warrant for Biggins for murder, three counts of robbery, arming allegations and perjury based primarily on his change of his account about the seized chain. He had prepared an affidavit for the warrant and submitted it to the district attorney's office before Biggins's testimony was read to the jury but had not yet been authorized to take a final warrant to a judge to be signed. Several days later, during the cross-examination of another witness, the prosecutor stipulated that Biggins was at that moment being arrested for murder.

### 3. *Further Relevant Proceedings Below*

After Biggins changed his account and the prosecutor withdrew his immunity, the prosecutor moved in limine for admission of Biggins's preliminary hearing testimony at trial. He argued that the People were not required to offer immunity to a witness who incriminated himself (by indicating the neck chain found in his bedroom belonged to the victim) and that the defense had sufficient opportunity to cross-examine Biggins at the preliminary hearing. Jones filed a written opposition to this motion.

Subsequently, Biggins invoked his Fifth Amendment right to refuse to testify at trial at a hearing held outside the presence of the jury. The defense moved for the trial court to grant Biggins judicial immunity or, alternatively, to require him to invoke his Fifth Amendment right in front of the jury. The

defense opposed admission of Biggins's preliminary hearing testimony because it included perjured testimony about material facts, the prosecution had improperly procured Biggins's unavailability at trial, and the defense had not had an adequate opportunity to cross-examine Biggins.

The court denied the defense motions, admitted Biggins's preliminary hearing testimony and indicated defense counsel could comment on Biggins's possible role in the incident based on the evidence, including Inspector Engler's testimony of Biggins's changed account.

After Biggins's preliminary hearing testimony was read to the jury, defendants moved for a mistrial, arguing that since Biggins was now charged with perjury as well as murder, his prior testimony was unreliable and prejudiced the defense. After a hearing, the trial court denied the motion, relying in significant part on *People v. Hollinquest* (2010) 190 Cal.App.4th 1534, 1546-1547 (*Hollinquest*).

Later, the parties revisited their *Crawford*-related arguments in connection with defendants' post-trial motion for a new trial, which we discuss further in subpart I.D of the Discussion section, *post*. The trial court again rejected these arguments.

## B. The Trial Court's Admission of Biggins's Preliminary Hearing Testimony Did Not Violate *Crawford*.

We are not persuaded by defendants' arguments that the admission of Biggins's preliminary hearing testimony at trial violated their confrontation rights because it prevented them from cross-examining Biggins after his eve-of-trial revelation that the neck chain police seized from his bedroom drawer belonged to one of the victims.

The United States Supreme Court has instructed that "[w]here testimonial evidence is at issue . . . the Sixth Amendment demands what the common law required: unavailability and *a prior opportunity for cross-*

40

*examination.*" (*Crawford, supra*, 541 U.S. at p. 68, italics added.)
Defendants had a prior, meaningful opportunity to cross-examine Biggins at the preliminary hearing. Defense counsel thoroughly cross-examined him, and Jones's counsel specifically cross-examined him about the neck chain police seized from his bedroom drawer. Rather than imposing any limitations on this questioning, the magistrate informed Jones's counsel it was giving him a lot of leeway and imposed no limits on his cross-examination or that of Molina's counsel, which followed. Further, defendants do not contend, and there is no indication, that the prosecution withheld any information from them about Biggins and his statements to the police prior to the preliminary hearing. Rather, Biggins's eve-of-trial change in his account appears to have been as much a surprise to the prosecution as to the defense.

Under these circumstances, for the reasons we discuss below, we conclude the trial court did not violate defendants' rights under the confrontation clause in admitting Biggins's preliminary hearing testimony at trial.[14]

### 1. *Legal Standards*

We review de novo the court's denial of the defendants' motions asserting their confrontation clause rights were violated. (*People v. Sweeney* (2009) 175 Cal.App.4th 210, 221 [appellate courts should generally apply the de novo standard to confrontation clause claims], citing *People v. Seijas* (2005) 36 Cal.4th 291, 304.) To the extent there are mixed questions of law and facts, "we defer to the trial court's determination of 'the historical facts'— which 'will rarely be in dispute'—but not the court's 'application of [the]

---

[14] Jones asserts that, if we conclude that he did not sufficiently raise his appellate claim below, he received ineffective assistance of counsel. We conclude Jones sufficiently raised this claim below and, therefore, do not address his ineffective assistance claim.

objective, constitutionally based legal test to [those] historical facts.' " (*People v. Giron-Chamul* (2016) 245 Cal.App.4th 932, 964, quoting *People v. Cromer* (2001) 24 Cal.4th 889, 900 (*Cromer*).)

In *Crawford*, the United States Supreme Court held that the confrontation clause "applies to 'witnesses' against the accused—in other words, those who 'bear testimony.' " (*Crawford*, *supra*, 541 U.S. at p. 51.) "Testimonial" statements made before trial, including at a preliminary hearing, are admissible at trial only if the witness is unavailable and the defendant has had a prior opportunity to cross-examine him or her. (*Id.* at p. 68.) As the California Supreme Court has further instructed, " ' " '[a] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby, "to expose to the jury the facts which jurors . . . could appropriately draw inferences relating to the reliability of the witness." ' " ' " (*People v. Hamilton* (2009) 45 Cal.4th 863, 943, quoting *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 680.) *Delaware v. Van Arsdall* drew support for its reference to a "prototypical form of bias" from *Davis v. Alaska* (1974) 415 U.S. 308, 318, which further explained that "[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested," including "by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to the issues or personalities at hand." (*Id.* at p. 316.)

In *Hollinquest*, Division One of this court summarized *Crawford* and the relevant California law that followed it: " ' "[T]he right of confrontation and cross-examination is an essential and fundamental requirement for the

kind of fair trial which is this country's constitutional goal. . . . The 'right of confrontation is not absolute, however [citations], "and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." [Citation.]' [Citations.] In particular, the right of confrontation 'does not preclude the prosecution from proving its case through the prior testimony of a witness who is unavailable at trial, so long as the defendant had the right and the opportunity to cross-examine the witness during the earlier proceeding at which the witness gave this testimony.' [Citation.] ' "If a witness is unavailable at trial and has testified at a previous judicial proceeding against the same defendant and was subject to cross-examination by that defendant, the previous testimony may be admitted at trial." [Citations.]' [Citation.]

"Also indisputable is the principle that a witness, upon proper assertion of the privilege against self-incrimination, is unavailable as a witness at trial. [Citation.] 'Evidence Code section 240, subdivision (a) defines unavailable witnesses as any of five types of witnesses. A witness who is exempted from testifying on the ground of privilege is defined as one type.' [Citation.] 'A witness who successfully asserts the privilege against self-incrimination is unavailable to testify for these purposes.' [Citation.]" (*Hollinquest*, *supra*, 190 Cal.App.4th at pp. 1546-1547, fn. omitted.)

The *Hollinquest* court further explained that Evidence Code section 1291, regarding the admission of former testimony, codified the "recognized exception to the rule that a criminal defendant has the right to confront the witnesses against him . . . . 'When the requirements of Evidence Code section 1291 are met, "admitting former testimony in evidence does not violate a defendant's right of confrontation under the federal Constitution. [Citations.]" [Citation.] [¶] Evidence Code section 1291, subdivision (a)(2),

43

provides that former testimony is not rendered inadmissible as hearsay if the declarant is "unavailable as a witness," and "[t]he party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing." ' [Citations.]

" 'The recent decision of *Crawford v. Washington* (2004) 541 U.S. 36, although changing the law of confrontation in some respects, left these principles intact.' [Citation.]  ' "[A]s long as a defendant was provided the *opportunity* for cross-examination, the admission of preliminary hearing testimony under Evidence Code section 1291 does not offend the confrontation clause of the federal Constitution simply because the defendant did not conduct a particular form of cross-examination that in hindsight might have been more effective." [Citations.]' [Citations.] . . . [¶] 'Under these rules,' the California Supreme Court has ' "routinely allowed admission of the preliminary hearing testimony of an unavailable witness." [Citation.]' [Citation.]" (*Hollinquest, supra*, 190 Cal.App.4th at pp. 1548-1549; see also *People v. Brock* (1985) 38 Cal.3d 180, 190 [pre-*Crawford* case concluding preliminary hearing testimony by an unavailable trial witness is admissible under section 1291 "where the defendant had a meaningful opportunity to cross-examine the witness in the former proceeding"].)

In short, "[t]he preference for face-to-face cross-examination at trial has been found to be outweighed by recognized competing interests that warrant dispensing with the right of confrontation under circumstances where the defense had the opportunity to cross-examine the witness at the previous hearing with an interest and motive similar to that which he has at the subsequent hearing. [Citations.] '[I]t is settled that the preference for live

44

testimony gives way when the witness properly invokes the privilege against self-incrimination and a prior appropriate opportunity for cross-examination existed.' " (*Hollinquest, supra,* 190 Cal.App.4th at pp. 1550-1551, quoting *People v. Williams* (2008) 43 Cal.4th 584, 623.)

Of particular importance to the present case, our Supreme Court has explained that events occurring after the first proceeding in which the testimony is given does not mean cross-examination must be reopened: " 'a defendant's interest and motive at a second proceeding is not dissimilar to his interest at a first proceeding within the meaning of Evidence Code section 1291, subdivision (a)(2), simply because events occurring after the first proceeding might have led counsel to alter the nature and scope of cross-examination of the witness in certain particulars. [Citation.] The " 'motives need not be identical, only "similar." ' " [Citation.] "Both the United States Supreme Court and [the California Supreme Court] have concluded that 'when a defendant has had an opportunity to cross-examine a witness at the time of his or her prior testimony, that testimony is deemed sufficiently reliable to satisfy the confrontation requirement [citation], *regardless whether subsequent circumstances bring into question the accuracy or the completeness of the earlier testimony.' "* [Citations.]' " (*People v. Valencia* (2008) 43 Cal.4th 268, 293-294, italics added, quoting *People v. Samayoa* (1997) 15 Cal.4th 795, 850; *People v. Wilson* (2005) 36 Cal.4th 309, 343; and *People v. Harris* (2005) 37 Cal.4th 310, 333.)

In other words, the confrontation clause "is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. The Clause thus reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little

45

dissent), but about how reliability can best be determined.' ([*Crawford*],
*supra*, 541 U.S. at p. 61.)  In other words, '[w]here testimonial statements are
at issue, the only indicium of reliability sufficient to satisfy constitutional
demands is the one the Constitution actually prescribes:  confrontation.' (*Id.*
at pp. 68-69.)" (*People v. Wilson*, *supra,* 36 Cal.4th at p. 343.)

### 2. *Analysis*

Defendants' *Crawford* arguments fail because they had a meaningful
opportunity to cross-examine Biggins at the preliminary hearing, including
about the neck chain police seized from Biggins's bedroom drawer and his
numerous lies to police.  At the preliminary hearing, defendants had an
interest and motive to question Biggins that was similar, if not identical, to
their interests at trial.  At the time of the preliminary hearing, the relevance
of Biggins's testimony to the prosecution's case against Molina and Jones was
known and obvious.  He directly implicated both Molina and Jones in the
incident, asserting that they approached the victims' car together when it
stopped in the Horseshoe; that upon exiting the car, Molina's girlfriend
indicated the victims had phones and wallets; that Jones and Molina (along
with Lige) fought with Bailey; that Jones shot Bailey; that Molina displayed a
neck chain immediately thereafter at Biggins's house; and that Jones left his
Mac 11 gun and his jacket with Biggins that night.

Biggins's biases and ulterior motives were also obvious at the time of
the preliminary hearing.  His own involvement in the incident, his concerns
that he could be prosecuted for robbery and murder and his efforts to
downplay his role to avoid such charges were also known and obvious.  He
implicated himself by testifying that those involved in the incident retreated
to his house immediately thereafter, where they displayed stolen items to
each other, that he took Jones's gun and Rocawear jacket, and that he had

46

changed his story during many months of police questioning to obscure his own potential culpability. He also acknowledged he was arrested and charged for possessing stolen property based on what police found in their search of his home, suggesting he had a further incentive to testify in a way that advanced his own personal interests.

The defense also had both the means and the opportunity to challenge Biggins's credibility at the preliminary hearing. Biggins admitted he had repeatedly lied to police inspectors over the course of their investigation. He testified that he felt coerced by the inspectors to tell the story they wanted to hear and that they suggestively informed him of facts they claimed to know. He admitted having been present and armed at the scene of the shooting and having hosted the gathering at which the spoils from the robbery were displayed. And he essentially admitted he had a motive to lie. By pinning blame for the shooting on Jones and the other violence on Molina and others, and denying any active role in the robbery, Biggins could avoid being charged and convicted and serving "[a] lot of time."

Further, the magistrate allowed counsel for Jones and Molina virtually unlimited time to cross-examine Biggins. Jones's counsel cross-examined him for over two hours, much of that time exploring Biggins's admitted lies to police (and asking him about the seized neck chain), and Molina's counsel cross-examined Biggins without interruption by the court until he was out of questions. Together, their cross-examination of Biggins occurred over two days and went on for 123 pages of reporter's transcript and defense counsel for Kittles and Lige cross-examined him for another 50 pages. Defendants were afforded a meaningful opportunity to cross-examine Biggins on all subjects. (Cf. *People v. Cloyd* (1997) 54 Cal.App.4th 1402, 1409 [nine

transcript pages of cross-examination indicated defense counsel was provided "full-opportunity" to cross-examine witness at preliminary hearing].)

In short, it was obvious at the time of the preliminary hearing that Biggins exhibited a prototypical form of bias, and defense counsel employed the evidence of his bias and ulterior motives to attack his credibility. Defendants thoroughly cross-examined him about his dishonesty and his motives.

Defendants nonetheless contend that his hearing testimony should not have been admitted because they did not have the opportunity to cross-examine him about his eve-of-trial admission that the neck chain police found in his bedroom belonged to one of the victims in the incident. They characterize his preliminary hearing testimony that the chain was his own as "perjury." Defendants' effort to elevate this change in story about the gold chain into a *Crawford* violation is not persuasive.

First, as we have just discussed, even "subsequently discovered impeaching evidence" generally does not render inadequate a defendant's opportunity for cross-examination at a preliminary hearing. (*People v. Valencia*, *supra*, 43 Cal.4th at pp. 294-295.) The fact that Biggins evidently was in possession of a part of the spoils from the robbery arguably implicated him in the incident and underscored his desire to avoid criminal liability. But the evidence available at the time of the preliminary hearing, including his testimony about his presence at the scene and the post-incident meeting at his house, already provided defense counsel ample grist for cross-examining him about his motive for testifying against them: to avoid a prison sentence for his own involvement. And the presence of the chain in Biggins's home, even though he initially denied it was taken in the robbery, was another basis for suspicion of his involvement, as the cross-examination

48

on that point suggested.  The bottom line is that it is doubtful that Biggins's eve-of-trial change in his account would have added to his cross-examination significantly had it been made at the time of the preliminary hearing or had Biggins been available at trial.

Second, to the extent defendants claim Biggins's change in his account demonstrates that his preliminary hearing testimony about the chain amounted to "perjury" and made his entire testimony unreliable to admit at trial, we disagree.  The court admitted not only Biggins's preliminary hearing testimony but also the testimony of Inspector Engler that Biggins later said his claim that the chain belonged to him was false.  The jury could assess whether the admitted falsity rendered all, some or none of his testimony unreliable.  Further, the chain evidence was only indirectly relevant to the core of Biggins's testimony about defendants' role in the robbery and murder.  Along with repeated lies he had earlier made to police, which Biggins also admitted, the jury could decide whether he was a liar across the board or a liar only regarding his own involvement in the crime.

Third, defendants do not establish that anyone acted improperly in the chain of events that led to Biggins's absence from trial.  Defendants argue, but fail to demonstrate, that the People withdrew the offer of immunity to Biggins in bad faith—an issue we address and reject in subpart I.D, *post*.  They do not contend that the law required the trial court to order that immunity be restored to Biggins or that Biggins could not lawfully assert his Fifth Amendment right not to testify at trial.

Fourth, the case relied on by the trial court here, *Hollinquest*, *supra*, 190 Cal.App.4th 1534, and a California Supreme Court case, *People v. Carter* (2005) 36 Cal.4th 1114 (*Carter*), support the conclusion that the trial court properly admitted Biggins's preliminary hearing testimony.  In *Hollinquest*,

49

Buchanan, the lover of the victim, Smith, conspired with the defendant, Hollinquest, for Hollinquest to rob Smith while Smith was in his car with Buchanan. (*Id.* at pp. 1540-1542.) This attempted robbery went awry. Hollinquest shot the fleeing Smith eight times, killing him, and was subsequently charged with murder and robbery. (*Ibid.*) After he received use immunity, Buchanan testified at Hollinquest's preliminary hearing. (*Id.* at p. 1540.) He said he initially lied to police to conceal his involvement in the robbery claiming he too was a victim, but at the hearing he detailed his participation. (*Id.* at pp. 1540-1542.) He also denied that he knew Hollinquest planned to kill Smith and said he had run inside a nearby house of a friend just before Hollinquest shot Smith outside. (*Id.* at pp. 1541-1542.) Buchanan further testified that after he spoke to police, he told Hollinquest by phone that police had questioned him. (*Id.* at p. 1542.)

After the preliminary hearing and before trial, for reasons not discussed in the opinion, the prosecution charged Buchanan with murder and revoked his use immunity, and Buchanan asserted his Fifth Amendment right not to testify against Hollinquest at the latter's trial. (*Hollinquest, supra,* 190 Cal.App.4th at p. 1546.) At the prosecution's request, the trial court admitted Buchanan's preliminary hearing testimony at trial, which Buchanan contended on appeal violated his confrontation rights. (*Ibid.*) Hollinquest argued that cell phone records showed that in the moments *after* the murder Buchanan attempted seven calls to Hollinquest and had one connected call (thereby suggesting Buchanan was more involved in the murder than he admitted), but that those records did not become available until after the preliminary hearing, making it impossible for his counsel to properly cross-examine Buchanan at the hearing about his account of the robbery/murder. (*Id.* at pp. 1544-1545, 1549, 1550.)

50

The *Hollinquest* court disagreed.  It was not convinced that Hollinquest's cross-examination at the preliminary hearing was compromised by the lack of prior access to cell phone records because Hollinquest's interest and motive at trial were "not dissimilar" to those he had at the time of the preliminary hearing " ' "simply because events occurring after the first proceeding might have led counsel to alter the nature and scope of cross-examination of the witness in certain particulars." ' " (*Hollinquest*, *supra*, 190 Cal.App.4th at p. 1549.)  The court noted that the defense probed Buchanan's calls to Hollinquest at the preliminary hearing.  (*Ibid*.)  "Thus," the court continued, "the defense had a reason and at least the opportunity to elicit testimony from Buchanan about the extent of his cell phone conversations with defendant at the preliminary hearing.  We also do not think any cross-examination of Buchanan on the subject of cell phone records by the defense at trial would have resulted in a more successful challenge to the reliability of his testimony.  [Citation.]  ' "As long as defendant was given the opportunity for effective cross-examination, the statutory requirements were satisfied; the admissibility of this evidence did not depend on whether defendant availed himself fully of that opportunity."  [Citation.]'  [Citation.]  Further, at trial the defense had the cell phone records, and managed to engage in cross-examination and argument as to their import in the case." (*Id*. at pp. 1549-1550, fn. omitted.)

The *Hollinquest* court also rejected Hollinquest's assertions that it was necessary to cross-examine Buchanan at trial to "bring out 'whether Buchanan was expecting or being given any benefits in his own case in exchange for his testimony' " and so that the jury could observe his demeanor. (*Hollinquest*, *supra*, 190 Cal.App.4th at p. 1550.)  Regarding the former, the court concluded the defense had the chance to explore the issue at trial

51

through other witnesses and that nothing indicated a pre-existing agreement between Buchanan and the prosecution. (*Ibid*.) Regarding the latter, the court observed that, while live testimony was always preferable to former testimony, it had been "found to be outweighed by recognized competing interests that warrant dispensing with the right of confrontation under circumstances where the defense had the opportunity to cross-examine the witness at the previous hearing with an interest and motive similar to that which he has at the subsequent hearing," and when a witness " 'properly invokes the privilege against self-incrimination and a prior appropriate opportunity for cross-examination existed.' " (*Id*. at pp. 1550-1551.)

As in *Hollinquest*, the defense here had ample opportunity to cross-examine Biggins at the preliminary hearing about his lies to police and his interest in protecting himself and had the same interest and motive for doing so as it had at trial. As with the phone records in *Hollinquest*, both the prosecution and the defense here received additional information only after the preliminary hearing that raised further questions about the credibility of Biggins's testimony, i.e., that Biggins, by his own admission, had falsely testified at the preliminary hearing that the neck chain seized from his bedroom drawer belonged to him rather than having been stolen from the murder victim, Bailey. As with Buchanan, Biggins, upon being charged and having his immunity withdrawn by the prosecution, invoked his Fifth Amendment right not to testify. As in *Hollinquest*, the trial court here allowed all the pertinent evidence to be presented to the jury, including Inspector Engler's testimony recounting Biggins's change in his account, and allowed the import of this evidence to be argued by counsel. Under these circumstances, Jones and Molina's confrontation rights were not violated by

52

the trial court's decision to admit Biggins's preliminary hearing testimony at trial.

Defendants attempt to distinguish *Hollinquest* by arguing that the phone records discovered after the preliminary hearing in that case were not particularly important to the defense. But on appeal, Hollinquest argued the phone records suggested Buchanan had been more complicit in the murder of Smith than he indicated at the preliminary hearing, at the very least rendering him an unreliable witness against Hollinquest. The import of the later discovered evidence in *Hollinquest* is strikingly similar to that of Jones and Molina, who sought to use Biggins's changed account about the seized neck chain to argue that he perjured himself and that none of his preliminary hearing testimony should be believed. In any event, defendants had plenty of opportunity to argue the import of Biggins's eve-of-trial change in his account at trial because all of Biggins's statements about the neck chain, including that it belonged to the murder victim, were presented to the jury.

*Carter*, another case the trial court cited, is also instructive. There, the prosecution sought to introduce the preliminary hearing testimony of a witness, Blevins, the former boyfriend of a woman, Kim, whom Carter was accused of killing. Blevins died before trial but had testified at the preliminary hearing that he saw Kim and Carter together before her death and that certain objects found by police in Carter's car were similar to objects he had seen in Kim's apartment. (*Carter, supra*, 36 Cal.4th at pp. 1171, 1173.) Carter moved to exclude Blevins's hearing testimony at trial on the ground that his counsel failed to engage in any meaningful cross-examination at the preliminary hearing, which motion the trial court denied. (*Id.* at p. 1171.)

53

On appeal, Carter argued the trial court should have excluded Blevins's testimony for lack of meaningful cross-examination because his counsel made no effort to focus on Blevins as a third-party suspect in Kim's murder despite knowing at the time that Blevins and Kim had argued bitterly just before her death. (*Carter, supra*, 36 Cal.4th at pp. 1171-1172.) Our Supreme Court rejected defendant's argument, concluding that, because Carter's motive and interest in cross-examining Blevins at the preliminary hearing was "closely similar, if not identical to, [Carter's] objectives at . . . trial," and because the defendant " 'was provided the *opportunity* for cross-examination, the admission of preliminary hearing testimony . . . [did] not offend the confrontation clause of the federal Constitution simply because the defendant did not conduct a particular form of cross-examination that in hindsight might have been more effective.' " (*Id.* at pp. 1173-1174, italics added.)

Similarly, at the preliminary hearing counsel for Jones asked Biggins, an admitted liar, relatively little about the neck chain police seized from his bedroom drawer, and Molina's counsel asked him nothing at all about it. This is so even though the neck chain could have been used to suggest that Biggins, not Molina (who Biggins said had shown a chain to the others at his house), had taken the chain from the murder victim that night. In other words, regardless of what defendants' counsel later learned would be a more effective cross-examination of Biggins after his eve-of-trial change in his account about the neck chain, like Carter, their motives and interests in cross-examining Biggins at the preliminary hearing were the same as at trial, and they had ample opportunity to cross-examine him. *Hollinquest* and *Carter* establish that under these circumstances, the admission of Biggins's preliminary hearing testimony at trial did not violate defendants' confrontation rights.

Defendants do not cite case law suggesting *Hollinquest* and *Carter* were wrongly decided or should not be relied on here. The only California case they lean into is *People v. Garner* (1989) 207 Cal.App.3d 935 (*Garner*). There, after a preliminary hearing, a witness who provided the only evidence connecting Garner to the crime confessed that he had perjured himself in his preliminary hearing testimony accusing defendant (*id.* at pp. 937-938) and invoked his Fifth Amendment right not to testify at trial for fear he would be charged with perjury. The trial court ruled that the witness was unavailable to testify, but nonetheless admitted his preliminary hearing testimony— while *barring* the admission of evidence regarding the witness's perjury confession and instructing the jury not to draw any inferences about his credibility based on his refusal to testify so as not to incriminate himself, in this case for perjury. (*Garner,* at p. 938.) The appellate court found the trial court's action wanting, holding: "When the People wish to go forward in reliance upon the testimony of a recanting witness, fundamental fairness would require, at a minimum, that the jury (1) be advised precisely why the witness is being allowed to refuse to testify, i.e., an alleged fear of a perjury prosecution, and (2) be instructed that they should draw all reasonable and appropriate inferences therefrom concerning the witness's credibility and the guilt or innocence of the accused." (*Id.* at p. 941.)[15]

---

[15] Jones emphasizes the dicta in *Garner* that the "truly preferable approach" would have been to condition the prosecution's request to introduce the perjured preliminary hearing testimony upon the prosecution's granting Garner immunity to testify. (*Garner, supra,* 207 Cal.App.3d at p. 941.) *Garner* is plainly distinguishable. The language Jones quotes is prefaced, "[w]hen the People wish to go forward in reliance upon the testimony of a *recanting* witness." (Ibid. [italics added]) In *Garner*, the witness's identification of the defendant was the only evidence connecting Garner to the crime, the witness thereafter recanted that very testimony, and the fact

Here, the trial court did what the *Garner* court required. The jury was fully aware of *both* Biggins's preliminary hearing testimony and his eve-of-trial change of account, and that he had lost his immunity to testify, was in the process of being charged with murder and perjury and, as a result, was unavailable to testify at trial. The jury was instructed that, "[i]f you decide that a witness deliberately lied about something significant in this case, you should consider not believing anything that witness says. Or if you think a witness lied about some things but told the truth about others, you may simply accept the part that you think is true and ignore the rest."

Defendants, particularly Jones, also cite numerous cases from other jurisdictions in support of their confrontation claim. These cases are, of course, not binding authority (see, e.g., *People v. Bradford* (1997) 15 Cal.4th 1229, 1292) and, in any event, none are on point or persuasive. *Harre v. A.H. Robins Co., Inc.* (11th Cir. 1985) 750 F.2d 1501, vacated in part on other grounds, 866 F.2d 1301; *U.S. v. McLaughlin* (E.D. Pa. 2000) 89 F.Supp.2d 617; and *Harrington v. City of Council Bluffs* (S.D. Iowa 2012) 902 F.Supp.2d 1181 involve post-trial discoveries of perjured testimony that have nothing to do with the admission of prior testimony at a criminal trial or *Crawford* issues. *U.S. v. Wilmore* (9th Cir. 2004) 381 F.3d 868 involves the admission of a witness's prior testimony before a grand jury, when the defendant obviously had no opportunity to cross-examine the witness. *Commonwealth v. Bazemore* (1992) 531 Pa. 582 and *People v. Torres* (Ill. 2012) 962 N.E.2d 919 each held that prior preliminary hearing testimony should not have been

that he recanted (as opposed to refusing to testify at trial for some other reason) was entirely withheld from the jury. (*Id.* at pp. 937-938.) None of that is true here. Biggins's testimony was not the only evidence connecting defendants to the crime, his changed his testimony did not recant his testimony about Jones and Molina, and the jury was fully apprised of his changed testimony.

admitted at a subsequent criminal trial, but in doing so relied heavily on the prosecution's failure to disclose all known, relevant information to the defense prior to the preliminary hearing, and *Torres* also involved the court's discouragement of cross-examination at the hearing. None of these circumstances exist in the present case.

Defendants also contend that the magistrate only afforded them a limited opportunity to cross-examine Biggins at the preliminary hearing. This is factually incorrect. As we have discussed, the magistrate, despite expressing reservations about time, gave defendants a full opportunity to cross-examine Biggins. He twice indicated he was allowing defense cross-examination of Biggins to continue at great length, stating that he was doing so because of the obvious implications of Biggins's testimony and even if he had to cancel the remainder of the scheduled hearing calendar. For example, he said during Jones's counsel's cross-examination, "We have gone over two hours with cross-examination. It is only a preliminary hearing. I understand the implications of this witness, and that is why I am giving that leeway."

Molina points to several statements by the magistrate during the cross-examination of Biggins by counsel for Kittles, which Molina construes as inhibiting cross-examination. We fail to see how the court's statements cited by Molina could have inhibited counsel *for Jones and Molina* when they had already completed their extensive cross-examinations. Further, the court did not limit Kittles's counsel regarding the subjects at issue here. Its statements were in response to questions that veered away from the incident, such as who Biggins feared such that he carried a gun and why he bought a .45 pistol when he already had a Mac 12, or questions that were cumulative, such as about Biggins arming himself with a Mac 12 on the night of the

57

incident, a subject that already had been fully explored by other counsel at the hearing.

In short, defendants' argument that the trial court's admission of Biggins's preliminary hearing testimony violated their confrontation rights under *Crawford* because they were denied a meaningful opportunity to cross-examine him is without merit. In light of our conclusion, we do not address defendants' claim that the error was prejudicial.[16]

## C. Any Error by the Trial Court in Instructing the Jury Regarding Biggins's Possible Perjury Was Harmless.

Jones also argues that the trial court committed prejudicial error by instructing the jury that the People, in order to prove their "charge" that Biggins (a witness and *not* a defendant in this case) had perjured himself regarding the neck chain police seized from his bedroom drawer, had to prove all of the elements of the crime of perjury beyond a reasonable doubt. The People argue that Jones is not entitled to raise this appellate claim and that it lacks merit. We conclude that, under either party's legal theory, we must determine whether any claimed court error was prejudicial, and further

---

[16] Molina, joined by Jones, also briefly and somewhat confusedly argues that the prosecution erred at trial by presenting what he knew was Biggins's "tainted and perjurious" preliminary hearing testimony (an apparent reference to his testimony about the neck chain seized from his bedroom drawer). Molina contends the error violated the immunity statute, section 1324 and Molina's federal constitutional due process right to a fair trial by presenting false evidence. Molina's argument fails because the prosecution did *not* admit Biggins's preliminary hearing testimony about the neck chain to prove its truth; to the contrary, the prosecution argued Biggins had committed perjury in that part of his testimony. Further, both Biggins's preliminary hearing testimony about the necklace *and* the evidence regarding his changed account were admitted at trial. Under these circumstances, we fail to see any prosecutor error that violated defendants' due process right to a fair trial.

conclude that any such error was harmless. Therefore, Jones's contention that we must reverse for instructional error lacks merit.

### 1. *Background*

We have already recounted Biggins's preliminary hearing testimony that the neck chain police seized from his bedroom drawer was his own and not from the incident; his eve-of-trial change in this account; the People's withdrawal of testimonial immunity to Biggins and decision to charge him with murder, conspiracy to commit robbery, robbery, assault with a deadly weapon and perjury; his refusal to testify at trial based on his Fifth Amendment rights; the court's ruling that he was unavailable to testify at trial; and the trial court's admission of his preliminary hearing testimony, as well as its uncontested admission of the evidence of his eve-of-trial change in his account.

In addition to the arguments we have already discussed, Jones argued below in moving to exclude Biggins's preliminary hearing testimony that, if the court admitted the testimony, "a curative instruction [was] needed to inform the jury that Biggins perjured himself at the preliminary hearing. His testimony . . . was . . . highly incriminating of all four defendants. Absent such an instruction, the jurors will have no reason to disbelieve his perjured testimony and will not be able to weigh his testimony against the factors outlined in CALCRIM [No.] 226 [regarding witness credibility]. Specifically, the jurors may give undue weight to Biggins'[s] testimony because they will not know that he 'deliberately lied about something significant to this case.' Without the benefit of cross-examination, a curative instruction describing the nature of the perjury is the only mechanism for informing the jury that Biggins lied under oath. [¶] The defense is currently drafting an instruction

59

for review by the court based on CALCRIM [No.] 2640, the instruction on perjury." (Fn. omitted.)

The court denied this motion but did not directly address the request for a curative instruction, saying it would discuss jury instructions with counsel "later." The parties do not identify any further discussion between the court and counsel about the matter, nor indicate anyone submitted a proposed instruction to the court.

By the time it began deliberations, the jury appears to have understood that Biggins had been charged with perjury in a separate case. Inspector Engler testified that the district attorney was preparing to charge Biggins with murder, robbery and perjury. Several days later, still during the trial, the prosecutor stipulated that on that day, Biggins was being arrested for "murder." Presumably, he was arrested on all the charges against him, including perjury and robbery.

In any event, Biggins was *not* on trial in this case. Nonetheless, the trial court instructed the jury as follows based on CALCRIM No. 2640:

"Arnold Biggins has been charged with perjury. To prove that Mr. Biggins has committed this crime the People must prove that:

"One, Mr. Biggins took an oath to testify truthfully before a competent tribunal under circumstances in which the oath of the State of California lawfully may be given.

"When Mr. Biggins testified, he willfully stated that the information was true even though he knew it was false.

"The information was material.

"Mr. Biggins knew he was making the statement under oath.

"And when Mr. Biggins made the false statement he then intended to testify falsely while under oath."

60

The court further instructed, "The People allege that Mr. Biggins made the following false statements: [¶] The chain seized from Mr. Biggins' dresser drawer was his and was not stolen."

The court gave other jury instructions that are relevant to this claim of error. Specifically, it instructed that, "[w]henever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt unless I specifically tell you otherwise" and that, "[i]f you decide that a witness deliberately lied about something significant in this case, you should consider not believing anything that witness says. Or if you think the witness lied about some things but told the truth about others, you may simply accept the part that you think is true and ignore the rest."

In closing argument, the prosecutor acknowledged possible concerns with Biggins's and Simonton's testimony. He argued the prosecution had proved the charges against Jones with other evidence, such as Harrell's identification of Jones as one of the assailants. He also said, "[A] play cast in hell is going to have bad angels. . . . They are bad people."

Most notably, the prosecutor agreed that Biggins lied in his preliminary hearing testimony, accused him of having committed perjury and "aided and abetted a robbery." Responding to defense counsel's contentions that he was trying to win at all costs by presenting Biggins's "perjurious" testimony, the prosecutor said, "No, Arnold Biggins lied. Arnold Biggins lied. He broke his agreement. His agreement was if you lie, you're going to get prosecuted for this murder. That's exactly what I did in this." He added, "Yes, it is perjury regarding the necklace," and argued the jury could nonetheless decide what it found believable about the remainder of Biggins's testimony.

Jones's counsel argued in closing that Jones was being framed for a shooting that *Simonton* committed. He told the jury not to rely on anything Biggins said, as Biggins had been arrested "not just for what happened in this robbery/murder but for perjury. For perjury."

As we have already discussed, the jury convicted Jones on most, but not all, of the charges brought against him. It found him guilty of the first degree murder of Bailey (count I) and found that he committed the murder for the benefit of a criminal street gang.[17] It also found that a principal was armed with a firearm and that a principal used a firearm for the benefit of the gang or to further its activities. However, it found *not true* that Jones himself murdered Bailey while he was engaged in the commission of a robbery or while he was an active participant in a criminal street gang and in order to further the activities of the gang, that Jones personally and intentionally discharged a firearm, and that he personally and intentionally discharged a firearm causing great bodily injury.

The jury further found Jones guilty of conspiracy to commit robbery (count II). It found true that he acted for the benefit of a criminal street gang and personally used a firearm in engaging in this conspiracy.

The jury also found Jones guilty of the robberies of Bailey, Green and Harrell (counts III to V). It further found that in the commission of these robberies, a principal was armed with a firearm, a principal personally used a firearm, an assault pistol, for the benefit of a criminal street gang to further criminal conduct by gang members, and Jones committed the robberies for this same gang purpose. However, the jury found *not true* that in committing

---

[17] As we will discuss in part IV, *post*, we must reverse the jury's gang findings and convictions because the court committed prejudicial error by admitting material hearsay testimony by a gang expert.

these robberies, Jones personally and intentionally discharged a firearm that caused great bodily injury or benefitted a criminal street gang.

The jury further found Jones guilty of assault with an assault pistol (count VI), assault with a firearm (count VII), and possession of a firearm by a felon (count VIII), all of which the jury concluded he committed for the benefit of a criminal street gang.  It also found him guilty of active participation in a criminal street gang (count X).

### 2. *Analysis*

#### a. Forfeiture

We first address the People's contentions that Jones invited any error below and has forfeited this instructional error claim, particularly regarding the instruction on Biggins's possible perjury that the court based on CALCRIM No. 2640.  The People contend Jones's counsel "requested and composed" that perjury instruction, and that in any event the instruction was a correct statement of law.  We disagree.

Invited error occurs when a defendant requests an incorrect instruction as part of a conscious and deliberate tactical choice.  (*People v. DeHoyos* (2013) 57 Cal.4th 79, 138.)  Here, Jones asked the trial court to instruct the jury that Biggins had perjured himself at the preliminary hearing regarding the neck chain found in his bedroom drawer in order to "cure" the damage done by that testimony's admission at trial.  We are not called on to evaluate whether such an instruction would have been appropriate in the absence of an admission by Biggins that he deliberately lied at the preliminary hearing. We note only that Jones requested an instruction that is materially different from the one given by the trial court, which refers only to the standards the People had to meet to prove a perjury charge against Biggins.  There was no invited error.

The People also argue Jones has forfeited his instructional error claim because " '[a] party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' " (*People v. Landry* (2016) 2 Cal.5th 52, 99-100.) Jones responds that the instruction is *not* legally correct because the court should not have instructed the jury that the prosecution had to prove Biggins's perjury beyond a reasonable doubt *in this case*. Jones further contends that the court's error was prejudicial to him and, therefore, is reviewable under section 1259,[18] and that case law suggests a defendant's mere contention that his substantial rights were violated is sufficient to defeat a claim of forfeiture (see *People v. Boyce* (2014) 59 Cal.4th 672, 691, fn. 12 ["no objection was necessary because, if [the defendant] were correct, such an error would have affected his substantial rights"]; *People v. Benavides* (2005) 35 Cal.4th 69, 111 ["[T]o the extent defendant asserts instructional error affected his substantial rights, he is not precluded from raising the claim on appeal even absent an objection in the trial court"]).

The People do not concede that a mere claim of a substantial rights violation (as opposed to an actual violation) defeats a forfeiture claim. Nonetheless, they acknowledge that, even under their forfeiture theory, we must review the merits of Jones's claim, if only to determine whether the trial court committed a prejudicial error that actually violated Jones's substantial rights under section 1259. We need not resolve this dispute regarding the forfeiture standard because, regardless, the parties agree we must examine the merits of Jones's claim. (See *People v. Cruz* (2016)

_____

[18] Section 1259 states, in relevant part: "Upon an appeal taken by the defendant, . . . [t]he appellate court may . . . review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."

2 Cal.App.5th 1178, 1183 [considering the merits of the defendant's contentions because under section 1259, "there is no other way of determining whether the instruction was reversibly erroneous" and, therefore, affected the defendant's substantial rights].) We turn to that examination now.[19]

### b. Any Error by the Trial Court in Giving the Biggins Perjury Instruction Was Harmless.

The trial court did not give the jury the perjury instruction Jones requested, presumably because the court did not think there was evidence presented at trial that Biggins *deliberately* lied about the neck chain at the preliminary hearing. However, the court, perhaps in a misguided effort to accommodate Jones's request, instead gave the pattern instruction addressing perjury that Jones's counsel had proposed be modified, CALCRIM No. 2640. That instruction is designed for use in a trial in which a defendant is charged with perjury. The parties debate at length whether the trial court's instruction was error in this case, in which Biggins was not on trial for perjury or any other crime.

Jones argues the trial court erred because, read with its instruction that the prosecution was obliged to prove its contentions beyond a reasonable doubt, the court directed the jury to conclude Biggins perjured himself only if the prosecution proved it beyond a reasonable doubt. Therefore, he contends, the court imposed on the jury an erroneous barrier to finding Biggins was not credible and lowered the prosecution's burden of proof. Jones further argues

---

[19] Given our decision to examine the merits of Jones's instructional error claim and our conclusion that any error was not prejudicial, we have no need to address Jones's alternative claim that any forfeiture resulting from his counsel's failure to object to the instruction was ineffective assistance of counsel.

the instruction violated his federal constitutional rights by impairing the jury's Sixth Amendment function as the sole judge of witness credibility.

The People respond that there was no error because the instruction was a correct statement of law. Also, there was no reasonable likelihood that the jury would fail to understand it held the prerogative to evaluate witness credibility because of the court's other instructions, particularly that the jury was free to determine whether a witness was lying, and because of the obvious "untenability" of requiring the prosecution to prove weaknesses in its own witness's credibility. The People further contend that at most any error, in effect, amounted to an exclusion of possible evidence of perjury and therefore constituted mere state law error.

We need not resolve the merits of Jones's instructional error claim because, as we shall discuss, we conclude any such error was harmless under both the state standard for prejudice that the People argue applies here (*People v. Watson* (1956) 46 Cal.2d 818, 836) and the federal standard that Jones argues applies (*Chapman v. California* (1967) 386 U.S. 18, 23-24 (*Chapman*)). As we will discuss in more detail below, we so conclude for several reasons. First, even aside from his change of account about the seized neck chain, Biggins cast ample doubt on his own credibility by testifying that he repeatedly lied to police in order to protect himself and that he felt coerced by his interrogators to tell the story they wanted to hear. Second, the People did not dispute that Biggins's testimony about the neck chain at the preliminary hearing was false. Third, and relatedly, the prosecution and the defense both argued that Biggins had perjured himself in that testimony. Fourth, the jury's verdicts make plain it did not find Biggins to be credible in several respects. Finally, other strong evidence points to Jones's active participation in the incident.

As we have discussed, in his preliminary hearing testimony, Biggins testified that he lied to his police interrogators repeatedly in order to protect himself, including telling them he was not at the scene of the incident, had never seen Jones with a gun, did not know who left the Rocawear jacket at his house, did not recognize a photograph of Simonton, did not have a gun with him at the incident, had only a small gun with him at the incident, and owned only a .45-caliber gun. Further, he testified at the hearing that the police inspectors who interrogated him attempted to coerce him to tell a certain story about the incident, including by pressuring him to identify Jones as having been at the incident, threatening to bring criminal charges against him if he did not, telling him his story was not good enough and feeding him bits of information as they questioned him. He also testified that he was worried about his own potential liability for robbery or murder for being present at the incident and because "[e]verybody came to my house" immediately after the incident. He admitted he had been involved in robberies in the past. All of this gave the jury ample reason to doubt Biggins's preliminary hearing testimony, even without the falsity of his testimony about the neck chain. The jury was free to decide whether Biggins had lied in that other testimony because the perjury instruction applied *only* to his testimony about the neck chain.

Further, the evidence regarding the neck chain indisputably showed Biggins's testimony about it was untrue. He acknowledged this on the eve of trial. Even if he implied to the prosecution team that he did not deliberately lie but confused a chain he owned with the one stolen in the robbery, his false testimony, as well as other aspects of his testimony, in particular, his admission that he lied to police in many instances to protect himself from

67

prosecution and his claimed lack of knowledge about how the chain ended up in his bedroom drawer, raised many problems with his credibility.

As we have indicated, both parties told the jury Biggins had perjured himself in his testimony about the neck chain. The prosecutor specifically told the jury Biggins had lied, aided and abetted in the robbery, broken his agreement with the prosecution and committed "perjury" about the necklace, while arguing the jury could nonetheless find the remainder of his preliminary hearing testimony believable.

Given this testimony and argument, it is no wonder that the jury's verdicts indicate it found Biggins's testimony not credible in several respects. Despite his account of the incident, which implicated all four defendants, the jury acquitted Kittles on all charges, acquitted Lige on one charge and hung on the other charges against Lige. Further, in finding not true that Jones personally and intentionally discharged a firearm in the course of the murder, the jury rejected either Biggins's and Simonton's testimony that Jones personally shot Bailey or at the very least their testimony indicating that the shooting was intentional. On the other hand, the jury appears to have relied in part on Biggins's testimony (which was consistent with Simonton's, as well as with Green's and Harrell's testimony about an armed man assaulting Green and Bailey) to conclude that Jones assaulted Green and Bailey with an assault pistol. The jury thus plainly understood that it could assess Biggins's credibility and reject any part of his testimony it did not believe was true.

Finally, evidence other than Biggins's testimony (as well as Simonton's) firmly supports Jones's convictions. Along with Green's and Harrell's testimony about the assaults, the evidence established that on the same day as the incident, Harrell specifically identified Jones from photo lineups as

68

one of the assailants who attacked Bailey and that Green provided a description of the gunman who approached his car that was consistent with Harrell's description and, apparently, with Jones's physical appearance. It also includes the particularly damning photographic evidence showing that on the night of the incident, Jones wore a Rocawear jacket matching the jacket police seized from Biggins's house that, as revealed by later testing, had Bailey's blood on it. It includes Moore's testimony that she brought some liquor to Jones at the Horseshoe the night of the incident and picked him, Molina and Kittles up on Nichols Street, where Biggins lived, shortly after the incident. Not only did Moore's testimony place Jones at the Horseshoe on the night of the crime and, later that night, at or near Biggins's house, it showed he lied to police by denying he was present at the Horseshoe at all in the hours before the incident and claiming he was at his girlfriend's house throughout that night. Likewise damning for Jones was his jail cell call instructing Molina to say he had not seen Jones on the day of the incident, which indicated he was concocting a false story.

In light of the other evidence against Jones and the absence of any dispute that Biggins testified falsely about the chain, the issue of whether Biggins committed perjury by *knowingly* misidentifying the seized neck chain as his own was of little consequence. The jury did not unqualifiedly accept all of Biggins's testimony; nor, given the ample other evidence against Jones, did it need to do so to convict him. We conclude, therefore, that any error by the trial court in instructing the jury about Biggins's possible perjury was harmless beyond a reasonable doubt.

### D. Jones's Claim That the Prosecutor Did Not Show He Acted Diligently to Obtain Biggins's Trial Testimony Lacks Merit.

Finally, Jones argues the prosecutor failed to meet his burden of showing he acted diligently to obtain Biggins's testimony at trial. Instead,

Jones contends, the prosecutor in bad faith charged Biggins with murder so as to deliberately render him unavailable to testify at trial, thereby preventing the jury from observing Biggins's poor demeanor and preventing the defense from cross-examining him, all in violation of Jones's Sixth Amendment right to confrontation. Specifically, Jones contends the prosecutor included a murder charge against Biggins that he knew he could not prove so that Biggins would invoke his Fifth Amendment right not to testify and the court would find him unavailable, enabling the prosecution to rely on Biggins's perjured preliminary hearing testimony alone to prove its case. Jones contends the prosecutor's bad faith is shown by his negotiated disposition of Biggins's case a few months after the trial in this case, which resulted in Biggins receiving only three years' probation for felony grand theft with a gang enhancement. Jones also cites the prosecutor's representations to Biggins's sentencing court that the People lacked sufficient evidence to try Biggins on the charges originally filed against him. We conclude Jones's claim lacks merit, particularly in light of the outcome of the trial in this case.

### 1. *Relevant Proceedings Below*

We have already discussed the events that occurred before and during the trial in this case regarding Biggins's testimony, as well as the jury's mixed verdicts.

In September 2014, about three months after the end of the trial in this case, the prosecution and Biggins agreed to a disposition of the separate criminal case brought against him. Biggins pleaded guilty to a new charge, felony grand theft (§ 487, subd. (c)),[20] and admitted to a gang enhancement

---

[20] Section 487, subdivision (c) provides that grand theft is committed "[w]hen the property is taken from the person of another."

allegation in return for dismissal of the originally filed charges, a suspended sentence and three years' probation. The parties stipulated there was a factual basis for his plea without citing any evidence. The court accepted this stipulation and Biggins's plea, agreed that the filed charges would be dismissed if he complied with certain conditions and found him guilty of grand theft.

At Biggins's sentencing hearing, the judge, who was not the judge who had accepted his plea, asked the prosecutor, who also prosecuted this case, "why the charges were reduced and the People are going to make this offer." The prosecutor responded:

"Your honor, this case dealt with four co-defendants that were arrested for the murder of Mr. Michael Bailey.

"Mr. Biggins was cooperating with the defense, with the police department, and myself during the investigation of this case.

"As we got closer to trial, Mr. Biggins had made several inconsistent statements, and on the eve of trial . . . we believe he made an inconsistent statement regarding the discovery of the victim's property in his residence.

"Based on that at that time we refused to give Mr. Biggins immunity and proceed[ed] with charging him as an accomplice in this murder.

"As we began to investigate the murder more and began to conduct a trial in which two co-defendants were convicted of the murder, and we did not call Mr. Biggins to testify in this case, arguments were made by the defense counsel regarding accomplice liability, and Mr. Biggins' role in this case that didn't support a theory of accomplice liability based on any evidence, except maybe the possession of the stolen property.

"And after speaking with the jury in that subsequent case they were of the opinion that they disregarded Mr. Biggins' testimony completely, not knowing whether or not it was truthful or false.

"And Mr. Biggins also provided a picture to myself from his defense counsel that showed a very similar necklace to the recovered necklace."

The court interrupted "to make a long story short" to say, "Essentially you did not have the evidence to go forward with the murder charge against this defendant" under a theory of accomplice liability, and so pursued the negotiated disposition. The prosecutor agreed that he had "proof issues" and said the negotiated disposition was a reasonable way to resolve the matter. He agreed with the court that, as the court put it, he was dismissing the original charges brought against Biggins "purely because the evidence didn't support a murder charge in this case[.]"

The court accepted the prosecutor's explanation. It sentenced Biggins to seven years in state prison, comprised of an upper term of three years for felony grand theft and four years for the gang enhancement, suspended imposition of sentence, placed Biggins on probation for three years, subject to certain terms and conditions, including 100 days in county jail, and awarded him the same number of days in custody credits. The court further ordered that, if Biggins successfully completed probation, his gang enhancement, a strike, would be stricken.

Several months later, in March 2015, Jones (as well as Molina)[21] moved for a new trial based in part on the argument that the prosecution had engaged in misconduct by wrongfully procuring Biggins's unavailability as a witness in the trial in the case and instead obtaining admission of his

---

[21] Molina has not argued prosecutorial misconduct in his appeal or joined Jones's appellate claim.

72

perjured preliminary hearing testimony. Jones emphasized that the prosecutor represented to the trial court in this case that he had adequate proof to charge Biggins for murder, thereby ensuring that Biggins would assert his Fifth Amendment right not to testify and be declared unavailable to testify, but that several months later the prosecutor represented to the sentencing court in Biggins's case that he lacked the evidence to try Biggins on the charges filed against him. To Jones, this indicated the prosecutor never had the evidence to charge or try Biggins for murder, since the evidence had not changed in the time between the prosecutor's representations to the two different courts. Molina made similar arguments in his new trial motion, and both their counsels argued the matter before the court.

The prosecutor who made all the representations about Biggins opposed these motions. He argued he had exercised his discretion to charge Biggins and decided later not to pursue those charges, both times acting in good faith. He contended he had met three times with Biggins before the trial in the present case to prepare him to testify but charged him, and denied him witness immunity, when Biggins changed his account about the seized neck chain based on the conclusion that Biggins had lied about the chain and been a more active participant in the incident than he had claimed.

The prosecutor also emphasized that the jury acquitted one defendant, Kittles, even though the prosecutor believed he had more evidence of her participation than of Biggins's and that the jury hung on charges against a second defendant, Lige, even though the prosecutor had presented physical evidence of his involvement (his fingerprint was found on a business card of Bailey's). He contended these decisions indicated "the jurors had their issues" with Simonton, who was "going to point the finger at Mr. Biggins

73

being an active participant." The jury's actions led the prosecution to reevaluate its case.

After hearing the remainder of the defense arguments for a new trial, the court denied Jones's and Molina's new trial motions. Among other things, the court found there was no prosecutorial misconduct.

## 2. *Analysis*

Jones's appeal regarding this claim is from the trial court's denial of those parts of his and Molina's motions for a new trial that argued the prosecutor had engaged in misconduct that violated their confrontation rights by deliberately rendering Biggins unavailable as a witness at trial. On appeal, Jones, relying on *Cromer, supra,* 24 Cal.4th 889 at page 901, argues we should conduct a de novo review of the court's ruling because it involves his confrontation clause rights and, relying on *People v. Sánchez (Edgardo)* (2016) 63 Cal.4th 411, 440 and *People v. Foy* (2016) 245 Cal.App.4th 328, 338, 339, that we should bear in mind that the *prosecutor* had the burden of proving below that (along with proving Biggins's unavailability, which is not in question) he undertook a good faith, reasonable effort to secure Biggins's attendance at trial.

The cases Jones relies on regarding the burden of proof in the trial court are inapposite. They involve appeals from trial court rulings admitting prior testimony of unavailable witnesses. In each case, the appellate court held either that the People showed due diligence in trying obtain the witness's live testimony (*Cromer, supra,* 24 Cal.4th at p. 893; *People v. Sánchez (Edgardo), supra*, 63 Cal.4th at pp. 440-448) or did not (*People v. Foy*, *supra,* 245 Cal.App.4th at pp. 340-341). At trial the People were the moving party seeking the admission of evidence, and it was in that context that they were required to show due diligence. Here, on the other hand,

74

*Jones* moved for a new trial based on alleged prosecutorial misconduct that he claimed violated his confrontation rights. As the moving party, Jones had the burden below of establishing that the prosecutor engaged in misconduct. (See *People v. Watts* (2018) 22 Cal.App.5th 102, 116-117 ["On a motion for a new trial, the defendant has the burden of showing both the ineffectiveness of counsel and the prejudice it caused"].)

Further, as this court recently noted, "We review a court's ruling on a motion for a new trial 'under a deferential abuse of discretion standard,' which, regarding a constitutional claim, means 'the asserted abuse of discretion is the asserted failure of the trial court to recognize violations of defendant's constitutional rights.' " (*People v. Ramirez Ruiz* (2020) 56 Cal.App.5th 809, 825.) Put differently, we review the denial of a motion for a new trial de novo when claimed errors of constitutional magnitude are involved (see *People v. Ault* (2004) 33 Cal.4th 1250, 1260-1262 [regarding defendant's constitutional right to a fully impartial jury]), but we defer to the trial court's express or implied findings if supported by substantial evidence. (*People v. Taylor* (1984) 162 Cal.App.3d 720, 724.) This standard of review is essentially the same as that stated in *Cromer*, the case Jones relies on for his assertion of de novo review. (See *Cromer*, *supra*, 24 Cal.4th at pp. 900-901 [outlining a two-step review in which the reviewing court "appl[ies] a deferential standard of review to the trial court's factual findings" and then conducts an independent review of a trial court's determination that the prosecution's efforts are sufficient to justify an exception to the defendant's confrontation rights at trial].)

With these principles in mind, we examine the merits of Jones's argument. His analysis is fatally flawed because it is based on the false premise that the prosecutor's agreement with Biggins's sentencing court that

75

he was dismissing the charges brought against Biggins "purely because the evidence didn't support a murder charge" shows the prosecutor charged Biggins in bad faith in the first place, since the evidence did not change between when the charges were filed in June 2014 and the sentencing hearing occurred in October 2014 in Biggins's case. Jones places too much reliance on the prosecutor's assent to the court's summary of his reasons for reducing the charges while ignoring the prosecutor's other statements and the context in which they were made. As the prosecutor later discussed with the trial court in opposing defendants' motions for a new trial in the present case (and alluded to before the Biggins sentencing court when he referred to the jury's disregard of Biggins's preliminary hearing testimony in this case), a highly significant event occurred between when the prosecutor filed the original charges against Biggins and when he agreed to the negotiated disposition of Biggins's case that caused him to reevaluate the strength of the evidence against Biggins: the jury in the present case returned a decidedly mixed set of verdicts regarding Jones, Molina, Kittles and Lige.

The jury acquitted Kittles altogether, acquitted and hung on the charges against Lige, and found not true that in committing the murder Jones personally and intentionally discharged a firearm causing great bodily injury and personally and intentionally discharged a firearm for the benefit of a criminal street gang or to promote criminal conduct by gang members which caused great bodily injury. As the prosecutor contended in opposing Jones's motion for a new trial, the jury's verdicts unquestionably indicated its discomfort with relying on Simonton's testimony (as well as Biggins's). The jury was not convinced of several factual contentions the prosecution made for which Simonton's testimony provided particularly important support, namely that Lige participated in the robbery (Simonton testified that Lige

76

participated in fighting with Bailey, later threw a "fake" necklace taken in the incident onto the roof of a building and went to the "Samoan's" house (meaning Biggins's) immediately after the incident), that Kittles also was involved (Simonton testified that she came to Biggins's house immediately afterwards as the group looked at what had been taken in the robbery) and that Jones shot Bailey dead (Simonton testified that he saw Jones shoot Bailey and later leave his jacket and gun with Biggins).

According to the prosecutor in opposing defendants' motions for a new trial, the jury's obvious discomfort caused him to reevaluate his ability to prove a robbery/murder case against Biggins. The prosecutor's assertion is supported by the record. No one presented evidence at the trial in this case that suggested Biggins was the shooter (the defense pointed at Simonton rather than Biggins, based on Simonton's apparent resemblance, like Jones, to the victims' description of the armed man who confronted them). The evidence other than Simonton's and Biggins's testimony suggested the robbers went together to Biggins's house immediately after the incident (as indicated by Moore's testimony that she picked up Jones, Molina and others on the street where Biggins lived soon after the incident) and indicated that Biggins kept Bailey's neck chain in his bedroom drawer. These post-robbery facts tend to show Biggins's involvement, but a jury might find them insufficient to establish beyond a reasonable doubt that Biggins *participated* in the robbery. To prove Biggins's involvement, the prosecutor could not necessarily rely on Biggins's prior testimony, since it was given in exchange for immunity. Moreover, Biggins did not directly implicate himself and there was evidence suggesting he believed the chain he retained was not the stolen one but a similar one he already owned. And Biggins's statements to police were many and varied and could have been portrayed, as they were in this

77

trial, as having been suggested by police and given under duress. Instead, the prosecutor would have needed to rely on Simonton, whose testimony placed Biggins at the scene of the crime. However, Simonton testified only that Biggins observed the incident from a nearby sidewalk and did not implicate him in the robberies or the murder. Further, as the prosecutor indicated, the jury apparently did not find Simonton's testimony credible in this case, as indicated by its rejection of his (and Biggins's) testimony that Jones was the shooter.

In short, there were legitimate reasons, arising after the prosecutor charged Biggins with murder and other crimes, for the prosecutor to become concerned he would be unable to prove Biggins participated in the robbery. Without being able to establish Biggins's participation in the robbery, the prosecutor would not be able to prove he was guilty of murder. The jury's verdict in the present case made the prosecutor aware that, as he told Biggins's sentencing court, he had "proof issues," i.e., that "the evidence did not support a murder charge."[22] The evidence supports the trial court's finding that the prosecutor acted in good faith when he charged Biggins with murder and other crimes and when he later decided to approve a plea agreement involving much less serious charges against Biggins.

Jones largely ignores the prosecutor's assertion in opposing the new trial motions below that the jury's discomfort with relying on Simonton's testimony was a significant reason he decided not to prosecute Biggins on the originally filed charges. Instead, Jones points out various confusing statements the prosecutor made to the sentencing court in Biggins's case

---

[22] For this reason, Jones's argument in his reply brief that the People violated section 1197, subdivision (a)(2), which authorizes a negotiated disposition of a serious felony charge only when there is insufficient evidence to support the charge, lacks merit.

when the court asked him the reasons for dismissing the original charges. For example, Jones contends that the prosecutor told the sentencing judge that his views of Biggins's case were affected by Biggins having cooperated with the defense (as well as the prosecution and the police) prior to the change in his account about the chain, but there is no indication in the record that Biggins cooperated with the defense. Jones asserts that the prosecutor's statements to the court that he was affected by further investigation of the murder made no sense, since Biggins was first charged after the prosecution already had investigated and prepared for trial for a period of five years. Jones also asserts that the prosecutor inexplicably referred to Biggins providing a photograph of his own, "very similar necklace" when Biggins provided this photograph before he was charged (apparently to criticize the prosecutor's decision to drop the perjury charge against Biggins as part of the negotiated disposition of his case). These statements may have been incorrect and/or not made much sense, but the trial court did not attribute them to deliberate, bad faith conduct on the part of the prosecutor, nor do we. In light of the verdict and what it indicated about the relative weakness of the evidence that remained available, these assertions are not grounds for holding there is insufficient evidence to support the trial court's finding.

Jones also relies on several cases, both within California and in other jurisdictions, that held a violation of confrontation or due process rights had occurred under various circumstances. None of these cases involved the circumstances present here, where the prosecutor provided a reasonable explanation for both his decision to charge Biggins and his later decision to dismiss those charges. (See *State v. Herrera* (1979) 286 Or. 349 [594 P.2d 823, 827-828] [prosecution failed to explain why it withdrew a witness's immunity to testify after the witness testified at a preliminary hearing];

79

*People v. Shapiro* (N.Y.App.Div.1980) 50 N.Y.2d 747 [409 N.E.2d 897, 902-905] [prosecutor's threats to charge exculpatory witnesses with perjury if they testified differently than before violated defendant's due process rights]; *People v. Robinson* (1983) 144 Cal.App.3d 962, 969-972 [prosecutor's threat that defense witness would be charged if she testified improperly deprived defendant of that witness, but was harmless]; *State v. Finley* (2000) 268 Kan. 557 [998 P.2d 95, 100-104] [prosecutor deprived defendant of his due process and fair trial rights by threatening to refile charges against defense witness that had been dropped in exchange for her agreement to testify, resulting in her refusal to testify]; *People v. Bryant* (1984) 157 Cal.App.3d 582, 587-594 [prosecutor's remarks to pending defense witness about present and possible future perjury charges against him, which led to witness refusing to testify, constituted government intimidation that violated defendant's constitutional right to call witnesses on his behalf].)  Therefore, these cases are inapposite.

Jones further argues that the fact that the robbery charges against Biggins were purportedly barred by the three-year statute of limitations on robbery is evidence of the prosecutor's bad faith.  Assuming for the sake of argument that Jones's assertion about the statute of limitations is correct, the prosecutor's inclusion of the robbery charges does not establish bad faith. First, as Jones concedes, Biggins could have waived the statute of limitations as part of a negotiated disposition of his case.  (*Cowan v. Superior Court* (1996) 14 Cal.4th 367, 372-373.)  Further, the prosecutor may have included the robbery charges because robbery is an element of the felony-murder doctrine even if it could not be separately prosecuted.  (*People v. Morris* (1988) 46 Cal.3d 1, 14 ["It is well settled that the statute of limitations applicable to the underlying felony is immaterial to the charge and conviction of felony murder"], disapproved on other grounds in *In re Sassounian* (1995)

9 Cal.4th 535, 543, fn. 5, 545, fn. 6; *People v. Garule* (2002) 28 Cal.4th 557, 638 [" '[t]he courts have long permitted felony-murder prosecutions notwithstanding the expiration of the felony statute of limitations for the simple reason that the prosecution is for murder, not for the underlying felony,' " quoting *Morris*, at p. 17].)

Finally, Jones argues that, given that the only legitimate charge against Biggins was perjury, the prosecution should have been required to provide him with immunity so that he could testify at trial. He relies primarily on dicta in *Garner* that the "truly preferable approach" is to condition a prosecution's request to introduce perjured preliminary hearing testimony upon the prosecution's granting the witness immunity to testify. (*Garner, supra*, 207 Cal.App.3d at p. 941.) We have already rejected this argument. (See footnote 15, *ante,* pages 55-56.) Further, we have already concluded that substantial evidence supports the trial court's finding that in filing the murder and robbery charges against Biggins the prosecutor did not act in bad faith. For this reason, we need not address Jones's argument that the prosecutor's misconduct was prejudicial.

## II.

### *Defendants' First Degree Murder Convictions Must Be Vacated Under Section 189 As Amended and Retroactively Applied to Their Cases.*

Defendants next argue that we must vacate their first degree murder convictions for multiple reasons. As we will explain, we agree that these convictions must be vacated because of the Legislature's post-trial amendments of the felony-murder doctrine outlined in section 189, which apply retroactively to defendants' cases.

After defendants' trial, the Legislature passed Senate Bill No. 1437, which became effective January 1, 2019 (*People v. Lewis* (2021) 11 Cal.5th 952, 959 (*Lewis*). Senate Bill No. 1437 amended sections 188 and 189 to,

81

among other things, incorporate the elements of the felony murder special circumstance in section 190.2, subdivision (e) into the crime of felony murder. (See §§ 189, subd. (e), 190.2, subd. (d).) As amended, section 189 allows imposition of first degree murder liability under a felony murder theory only on the actual killer and on persons who are not the actual killer but who either (1) aided and abetted, with the intent to kill, murder in the first degree[23] or (2) were major participants in the underlying felony and acted with reckless indifference to human life. (§ 189, subds. (a), (e).) It prohibits the imputation of malice to a person based solely on his participation in a crime. (Stats. 2018, ch. 1015, § 1, subd. (f); §§ 188, subd. (a)(3), 189, subds. (a), (e).) As a result of the amendments, murder liability can no longer be imposed on a non-killer under the natural and probable consequences doctrine at all and can only be imposed under the felony-murder doctrine in limited circumstances. (*Lewis*, at p. 957.)

Senate Bill No. 1437 also added section 1170.95 to the Penal Code (Stats. 2018, ch. 1015, § 4), which provides that a person who has been convicted of first degree murder under the natural and probable consequences or felony-murder doctrines can petition the superior court for resentencing. In *People v. Gentile* (2020) 10 Cal.5th 830 at pages 852 to 859, our Supreme Court held this petition procedure was the exclusive remedy for those previously convicted of first degree murder, including those whose convictions had not yet become final when Senate Bill No. 1437 was enacted. However, *Gentile* was superseded when Senate Bill No. 775 took effect on January 1, 2022. It provides that a defendant whose conviction has not yet

---

[23] Specifically, a person who "was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree." (§ 189, subd. (e)(2).)

become final *may* challenge on direct appeal the validity of a murder conviction under sections 188 and 189, as amended by Senate Bill No. 1437, without first petitioning the superior court.[24] (Stats. 2021, ch. 551, § 2(g); § 1170.95, subd. (g).) After the Governor signed Senate Bill No. 775 in October 2021, we allowed defendants to file supplemental briefing regarding the impact of section 189, as amended by Senate Bill No. 1437, on their appeals.

In their supplemental briefing, defendants argue that: (1) the jury may have convicted them of first degree murder based on the natural and probable consequences doctrine and, if not, based on the felony-murder doctrine, (2) the legislative amendments of sections 188 and 189 apply retroactively to their cases under *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), (3) these amendments require reversal of their convictions, and (4) their constitutional protections against double jeopardy bar the prosecution from retrying them for murder.

The People respond that defendants were convicted under the felony-murder doctrine and that, while the instructions given were erroneous in light of the retroactive application of the legislative amendments, the error was harmless given the evidence and the jury's verdicts. Therefore, we should affirm the convictions.

We agree that the legislative amendments to sections 188 and 189 apply retroactively to defendants' cases under *Estrada*. Newly enacted legislation lessening criminal punishment or reducing criminal liability

---

[24] Subdivision (g) of section 1170.95 now states: "A person convicted of murder, attempted murder, or manslaughter whose conviction is not final may challenge on direct appeal the validity of that conviction based on the changes made to Sections 188 and 189 by Senate Bill [No.] 1437 (Chapter 1015 of the Statutes of 2018)."

presumptively applies to all cases not yet final on appeal at the time of the legislation's effective date. (*Estrada, supra,* 63 Cal.2d at pp. 744-745.) This presumption "rests on an inference that, in the absence of contrary indications, a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not." (*People v. Conley* (2016) 63 Cal.4th 646, 657; see *People v. Frahs* (2020) 9 Cal.5th 618, 628-629; *Estrada*, at p. 745; *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 308-309 [applying *Estrada* rule and concluding Proposition 57 applied retroactively because it was an ameliorative change to the criminal law and nothing in the law rebutted inference of intent to extend the benefit as broadly as possible].) There are no indications that the Legislature intended to prevent the retroactive application of Senate Bill No. 1437 or Senate Bill No. 775 to cases pending on appeal when they were enacted, and the People do not contend otherwise. On the contrary, the latter senate bill makes plain the Legislature's intent that the former senate bill would be fully retroactive. Therefore, we apply Senate Bill No. 1437 to defendants' cases.

We reject defendants' contentions that the jury convicted them of first degree murder under the natural and probable consequences doctrine. [25] We agree, however, that the jury likely convicted them under a felony-murder doctrine that, upon retroactive application of the legislative amendments to

---

[25] We need not address defendants' additional claim that they were improperly convicted of first degree murder under the natural and probable consequences doctrine in violation of *People v. Chiu* (2014) 59 Cal.4th 155 because our Supreme Court has concluded the more recent legislative changes contained in Senate Bill No. 1437 supersede *Chiu*. (*People v. Gentile, supra,* 10 Cal.5th at pp. 847-849.)

sections 188 and 189, was not legally valid.  We further conclude this erroneous instruction prejudiced defendants, requiring vacatur of their convictions.  We also conclude that the prosecution is not barred from retrying defendants for murder.

## A. The Legislature's Elimination of Murder Liability Under the Natural and Probable Consequences Doctrine Does Not Require Reversal.

Defendants first contend that the jury may have convicted them of first degree murder based on the natural and probable consequences doctrine and that, since Senate Bill No. 1437 eliminated murder liability under this doctrine altogether, we must reverse their convictions.  We disagree.  The trial court instructed the jury that it could convict them of murder under the natural and probable consequences doctrine,[26] but it did not instruct that such a murder was murder of the *first degree*.  The court's basic malice murder instruction informed the jury that, if it decided a defendant committed murder, "it is murder of the second degree, unless the People have proved beyond a reasonable doubt that it is murder of the first degree."  The two instructions that allowed the jury to find a defendant guilty of first

---

[26] Specifically, using former CALCRIM No. 402, the court told the jury that the defendants were charged with three counts of robbery (against Bailey, Green and Harrell) and one count of murder.  It instructed that, if the jury found a defendant guilty of robbery, it should also decide if he or she was guilty of murder under the theory that, "[u]nder certain circumstances, a person who is guilty of one crime may also be guilty of other crimes that were committed at the same time."  Similarly, using both former CALCRIM No. 402 and former CALCRIM No. 417, the court instructed that the jury could find a defendant guilty of murder under the natural and probable consequences instruction if (1) he was guilty of robbery, (2) during the commission of robbery or to further the conspiracy, a co-participant in the robbery committed the crime of murder and (3) murder was a natural and probable consequence of the commission of the robbery.

degree murder required the People to prove the elements of either premeditated murder or felony murder. Neither implicated the natural and probable consequences doctrine.[27]

Thus, even though the jury was erroneously instructed that it could convict the defendants of murder under the natural and probable consequences doctrine, the error does not require reversal because the court's natural and probable consequences instructions did not permit the jury to find defendants guilty of *first degree* murder, the charge for which the jury found defendants guilty. The court's instructions permitted the jury to find first degree murder only for premeditated murder or felony murder. "We presume jurors follow a court's instructions." (*People v. Johnson* (2022) 12 Cal.5th 544, 632.) Defendants give us no reason to conclude otherwise.

Defendants posit that they could have been convicted of first degree murder based on the natural and probable consequences doctrine, asserting factual bases on which they claim the jury might have done so. The problem with all of these theories is that they ignore the verdict finding them guilty of first degree murder and the instructions limiting first degree murder to premeditated murder and felony murder.[28]

---

[27] Indeed, the felony murder instruction stated that "[a] person may be guilty of felony murder even if the killing was unintentional, accidental or negligent," a much broader parameter than a killing done as a natural and probable consequence of another act.

[28] For example, defendants contend the jury could have found them guilty of first degree murder based on the court's natural and probable consequence instruction by finding that they participated in a robbery and assault, the natural and probable consequence of which was murder. Molina further contends the jury could have found he only wanted to "humiliate" the men who gave Kittles a ride and walked away from the Horseshoe area before the robbery occurred.

Molina also argues that the jury's finding that the firearm enhancements alleged against him were not true suggests it found him guilty of murder based on the natural and probable consequences doctrine. We cannot readily explain the jury's finding not true as to Molina, but true as to Jones, that a principal was personally armed with and personally used a firearm in connection with the incident. Defendants were charged with, and found guilty of, first degree murder, conspiracy to commit robbery, and robbery regarding the same incident and the evidence unequivocally showed Bailey died from gunshot wounds. But we need not explain the inconsistencies to resolve the issues raised by defendants. (See *People v. Carbajal* (2013) 56 Cal.4th 521, 533 [" 'The system accepts the possibility that "the jury arrived at an inconsistent conclusion through 'mistake, compromise, or lenity' " ' "]; *People v. Gonzalez* (2018) 5 Cal.5th 186, 207 ["[w]here a jury's findings are irreconcilable, we normally attribute such tensions to compromise, lenity, or mistake, and give effect to all of the jury's findings"].)

Molina also contends that the jury could have improperly convicted him of first degree murder under the natural and probable consequences doctrine based on the felony murder instructions, which permitted conviction of defendants who were accomplices to a robbery or participated in a conspiracy to rob in which one of the perpetrators causes a death to occur. Molina is incorrect. He conflates the felony murder instructions with a natural and probable consequences instruction. The trial court's felony murder instructions nowhere refer to or require any finding of "natural and probable consequences"; nor did they need to. (*People v. Escobar* (1996) 48 Cal.App.4th 999, 1020 [felony-murder doctrine has "no requirement that killings which occur during the perpetration of a felony be a natural and probable consequence of the felony aided and abetted"], abrogated on another point in

*People v. Mendoza* (2000) 23 Cal.4th 896, 911.)  Prior to Senate Bill No. 1437, felony murder encompassed "a variety of unintended homicides" and "condemn[ed] alike consequences that are highly probable, conceivably possible, or wholly unforeseeable."  (*People v. Dillon* (1983) 34 Cal.3d 441, 477, overruled on another point in *People v. Chun* (2009) 45 Cal.4th 1172, 1185-1188.)  Here, consistent with the law at the time, the felony murder instruction required only that the defendant be an accomplice to, or part of a conspiracy to commit, robbery and that a death occur in the commission of that offense.[29]

In short, because of the retroactive application of Senate Bill No. 1437, the trial court's instructions that the jury could convict defendants of murder under the natural and probable consequences doctrine were erroneous.  However, the jury could not and did not rely on this theory to convict defendants of first degree murder, and the error was thus harmless under any standard.  Defendants' contentions to the contrary are without merit.

## B. The Legislature's Amendments to Section 189 Render the Trial Court's Felony-Murder Instruction Incomplete.

Defendants further argue that, should we conclude they were convicted under the felony-murder doctrine, the Legislature's amendments to

---

[29] As we will discuss, since Senate Bill No. 1437's adoption, more is required to convict a defendant of felony murder, and for this reason the case must be remanded for a new trial.  Under the law as amended, felony murder can be a basis for a first degree murder conviction of a robbery participant only if the person (1) was the actual killer, (2) with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree, or (3) was a major participant in the robbery who acted with reckless indifference to human life. (*Lewis*, *supra,* 11 Cal.5th at p. 957; §§ 188, 189.)  But the amendments to the felony murder law, which we will address in greater detail below, present an issue distinct from the natural and probable consequences doctrine.

section 189 require vacatur of their convictions. We agree. Although the trial court also instructed the jury that it could convict defendants of first degree murder if the murder was willful, deliberate and premeditated—a valid legal theory—the People do not contend, and we have no reason to conclude, that the jury convicted defendants under that theory. Rather, the record indicates that the jury convicted defendants under an invalid legal theory—the trial court's felony murder instructions—because, given the retroactive application of the Legislature's amendments to section 189, those instructions were incomplete. This error was prejudicial to defendants, requiring vacatur of their first degree murder convictions.

### 1. *The Trial Court's First Degree Murder Instructions*

The trial court instructed the jury that it could find defendants guilty of first degree murder under two theories. First, under CALCRIM No. 521, it could find them guilty if the People proved they acted "willfully, deliberately, and with premeditation" to commit a murder; otherwise, "the murder [was] second degree murder."

Second, the jury was instructed it could convict defendants of first degree murder under the felony-murder doctrine. Specifically, the jury was told it could convict Jones under CALCRIM No. 540A if he "committed robbery" intentionally and, "[w]hile committing the robbery, . . . caused the death of another person." Under CALCRIM No. 540B, the jury was further told it could find *any* defendant guilty of first degree murder if he or she aided and abetted the "perpetrator" of "the act that resulted in the death," and the prosecution proved that: (1) "[the defendant] committed, attempted to commit, aided and abetted or was a member of a conspiracy to commit robbery"; (2) "[h]e or she intended to commit or intended to aid and abet the perpetrator in committing or intended that one or more of the members of the

89

conspiracy commit robbery"; (3) "[i]f the defendant did not personally commit or attempt to commit robbery, then a perpetrator, whom the defendant was aiding and abetting or with whom the defendant conspired, personally committed or attempted to commit robbery"; and (4) "[w]hile committing or attempting to commit robbery, the perpetrator caused the death of another person."[30]

Third, the general murder instruction, CALCRIM No. 520, as revised later by the court in response to a question by the jury during its deliberations (additions indicated by brackets), stated, "If you decide the defendant committed murder, it is murder of the second degree, unless the People have proved beyond a reasonable doubt that it is murder of the first degree as defined in [either] CALCRIM number 521 [and/or 540(a) and/or 540(b)"].

### 2. *We Review the Effect of the Court's Incomplete Instruction Under the Chapman Prejudice Standard.*

When the court instructs the jury on two theories of potential criminal liability, one of which is legally valid and the other legally invalid, we must determine whether the error—meaning the legally invalid instruction—was harmless beyond a reasonable doubt. (*People v. Aledamat* (2019) 8 Cal.5th 1, 12-13.) To assess this, we consider whether the evidence supported either theory and whether there are indicia in the record indicating that the jury based its verdict on one or the other. (*Ibid.*) We must reverse unless it appears beyond a reasonable doubt that the error did not contribute to the verdict. (*Id.* at p. 13 [when legally valid and legally invalid theories are

---

[30] In both of these felony murder instructions, the court told the jury to refer to the court's separate instructions on robbery, aiding and abetting and conspiracy.

presented to a jury, "[t]he reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt"].)

Here, the trial court gave the jury a legally valid theory—premeditated murder—and a legally invalid theory—felony murder—upon which the jury could rely to convict defendants of first degree murder. If we conclude beyond a reasonable doubt that the jury convicted defendants under the premeditated murder theory, the court's invalid felony murder instruction, obviously, would be harmless. Therefore, we address this issue first.

### 3. *We Cannot Conclude Beyond a Reasonable Doubt That the Jury Convicted Defendants of Premeditated Murder.*

The evidence and jury verdicts here indicate that the jury convicted defendants of first degree murder under a felony murder theory rather than a premeditated murder theory.

It is telling that the People do not argue on appeal that the jury relied on a premeditated murder theory. It is even more telling that in closing arguments, the prosecutor did not argue that the jury should convict Jones or Molina of first degree murder under a premeditated murder theory, instead focusing entirely on a felony murder theory. The jury had been instructed that premeditated murder required not only that the killing was premeditated, meaning the defendant "decided to kill before completing the acts that caused death" but also that the defendant "acted deliberately," meaning he "carefully weighed the considerations for and against his or her choice and, knowing the consequences, decided to kill." The prosecutor's failure to argue for conviction under these instructions indicates he did not believe the evidence supported a premeditated murder theory.

91

And indeed, the evidence does not.  It indicates that the entire incident, from the time the three victims arrived in their car until they drove away, lasted only seven minutes.  This includes the car arriving at the Horseshoe, Kittles's last conversation with Bailey and her exit from the car, and the men approaching the car, talking to the victims, robbing them and looking for other valuables in the car, ordering them out of the car, looking on their persons for additional items to take, attempting to get them down on the ground, attempting to take their clothes, fighting with them, and after the shooting, fleeing as Green and Harrell carried Bailey to the car, put him in it, got in themselves and drove away.

The evidence further indicates that the sequence of events immediately around the shooting, at most, lasted a few minutes, and there is no evidence that this sequence was planned.  It involved a gunman fighting with a resistant Bailey over the gun and holding a gun to Bailey's head, others in the vicinity urging the gunman to kill Bailey, Bailey backing up and falling to the ground, attempting to get up, the gunman shooting Bailey in the side or abdomen, Bailey trying to get up a second time and the gunman shooting him again, twice.

This evidence does not suggest premeditated murder, which requires proof beyond a reasonable doubt of both deliberation and premeditation. " ' "Deliberation" refers to careful weighing of considerations in forming a course of action; ' "premeditation" means thought over in advance.  [Citations.]' [Citation.]  "Premeditation and deliberation can occur in a brief interval.  'The test is not time, but reflection.  "Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." ' " ' " (*People v. Solomon* (2010) 49 Cal.4th 792, 812.)  Thus, it is legally possible for a jury to find a murder that occurred in a matter of a few minutes was nonetheless premeditated.  Nonetheless, here there is virtually no evidence that Molina

or Jones acted with premeditation, and certainly none beyond a reasonable doubt.  For example, there is no evidence that the perpetrators had any plan to kill the men upon robbing them.  The jury found "not true" that Jones personally and intentionally discharged a firearm in connection with the murder, and there was no evidence that Molina was the shooter.  Further, the shooter only shot Bailey, the one victim who tried to take the shooter's gun and repeatedly resisted the demand to get down on the ground.  The shooter fired the fatal shot only when Bailey persisted in getting back up off the ground even after being shot once and sustaining a non-fatal wound.

The jury conceivably might have thought other perpetrators of the robberies acted as aiders and abettors in Bailey's shooting by urging the shooter to "take [Bailey] out" when he put a gun to Bailey's head during their fight.  It might have thought these perpetrators could have included Molina and/or Jones, although no evidence identifies the specific participants who urged the killing.  But the evidence indicates the  comments were made in the heat of the moment, in the excitement caused by the unplanned fighting between Bailey and the shooter.  Thus, even if  Molina and Jones had urged the gunman to shoot Bailey,  that would not establish premeditation.[31]

Further, even assuming arguendo that the jury could have found premeditation, the evidence does not support a finding that the killing was deliberate—that the shooter or any arguable accomplices "carefully weighed the considerations for and against his or her choice, and knowing the consequences, decided to kill," as required by the court's premeditated

---

[31]  An aider and abettor can only be convicted of first degree murder if he or she "acted willfully, deliberately, and with premeditation, having formed his own culpable intent.  Such an aider and abettor, then, acts with the mens rea required for first degree murder." (*People v. Chiu, supra,* 59 Cal.4th at p. 166.)

murder instruction. Again, the sequence of events suggests the opposite—that any decision to kill was made reactively, "rashly, impulsively, or without careful consideration," as the instruction states. (See *People v. Thomas* (1945) 25 Cal.2d 880, 901 ["The word 'deliberate' is an antonym of 'Hasty, impetuous, rash, impulsive' "]; *People v. Brooks* (2017) 3 Cal.5th 1, 58 [" 'the express requirement for a concurrence of deliberation and premeditation excludes from murder of the first degree those homicides . . . which are the result of mere unconsidered or rash impulse hastily executed' "].)

Specifically, the evidence, particularly the testimony of Green and Harrell, indicates that Bailey fought with some of the perpetrators and got the better of one of them, and then attempted to take the gun from the shooter. According to Green, at some point, the shooter pointed the gun at Bailey's head and ordered him to get down on the ground, while the men Bailey had fought with moved away and, with others, said, " 'Take him out. Fuck it. Shoot him. Take him out.' " But the shooter did not shoot Bailey at that point. Instead, Bailey backed up and fell backwards. It was only as he tried to get back up again that the gunman first shot him, and that first shot was to his flank or abdomen. Only after, having thus been wounded, Bailey again tried to stand up did the gunman shoot him two more times (including the shot to the head that killed him). Further, the gunman did not shoot Bailey's companions; he and his accomplices fled and the robbery victims left in their car, taking the dying Bailey with them. This sequence of events suggests that any decision to kill was made quickly and hastily by the shooter in response to Bailey's resistance to staying down on the ground. Nothing about the circumstances indicates this was a calculated decision to kill made after any reflection.

Finally, the evidence and the jury's verdicts indicate it *did* conclude the evidence met the required elements of felony murder in effect at the time. The jury concluded that defendants participated in a conspiracy to rob, and in the armed robberies of, Bailey, Green and Harrell, and the evidence indicates that Bailey was murdered, albeit not necessarily by Jones or Molina, in the commission of those crimes. These conclusions are supported by evidence showing that Molina encouraged his girlfriend, Kittles, to direct the three men to the Horseshoe, where a group, which included Jones and Molina, immediately commenced to rob them at gunpoint. As we have already described, the perpetrators searched the three men for phones, jewelry and other valuables and rummaged through their car as the men were ordered to get out of the car and to lie down on the ground. The violence escalated after Bailey refused to stay down and instead fought with the gunman and others, struggled for control of the gun and was then shot. The group immediately dispersed and, according to Biggins and Simonton, and as strongly suggested by Moore's testimony, they along with Jones, Molina and others retreated to Biggins's home. There, according to Biggins and/or Simonton, they displayed the stolen loot, and Jones acknowledged shooting Bailey and left his gun and Rocawear jacket with Biggins for safe keeping. This evidence strongly supports a finding that Bailey was murdered while defendants were engaged in robbery.

Further indicating the jury relied on felony murder to convict defendants is the jury's question to the court, late in its deliberations, about the role of section 189 (the felony murder statute) in the murder charges, and the court's response that first degree murder could be found under the felony-murder doctrine. This interchange indicates the jury was focused on felony murder.

Thus, considering the evidence, verdicts and other relevant circumstances, we cannot conclude beyond a reasonable doubt that the jury relied on a premeditated murder theory rather than a felony murder theory in reaching its first degree murder verdict.  We now turn to the felony murder instructions themselves.

**4.** ***The Court's Felony-Murder Instructions Do Not Include the Elements Later Added to Section 189 and, Retroactively Applying the Amended Statute, Are Erroneous.***

The trial court's felony murder instructions under CALCRIM No. 540A and CALCRIM No. 540B are consistent with the former version of section 189 that was in effect at the time of defendants' trial.  Former section 189 stated in relevant part, "All murder . . . which is committed in the perpetration of, or attempt to perpetrate . . . robbery . . . is murder of the first degree." (Stats. 2018, ch. 423, § 42.)  In its instructions, the court did not include the elements required to prove felony murder under section 189 as subsequently amended by Senate Bill No. 1437 because those amendments had not yet been enacted.  Section 189 as thus amended applies retroactively to defendants' cases and, as a result of the passage of Senate Bill No. 775, can be raised in a direct appeal.  (§ 1170.95, subd. (g).)  These elements, contained in a newly created section 189, subdivision (e) (Stats. 2018, ch. 1015, § 3), are as follows:

"(e)  A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) [robbery, et cetera] in which a death occurs is liable for murder only if one of the following is proven:

"(1)  The person was the actual killer.

"(2)  The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree.

96

"(3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."[32]

### C. Given the Retroactive Application of the Elements Later Added to Section 189, the Court's Instructions on the Felony-Murder Doctrine Are Incomplete and Require Vacatur of Defendants' Murder Convictions.

Both the People and defendants agree that, if we conclude the trial court's felony murder instructions were incomplete, we should undertake a harmless error analysis under the federal standard for constitutional error established in *Chapman*, *supra*, 386 U.S. 18 at page 24. We agree. (See *People v. Mil* (2012) 53 Cal.4th 400, 409, 415, 417 (*Mil*) [applying *Chapman* harmless error standard to determine whether failure to instruct on reckless disregard requirement for special circumstance required reversal]; *People v. Merritt* (2017) 2 Cal.5th 819, 827 (*Merritt*) [incursion on right to jury trial occurs whether instruction omits one element or multiple elements of offense and requires harmless error analysis].) We must determine whether, if the omitted elements had been included in the instructions, we can conclude beyond a reasonable doubt that the jury would have reached the same verdict on defendants' felony murder convictions. (*Mil*, at p. 417.) " 'If other aspects of the verdict or the evidence leave no reasonable doubt that the jury made the findings necessary for [major participation and reckless indifference to human life], the erroneous felony-murder instruction was harmless.' " (*People v. Aledamat*, *supra*, 8 Cal.5th at p. 10, quoting *People v. Chun*, *supra*,

---

[32] The court told the jury it could find Jones guilty of felony murder if he "caused" Bailey's death under CALCRIM No. 540A, but the court did not instruct the jury to find Jones was the actual killer or acted with an intent to kill in doing so.

45 Cal.4th at pp. 1204-1205.)[33]  In other words, we must determine whether the verdict in defendants' trial " 'was surely unattributable to the error.' " (*People v. Harris* (2004) 9 Cal.4th 407, 440.)

Undertaking a *Chapman* harmless error analysis here, we conclude that the erroneous felony murder instructions resulted in prejudice to both defendants, requiring that we vacate their murder convictions.  The admissible evidence presented at their trial is not strong enough for us to conclude beyond a reasonable doubt that the jury would have found Molina or Jones guilty of first degree murder under a proper instruction that included the felony murder elements later added to section 189 by Senate Bill No. 1437.

---

[33]  There are appellate decisions addressing circumstances in which the erroneous omission of elements from an instruction resulted from legislation that added new elements to an offense after the defendant was convicted but before the conviction was final.  (*People v. Figueroa* (1993) 20 Cal.App.4th 65, 69 (*Figueroa*); *People v. Ramos* (2016) 244 Cal.App.4th 99, 102-103 (*Ramos*).) In both cases, the courts held the defendant was entitled to retroactive application of the ameliorative legislation and remanded the case for a retrial.  (*Figueroa*, at pp. 69-70, 71; *Ramos*, at pp. 103, 105.)  The court in *Figueroa* did not address whether harmless error analysis should be applied, neither party apparently having raised it.  (See *id.* at p. 71.)  The court in *Ramos* applied the harmless error analysis under *Chapman*, concluded the omission was not harmless beyond a reasonable doubt, and remanded for possible retrial.  (*Ramos*, at pp. 103-104, 105.)  The *Ramos* court, in part based on *Figueroa*, questioned whether it was "proper to assess the problem under the harmless error rubric."  (*Ramos,* at pp. 103-104.)  However, it did not discuss the California Supreme Court's decisions in *Mil* and *Merritt* or provide any analysis of whether or why the omission from instructions of elements to a crime should be treated differently where the omission was erroneous at the time of trial or became erroneous because of a subsequent change in the law.  We see no reason to treat the omission of elements from an instruction differently based on whether the error was made at trial or the result of a retroactive application of a subsequent change in the law, and the parties do not suggest any.  We therefore follow the rule of *Mil* and *Merritt* and apply the *Chapman* standard here.

## 1. *The Relevant Instructions*

As we have discussed, the jury was not properly instructed because the felony murder instruction it was given did not indicate that, as the amended section 189 requires, a defendant who participates in a robbery in which a death occurs is liable for first degree murder *only* if it is proven that (1) the defendant was the actual killer; (2) the defendant, if not the actual killer, "with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree"; or (3) the defendant "was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e)(1)-(3).) Therefore, we must determine whether the record indicates beyond a reasonable doubt that the jury, if properly instructed, would have found any of these alternative elements were met.

Section 189, subdivision (e)(3), which allows imposition of first degree murder liability on a non-killer who, as a major participant in a robbery in which a person was killed, acted with reckless indifference to human life, is modeled after, and incorporates, section 190.2. Section 190.2 is the special circumstance statute that authorizes the imposition of death or imprisonment in state prison for life for "every person, not the actual killer, who, with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony [such as robbery] . . . "which results in the death of some person or persons, and who is found guilty of murder in the first degree." (§ 190.2, subds. (d), (a)(17)(A).)

As we have discussed, in the murder count brought against Jones (count I), the People alleged as special circumstance allegations under

99

section 190.2, subdivision (a)(17) that Jones did an act that caused the death of Bailey while engaging in the commission of a robbery and, under section 190.2, subdivision (a)(22), that he murdered Bailey as a member of a criminal street gang to further the activities of the gang. The jury decided these allegations were not true. The jury was *not* instructed under section 190.2, subdivision (d) to determine whether, if it did not find Jones was the actual killer, he was a major participant in a robbery in which a person was killed and acted with reckless indifference to human life. At the time of trial, these were the elements of the special circumstance for non-killers but were not elements of what became the crime of felony murder itself. (See Stats. 1998, ch. 629, § 2 [§ 190.2, subds. (a)(17), (b)-(d)]; *People v. Price* (2021) 71 Cal.App.5th 1128, 1139, 1142-1143, review granted, (2022) 504 P.3d 259.) No special circumstance allegation under section 190.2 was made against Molina.

We cannot say that the guilty verdict as to Jones actually rendered in *this* trial "was surely unattributable to" the omission of the new elements of felony murder in section 189, subdivision (e). The jury's rejection of allegations that Jones personally and intentionally discharged his firearm during the incident indicates it rejected the prosecution's contention that he was Bailey's actual killer,[34] and there is no evidence that Molina was Bailey's

---

[34] As we have discussed, theoretically, the jury also could have rejected the firearm allegations if it concluded that Jones was the shooter but discharged the firearm unintentionally at Bailey. However, no rational juror could reach this conclusion based on the evidence. In particular, Green testified that, after Bailey fell back in the midst of fight with the shooter that included the shooter putting a gun to Bailey's head, Bailey tried to get up and the shooter fired one shot at him, hitting him in the side or abdomen. Only when Bailey continued his efforts to get up did the shooter fire two more shots, including a fatal shot to Bailey's head.

actual killer either.  The only evidence that Jones or Molina, acting with the intent to kill, aided and abetted another participant in committing the first degree murder of Bailey was that some or all of the non-shooters in the group urged the gunman to kill Bailey while he was pointing the gun at Bailey's head.[35]  We cannot say with any degree of certainty based on that evidence that the jury in this case, if instructed under the current statute, would have found defendants were non-killers but harbored the intent to kill.  Therefore, we focus on the third alternative basis for conviction of felony murder under the current murder statute.  The question we will address is whether under *Chapman* the trial record indicates beyond a reasonable doubt that the jury, if properly instructed, would have found that either Jones or Molina was a major participant in a robbery in which Bailey was killed and acted with reckless indifference of human life.

### 2. *Relevant Factors*

Not surprisingly, we have not found any appellate decisions addressing whether the failure to instruct under section 189 as amended by Senate Bill No. 1437 and retroactively applied was prejudicial because a defendant's right to raise such an issue on direct appeal only became effective as of January 1, 2022.  Therefore, we turn to case law discussing these same elements under section 190.2 for guidance.  (See *People v. Price, supra,* 71 Cal.App.5th at p. 1143 [Senate Bill No. 1437 "limited felony-murder liability to murders that fall within the felony-murder special-circumstances provisions of section 190.2"], review granted (Feb. 9, 2022, S272572); *In re Taylor* (2019) 34 Cal.App.5th 543, 561 [standard under § 189, subd. (e)(3) for

---

[35] Aiding and abetting can consist of words as well as acts, and includes promoting, encouraging and instigating a crime.  (See CALCRIM No. 401.)

holding defendant liable for felony murder is same standard for finding a special circumstance under § 190.2, subd. (d), as the former provision expressly incorporates the latter].)

Our Supreme Court has interpreted the "major participant" and "reckless indifference to human life" elements in section 190.2 in two cases, *People v. Banks* (2015) 61 Cal.4th 788, 798, 805-811 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522, 608-623 (*Clark*). In those cases, the court outlined a series of factors that appellate courts have since considered regarding these two elements, which it acknowledged often overlap, in reviewing defendants' substantial evidence challenges to juries' section 190.2 findings. (*Banks*, at pp. 803, 805-811; *Clark*, at pp. 615, 618-623.) Here we employ a harmless error rather than a substantial evidence standard of review. Nonetheless, we review these factors because they are relevant to our determination of whether we can conclude, beyond a reasonable doubt, that the jury, if properly instructed on the current felony-murder doctrine, would have concluded Molina and/or Jones were major participants in a robbery who acted with reckless indifference to human life.

The *Banks* court instructed regarding whether a defendant was a "major participant" in the underlying felony that "a defendant's personal involvement must be substantial, greater than the actions of an ordinary aider and abettor to an ordinary felony murder." (*Banks*, *supra*, 61 Cal.4th at p. 802.) The court rejected the argument that participation in planning with the intent of facilitating a felony's commission or in conduct integral to its commission alone constituted major participation because this "would sweep in essentially every felony murderer . . . whether an actual killer or not." (*Id.* at p. 803.) The court outlined several factors to consider instead. "What role did the defendant have in planning the criminal enterprise that led to one or

102

more deaths?  What role did the defendant have in supplying or using lethal weapons?  What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?  Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?  What did the defendant do after lethal force was used?  No one of these considerations is necessary, nor is any one of them necessarily sufficient.  All may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major.' " (*Id*. at p. 803, fn. omitted.)

The *Banks* court held that the "reckless indifference to human life" element required that the defendant "be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create." (*Banks*, *supra*, 61 Cal.4th at p. 801.)  The *Clark* court noted that our United States Supreme Court has provided "some indication" in related cases that preceded, and led to, *Banks* and *Clark* that "reckless indifference" "encompasses a willingness to kill (or assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Clark*, *supra*, 63 Cal.4th at pp. 616-617.)[36]

The *Clark* court further addressed the "reckless indifference" element. (*Clark*, *supra*, 63 Cal.4th at pp. 618-623.)  As later summarized by an appellate court, it outlined certain factors to consider, such as a "defendant's

---

[36] See *Tison v. Arizona* (1987) 481 U.S. 137 and *Enmund v. Florida* (1982) 458 U.S. 782.

knowledge of weapons used in the crime, and their actual use and number; [the] defendant's proximity to the crime and opportunity to stop the killing or aid [the victim or victims]; the duration of the crime; [the] defendant's knowledge of [the actual killer's] propensity to kill; and [the] defendant's efforts to minimize the possibility of violence during the crime." (*In re Miller* (2017) 14 Cal.App.5th 960, 975.)

### 3. *The Error Was Prejudicial to Molina.*

If it had been properly instructed, the jury might have found that Molina was a major participant in the robberies who acted with reckless indifference to human life, but the evidence of this was not so overwhelming that we can conclude beyond a reasonable doubt that the jury would have so found.

Regarding the major participant factors, the jury might have reasonably inferred from Molina's texts and phone calls with Kittles while she was traveling to Double Rock, and from the testimony of Green, Harrell, Simonton and Biggins about subsequent events, that Molina was a leader of the conspiracy to commit armed robbery who directed Kittles to the Horseshoe in order to rob the men who thought they were driving her home. Further, Biggins and Simonton testified that Molina himself approached the car with the gunman (whom they identified as Jones) and immediately began robbing the men.

The jury also might have reasonably concluded that Molina participated in, encouraged, or at least did nothing to stop, the violence that led to Bailey's shooting. Simonton and Biggins testified that Molina was among those who, rather than attempt to restrain the gunman, fought with Bailey when he refused to stay down on the ground, and Green testified that those men (and others), whom he did not identify, urged the gunman to shoot Bailey. (See *In re McDowell* (2020) 55 Cal.App.5th 999, 1003, 1012 [sufficient

evidence that petitioner was a major participant in a burglary in which he did not try to restrain an armed accomplice who fired a warning shot and shot the victim].)

As for whether Molina acted with reckless indifference to human life, the jury might have reasonably inferred from the evidence that he developed the plan to rob, accompanied a gunman to the car and initiated the robberies knowing at least one person was armed, but this was not alone sufficient to establish reckless indifference. (See *In re Miller*, *supra*, 14 Cal.App.5th at pp. 966-967 [finding insufficient evidence of reckless indifference in part because there was no evidence the petitioner "knew lethal force was appreciably more likely than that inherent in a 'garden-variety armed robbery' "].) There was no evidence that Molina himself used a gun (see *In re Moore* (2021) 68 Cal.App.5th 434, 451-452 [noting the petitioner, although he knew a robbery accomplice was armed, did not use a gun in concluding it was not shown that he acted with reckless indifference]), or that he knew anyone else participating in the incident had a history of violence. Further, the jury's rejection of the firearm enhancement allegations against Molina, while not readily explainable, suggests a hesitation on its part to hold Molina fully culpable for the gun violence that occurred during the incidents.

On the other hand, as we have discussed, the jury might have reasonably inferred from the evidence that Molina was close enough to the gunman to stop the growing violence and instead actively encouraged it or at least did nothing to stop it. (See *Clark*, *supra*, 63 Cal.4th at p. 619 ["Proximity to the murder and the events leading up to it may be particularly significant where . . . the murder is a culmination or a foreseeable result of several intermediate steps . . ."]; *People v. Williams (*2015) 61 Cal.4th 1244, 1282 [defendant acted with reckless indifference when he repeatedly

105

instructed other carjackers to shoot a resisting victim]; *In re McDowell, supra*, 55 Cal.App.5th at pp. 1014-1015 [petitioner acted with reckless indifference in part because he "was present when the violence ensued but took no steps to prevent it"].)[37]

In short, the evidence as to Molina is mixed and could have resulted in a verdict either way on the major participant and reckless disregard elements. Its incriminating power is somewhat diluted because it rests in part on the testimony of Simonton and Biggins, of which the jury was obviously skeptical (as we have discussed in subparts I.C.2.b and I.D.2, *ante*). Nor do we know what the People could have shown to establish these elements if they had been aware of them when the case was tried. In short, we cannot conclude beyond a reasonable doubt that the jury, if properly instructed, would have concluded Molina was a major participant in the robberies and acted with a reckless indifference to human life. Therefore, we must vacate his first degree murder conviction.

### 4. *The Error Was Prejudicial to Jones.*

There is also evidence from which the jury might have reasonably inferred that Jones was a major participant in the robberies, though it too is mixed.

---

[37] In arguing harmless error, the People contend that Molina acted in the company of multiple, armed Double Rock criminal street gang members, that gang members had a history of violence and that the robbery was of three able-bodied men whose submission foreseeably would require firearm use. These contentions are unpersuasive because, as we will discuss shortly in part IV, *post*, the jury's gang-related verdicts and findings must also be vacated based on the retroactive application of another legislative change in the law and because much of the gang expert testimony is inadmissible and/or testimonial hearsay. (See also *In re Ramirez* (2019) 32 Cal.App.5th 384, 405 [petitioner's knowledge of gang participation "says nothing about petitioner's knowledge of his cohorts' likelihood of killing"].)

The jury determined that Jones committed first degree murder and that a principal was personally armed with and personally used an assault pistol in connection with the murder. The jury might have concluded that Jones was the principal who was armed and used a firearm in connection with the murder, but even if it had, it specifically found not true that he intentionally discharged a firearm. Thus, even though a firearm obviously was used to shoot and kill Bailey, the jury concluded that the prosecution had not proven beyond a reasonable doubt that Jones was the one to kill him.[38]

The jury also found that Jones was guilty of the robberies of Bailey and Green, that a principal was personally armed with and personally used an assault pistol in the robberies of Bailey, Green and Harrell, but that Jones did not personally and intentionally discharge such a weapon in robbing any of the three and a principal did not personally and intentionally discharge a weapon in robbing any of the three.

The jury also concluded that Jones was guilty of the murder of Bailey, the murder was committed while Jones was engaged in robbery and Jones was armed with and used an assault pistol. There was also circumstantial evidence that Jones participated in planning the robberies and played a lead role in robbing the three victims. Simonton testified that, while talking to Kittles earlier in the evening, Molina had handed his phone to Jones, who also spoke with her; that when the victim's car arrived Jones told Simonton to stay by a gate; and that Jones, followed by Molina, approached the car, took out a gun, ordered the men out of the car and down onto the ground. The jury apparently did not believe Simonton's and Biggins's testimony

---

[38] As we have discussed, the firearm discharge instruction allowed the jury to find the allegation that Jones discharged a firearm was not true if it concluded that Jones *did* shoot Bailey, but only unintentionally. However, there is no evidence that the shooting was unintentional.

enough to conclude beyond a reasonable doubt that Jones was the gunman who shot Bailey. But Harrell identified Jones as one of the men who fought with Bailey.[39] From his testimony, as well as Green's testimony that two men who fought with Bailey, along with other participants, urged the gunman to shoot Bailey, the jury might have reasonably concluded that Jones was among those who urged the shooter to kill Bailey. And there is evidence indicating that, after the shooting, Jones accompanied several people to Biggins's house, where they displayed the items stolen from the victims, and that Jones, Molina and Kittles left Biggins's house together.

All of this evidence, if believed, would support a finding that Jones was a major participant in the robberies, even if he was not the shooter. Nonetheless, we cannot find beyond a reasonable doubt that the jury would have so found if it had been instructed on the new elements of felony murder, especially since, again, some of the evidence came from Simonton and Biggins, whom the jury viewed skeptically.

There is also evidence from which the jury might have inferred that Jones acted with reckless indifference to human life. Most significantly, a jury might have reasonably concluded from Jones's use of his firearm to assault Bailey and Green and from the encouragement by those who fought with Bailey (in which it could have concluded Jones participated) that the shooter should "take [Bailey] out," that Jones escalated the violence and encouraged the shooter to murder Bailey, even if he was not himself the shooter. But there was no evidence—perhaps because the prosecution had no

---

[39] Jones contends Harrell's identification is suspect in light of the circumstances surrounding it, such as the inclusion of Jones's photo in multiple photo lineups shown to Harrell. We need not address his contentions other than to say that, regardless, a jury could have reasonably relied on Harrell's identification.

reason to present any or because it focused on the theory was that Jones was the shooter—that Jones was aware anyone else participating in the robberies had a history of lethal violence.

The People's arguments regarding Jones are similar to their arguments regarding Molina. They are equally unconvincing.

In short, we cannot conclude beyond a reasonable doubt that the jury would have found that Jones acted with reckless indifference to human life had it been instructed on that element.

For all of these reasons, we conclude the instructional error was prejudicial to Jones.[40]

## D. The People Are Not Barred from Retrying Defendants for First Degree Murder Under the Felony-Murder Doctrine.

Defendants also argue that any retrial of them on murder charges would be a violation of their rights against double jeopardy because there is insufficient evidence of their guilt. We disagree.

"Double jeopardy forbids retrial after a reversal due to insufficient evidence to support the verdict. Where the prosecution makes its case under the law as it stood at trial, double jeopardy is not implicated as it would otherwise be where there is evidentiary insufficiency. (*People v. Shirley* (1982) 31 Cal.3d 18, 71; see *Burks v. United States* (1978) 437 U.S. 1, 11-15 [retrial permitted for procedural error where evidentiary insufficiency not

---

[40] Jones requests that we should remand his case to the trial court to give him the opportunity to make a record of information that will be relevant to a future parole board's fulfillment of its obligations under section 3051 to conduct a youth offender parole hearing when he becomes eligible for parole under that conviction. (See *People v. Franklin* (2016) 63 Cal.4th 261.) We need not address this issue in light of our decisions, which require that the trial court hold a resentencing hearing. The court should of course consider the requirements of section 3051 and *Franklin* on remand.

implicated].)" (*In re D.N.* (2018) 19 Cal.App.5th 898, 902-903.)  There is a "settled rule that the double jeopardy clause does not prohibit retrial after a reversal premised on error of law." (*Shirley*, 31 Cal.3d at p. 71; accord, *People v. Otto* (1992) 2 Cal.4th 1088, 1116.)  In *Mil*, after concluding that omission of the reckless disregard element from the trial court's jury instruction was prejudicial under *Chapman*, our Supreme Court remanded the case to the Court of Appeal "with directions to remand to the trial court for resentencing or retrial on the issue of the special circumstances at the option of the prosecuting attorney." (*Mil, supra,* 53 Cal.4th at pp. 419-420.)

As several courts have held, these principles apply when legal error results because the Legislature added new elements to the crime post-trial and those elements must be applied retroactively to a defendant's not-yet-final case.  In such circumstances, the courts have held the defendant is not entitled to a "windfall" (*Figueroa, supra*, 20 Cal.App.4th at p. 71) and "[t]he People are entitled to an opportunity to prove beyond a reasonable doubt" robbery with the new elements included and to proffer evidence that may not have been necessary or relevant under the law in effect at the time of trial. (*Ibid.*; *People v. Lopez* (2020) 57 Cal.App.5th 409, 416; *People v. Eagle* (2016) 246 Cal.App.4th 275, 280 ["When a statutory amendment adds an additional element to an offense, the prosecution must be afforded the opportunity to establish the additional element on remand"].)  The courts have also held that a remand and retrial are not barred by the double jeopardy clause. (*Figueroa*, at p. 72, fn. 2; *Ramos, supra*, 244 Cal.App.4th at p. 104; *Eagle*, at p. 280.)  Defendants cite no contrary authority.  On the basis of these authorities, we reject defendants' double jeopardy argument.

## III.

### *Molina's Claim That the Court Should Have Instructed on Lesser Included Conspiracy Offenses Lacks Merit.*

Next, Molina argues the trial court prejudicially erred by not instructing sua sponte on conspiracy to commit assault and conspiracy to commit battery as lesser included offenses to conspiracy to commit robbery. We disagree.

The parties acknowledge that appellate courts have disagreed over whether trial courts should consider overt acts alleged in a conspiracy charge[41] in determining whether to instruct sua sponte on lesser conspiracy offenses. On the one hand, in *People v. Fenenbock* (1996) 46 Cal.App.4th 1688 (*Fenenbock*), Division One of this court held that, because the essence of conspiracy is the co-conspirators' agreement itself and overt acts need not be committed by the defendants or- even be criminal, such acts "do not necessarily reveal the criminal objective of the conspiracy," and, therefore, do not provide notice of any allegedly lesser included offenses. (*Id.* at p. 1709.) The *Fenenbock* court concluded, "[I]t is the description of the agreement within the accusatory pleading, not the description of the overt acts, which must be examined to determine whether a lesser offense was necessarily the target of the conspiracy." (*Ibid.*) The court concluded that, because the conspiracy charge before it alleged only that the defendants "conspired to murder [the victim]," it did not necessarily include any conspiracies to commit an assault, battery, or mayhem as lesser included offenses. Therefore, the trial court did not err in failing to give instructions of conspiracy to commit lesser offenses. (*Ibid.*)

---

[41] "A criminal conspiracy exists when two or more persons agree to commit a crime *and do some overt act* in furtherance of the agreement." (*People v. Cockrell* (1965) 63 Cal.2d 659, 667, italics added.)

111

On the other hand, in *People v. Cook* (2001) 91 Cal.App.4th 910, the Third Appellate District held that a trial court *should* consider the overt acts alleged in a conspiracy charge to determine whether to instruct on any lesser conspiracy offenses. There, the defendants appealed their convictions for conspiracy to commit assault with a firearm on the ground that the trial court erred under *Fenenbock* in instructing that offense was a lesser included offense to the murder conspiracy charged in the information. (*Cook,* at pp. 913-915.) The court noted that the information alleged as overt acts that the conspirators acquired a gun and used it to seek revenge against the victims. (*Id*. at pp. 921-922.) Based on these overt acts, the court concluded the trial court did not err in instructing on the lesser included offense because, "[l]ooking to the accusatory pleading as a whole, the information gave notice that defendants were charged with conspiracy to commit murder by means of a firearm and therefore also gave notice of the lesser included offense of conspiracy to commit assault with a firearm." (*Id*. at p. 922.)

We need not choose between the different approaches taken in *Fenenbock* and *Cook* to resolve Molina's claim because, assuming for the sake of argument that *Cook* controls, the trial court here still had no duty to instruct the jury on conspiracy to commit assault or conspiracy to commit battery. The People charged Molina and the other defendants in count II with committing "CONSPIRACY TO COMMIT A CRIME, to wit: Violating Section 182[, subdivision] (a)(1) of the California Penal Code, a Felony, in that the said defendants did willfully and unlawfully conspire together and with another person(s) whose identify is unknown, to commit the crime of ROBBERY, in violation of section 211 of the Penal Code, a felony . . . ." The People then listed 12 overt acts committed "pursuant to and for the purpose

112

of the aforesaid conspiracy," of which Molina relies on the following for his "lesser included" argument:

"6. ON OR ABOUT OCTOBER 4, 2009, WILLIAM JONES AND LANCE MOLINA APPROACH THE ALTIMA OCCUPIED BY MICHAEL BAILEY, KEDRIC GREEN AND KEVIN HARRELL.

"7. . . . WILLIAM JONES TELLS MICHAEL BAILEY, KEDRIC GREEN AND KEVIN HARRELL THAT HE'S FROM 'DOUBLE ROCK' AND POINTS AN ASSAULT PISTOL FIREARM AT THEM AND ORDERS THEM OUT OF THE ALTIMA AND ONTO THE GROUND.

"8. . . . LANCE MOLINA, MAURICE LIGE, WILLIAM JONES AND SEVERAL MEN SURROUND MICHAEL BAILEY, KEDRIC GREEN AND KEVIN HARRELL AND REMOVE PROPERTY FROM THEIR PERSON INCLUDING WATCH, NECKLACE, WALLETS, CELL PHONES, MONEY AND MISCELLANEOUS CARDS.

"9. . . . WILLIAM JONES STRIKES KEDRIC GREEN ON THE HEAD WITH THE ASSAULT PISTOL.

"10. . . . LANCE MOLINA, MAURICE LIGE AND WILLIAM JONES PREVENT MICHAEL BAILEY FROM TAKING THE ASSAULT PISTOL AWAY FROM WILLIAM JONES."

Molina does not, and cannot, contend that assault or battery are lesser included offenses to the crime of robbery. (See *People v. O'Malley* (2016) 62 Cal.4th 944, 984 ["assault is not a lesser included offense of robbery under the statutory elements test, because robbery can be committed by 'force *or* fear' (§ 211, italics added), and a robbery committed by fear does not involve the use of force, which is an element of the crime of assault"]; *People v. Wolcott* (1983) 34 Cal.3d 92, 99 [assault is not a lesser included offense of

113

robbery because "[n]either an attempt to inflict violent injury, nor the present ability to do so, is required for the crime of robbery"].)

Instead, Molina relies on *Cook* and the overt acts alleged in the information that we have quoted to argue the trial court should have instructed on the lesser conspiracy offenses of assault and battery. This argument is unpersuasive because nothing in the conspiracy to commit robbery allegations, including regarding overt acts, suggest Molina agreed to a conspiracy to commit those lesser offenses.

In *Cook*, the appellate court found it significant that the charging document alleged overt acts by all the conspirators to obtain a firearm in order to exact revenge against the victim as part of a conspiracy to commit murder *by use of a firearm*. (*Cook*, *supra*, 91 Cal.App.4th at pp. 921-922.) Based on these particular allegations, the court concluded that conspiracy to commit assault with a firearm was necessarily a lesser included offense of the conspiracy to commit murder that was charged.

There is nothing equivalent in the pleadings in this case. As we have discussed, assault and battery are not lesser included offenses of robbery. (*People v. O'Malley*, *supra*, 62 Cal.4th at p. 984; *People v. Wolcott*, *supra*, 34 Cal.3d at p. 99.) Nothing in the information's allegations transforms conspiracy to commit either assault or battery into a lesser included offense to the alleged conspiracy to commit robbery. That conspiracy is alleged as simple robbery, without reference to any weapons or use of force. While there is an overt act allegation that Jones ordered the robbery victims out of their car with the use of a pistol and struck Bailey with that pistol, there is no indication that Molina conspired for this to occur; while there is an allegation that Molina and others prevented Bailey from taking the pistol from Jones,

114

again, there is no indication that Molina conspired to assault Bailey with anyone else.

Therefore, unlike in *Cook*, the information's overt act allegations do not transform the offenses cited by Molina into lesser included offenses of the charged robbery conspiracy, and the court had no sua sponte duty to instruct on them. (See *People v. Cortez* (2018) 24 Cal.App.5th 807, 819-821 [agreeing with *Cook* that overt act allegations may be considered in determining lesser included offense instructions but rejecting appellant's argument that certain lesser included instructions should have been given because there were "no allegations of the requisite element of defendant agreeing or conspiring to commit those [lesser] offenses"].) Molina's argument that the court erred by not instructing on lesser included conspiracy offenses is without merit.[42]

## IV.

### *Defendants' Gang-Related Convictions and Enhancements Must Be Vacated.*

Jones and Molina argue that we must reverse the jury's findings regarding the gang enhancement allegations brought against them, and the jury's verdict that they were guilty of active participation in a criminal street gang. Jones argues in his initial briefs that there was insufficient evidence of the existence of the Double Rock street gang. In supplemental briefing, he further argues that the court committed instructional error by failing to give the jury a definition of what it means to be "in association" with a criminal street gang.

Molina, joined by Jones, argues in his initial briefs that "abundant case-specific hearsay" was presented to the jury as a basis for the prosecution gang expert's opinions that there was a Double Rock gang composed of

---

[42] In light of our conclusion, we do not address Molina's contention that the court's error was prejudicial.

certain residents of Double Rock, that crimes by those residents constituted predicate offenses of a criminal street gang, and that defendants were affiliated with the gang, all in violation of *Crawford*, *supra*, 541 U.S. 36 and *Sanchez*, *supra*, 63 Cal.4th 665. They contend admission of the hearsay evidence was prejudicial under the standard for federal constitutional error established in *Chapman*, *supra*, 386 U.S. at pages 23-24.

In 2021, the Legislature adopted Assembly Bill No. 333, which modified section 186.22, a part of the Street Terrorism Enforcement and Prevention Act, to add and/or revise the elements that must be proven to establish the existence of a criminal street gang and a defendant's commission of crimes on behalf of one, which changes became effective January 1, 2022. (Stats. 2021, ch. 699, § 3.) Beginning in October 2021, we allowed the parties to file supplemental briefs regarding the impact of these changes on defendants' cases. In their supplemental briefs, defendants argue these changes apply retroactively and also require reversal of their gang offenses and enhancements.

The People have argued throughout that we should affirm the jury's verdicts finding defendants liable for certain gang offenses and enhancements. They contend that regardless of any errors made, the prosecution provided ample admissible evidence to support the jury's verdicts under both the old and present versions of section 186.22 and that, should we vacate the jury's verdicts, they should have the opportunity to retry defendants on the gang offenses and enhancements.

We conclude that vacatur of the jury's verdicts regarding the gang offenses and enhancements is necessary, because of both instructional error resulting from the retroactive application of the recent modifications to section 186.22 and the considerable *Sanchez* and *Crawford* error that

116

occurred here.  As we will discuss, we conclude these errors are prejudicial to both Molina and Jones.  However, we conclude that the People are not barred from retrying defendants regarding the gang offenses and enhancements.

## A.  The Jury Verdicts

For Molina, the jury found true the gang enhancement allegations attached to the conspiracy to commit robbery (count II) and the robbery counts (counts III through V).[43]  The court imposed stayed sentences of 5 and 10 years for the enhancements attached to counts II and III, an additional 10 years for the enhancement attached to count IV and an additional 3 years and 4 months for the enhancement attached to count V.  Molina was also convicted of actively participating in a criminal street gang under section 186.22, subdivision (a) (count X), for which a three-year sentence was also stayed.

For Jones, the jury found gang enhancement allegations made under section 186.22, subdivision (b)(1) to be true for the same offenses as Molina (counts II through V) as well as for his convictions of assault with an assault pistol against Bailey (count VI), assault with an assault pistol against Green (count VII) and possession of a firearm by a felon (count VIII).  He received stayed sentences of 5, 10, 10, 4 and 4 years for the section 186.22, subdivision (b)(1) enhancements attached to counts II, III, V, VII and VIII respectively, and an additional 10 years for the enhancement attached to

_____

[43]  We do not specifically address here the jury's finding true the allegations of gang enhancement for both Molina and Jones regarding their first degree murder convictions (count I) because we have concluded that we must vacate those convictions in the Discussion section, part IV, *ante*.  Had we affirmed them, we would have reversed the count I gang enhancement findings based on the same analysis we present here.

117

count IV.[44]  The court did not impose a sentence for the section 186.22, subdivision (b)(1) enhancement found to be true regarding Jones's count VI conviction.

In addition, enhancement allegations made under section 12022.53, subdivision (b) that a principal personally used a firearm for the benefit of a criminal street gang, were found true regarding Jones's count III, IV and V convictions, for which he received sentences of 10 years stayed, 10 years consecutive and 10 years concurrent respectively.

Like Molina, Jones was also convicted of actively participating in a criminal street gang under section 186.22, subdivision (a) (count X), for which his three-year sentence was also stayed.

## B.  The Relevant Law Regarding the Gang Contentions

### 1.  *The Law Regarding Criminal Street Gang Activities*

The parties agree that, like the changes to the law of felony murder contained in Senate Bill No. 1437 and Senate Bill No. 775, the changes to section 186.22 contained in Assembly Bill No. 333 apply retroactively to defendants' cases as newly enacted legislation lessening criminal punishment

---

[44]  As we discuss in subpart VII.A of the Discussion section, *post*, the section 186.22, subdivision (b)(1)(C) enhancement sentences imposed on Jones for the robbery counts (III, IV and V) were also improper because they violated section 12022.53, subdivision (e)(2).

Also, the court imposed on Jones a 10-year stayed sentence for a second section 186.22 enhancement purportedly attached to count VII, in addition to the one we have mentioned.  This second section186.22 enhancement sentence is also listed on the abstract of judgment, but we have found no jury verdict or information charge regarding it.  It is unclear what this refers to, as neither the jury's verdict nor the sentencing court's oral summary of the jury's findings and convictions include a finding for a second section 186.22 enhancement under count VII.  The parties do not address it.  This sentence must be stricken for reasons we discuss in subpart VII.C of this Discussion section, *post*.

or reducing criminal liability, which presumptively applies to all cases not yet final on appeal at the time of the legislation's effective date. (*Estrada, supra,* 63 Cal.2d 740, 744-745.) We agree, as there are no indications that the Legislature intended to prevent the retroactive application of Assembly Bill No. 333 to cases pending on appeal at the time of its enactment. Therefore, we discuss the law regarding the gang offenses and enhancements as modified by Assembly Bill No. 333.

Section 186.22 proscribes the substantive offense of active participation in a criminal street gang, as set forth in subdivision (a),[45] and includes enhancement provisions, which are found in subdivision (b).[46] (*People v.*

---

[45] Section 186.22, subdivision (a) provides: "A person who actively participates in a criminal street gang with knowledge that its members engage in, or have engaged in, a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in felonious criminal conduct by members of that gang, shall be punished by imprisonment in a county jail for a period not to exceed one year, or by imprisonment in the state prison for 16 months, or two or three years."

[46] Section 186.22, subdivision (b)(1) states: "Except as provided in paragraphs (4) and (5), a person who is convicted of a felony committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which the person has been convicted, be punished as follows:

"(A) Except as provided in subparagraphs (B) and (C), the person shall be punished by an additional term of two, three, or four years at the court's discretion.

"(B) If the felony is a serious felony, as defined in subdivision (c) of Section 1192.7, the person shall be punished by an additional term of five years.

"(C) If the felony is a violent felony, as defined in subdivision (c) of Section 667.5, the person shall be punished by an additional term of 10 years."

119

*Elizalde* (2015) 61 Cal.4th 523, 538-539.) The elements of the offense are: "First, active participation in a criminal street gang, in the sense of participation that is more than nominal or passive; second, knowledge that the gang's members engage in or have engaged in a pattern of criminal gang activity; and third, the willful promotion, furtherance, or assistance in any felonious criminal conduct by members of that gang." (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1130.) The enhancement provisions apply when a felony is committed "for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members." (§ 186.22, subd. (b).)

In addition, section 12022.53, subdivisions (b) and (e)(1) together authorize a gang-related firearm enhancement sentence for any person who is a principal in the commission of an offense such as robbery if that person has violated section 186.22, subdivision (b) and any principal in the offense has personally used a firearm.[47]

A criminal street gang is defined in section 186.22 as "an ongoing, organized association or group of three or more persons, whether formal or

---

[47] Section 12022.53, subdivision (b) states: "Notwithstanding any other law, a person who, in the commission of a felony specified in subdivision (a), personally uses a firearm, shall be punished by an additional and consecutive term of imprisonment in the state prison for 10 years. The firearm need not be operable or loaded for this enhancement to apply."

Section 12022.53, subdivision (e)(1) states in relevant part: "The enhancements provided in this section shall apply to any person who is a principal in the commission of an offense if both of the following are pled and proved:

"(A) The person violated subdivision (b) of Section 186.22.

"(B) Any principal in the offense committed any act specified in subdivision (b) . . . ."

informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in subdivision (e), having a common name or common identifying sign or symbol, and whose members collectively engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f).) In *People v. Prunty* (2015) 62 Cal.4th 59 (*Prunty*), our Supreme Court construed the phrase "organization, association, or group . . . , whether formal or informal," as used in this subsection, as "contemplat[ing] some kind of relationship, or degree of 'togetherness,' uniting those individuals" (*id.* at p. 72). The *Prunty* court did not also consider the meaning of the terms "an ongoing, *organized* association or group" or "members *collectively* engaging in, or having engaged in, a pattern of criminal gang activity" because the italicized terms were not added to the subdivision until 2021. (Stats. 2021, ch. 699, § 3, italics added.) However, in discussing the statutory language of section 186.22, subdivision (f) that was in effect at the time of defendants' trial in the present case,[48] the *Prunty* court pointed out that "the words the Legislature chose to describe the collection of people who constitute a 'criminal street gang'—'organization, association, or group, whether formal or informal'—contemplate some kind of relationship, or degree of togetherness, uniting those individuals. [§ 186.22(f).] Dictionary definitions of 'association' emphasize the existence of some connection among members, i.e., '[a]n *organized* body of people who have an interest, activity, or purpose in

_____

[48] The former subdivision in effect at the time of defendants' trial stated that a criminal street gang was "any ongoing *organization*, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in . . . subdivision (e), having a common name or common identifying sign or symbol, and whose members *individually or collectively* engage in or have engaged in, a pattern of criminal gang activity." (Stats. 2013, ch. 508 § 1, italics added.)

common' (American Heritage Dict. (4th ed. 2000) p. 109), or 'an organization of persons having a common interest' (Merriam-Webster's Collegiate Dict. (11th ed. 2003) p. 75). The same is true of definitions of 'organization,' which describe, for example, '[a] group of persons *organized* for a particular purpose . . .' (American Heritage Dict., *supra*, at p. 1239), and persons comprising a 'functional structure' (Merriam-Webster's Collegiate Dict., *supra*, at p. 874). Both terms envision some measure of connection among members, such as unity of purpose, shared activities, or other manifestations of a common relationship." (*Prunty*, at p. 72, italics added.)

"The phrase 'primary activities,' . . . implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations," as opposed to the occasional commission of those crimes by one or more of the group's members. (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323.) "Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute." (*Id.* at p. 324.) "A gang engages in a 'pattern of criminal gang activity' when its members participate in 'two or more' statutorily enumerated criminal offenses (the so-called 'predicate offenses') that are committed within a certain time frame and 'on separate occasions, or by two or more persons.' " (*People v. Zermeno* (1999) 21 Cal.4th 927, 930.)

Further, as used in section 186.22, " 'pattern of criminal activity' means the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of, two or more" of certain enumerated offenses, "provided at least one of these offenses occurred after the effective date of this chapter, and the last of those offenses occurred within three years of the prior offense and within three years of the date the

current offense is alleged to have been committed, the offenses were committed on separate occasions or by two or more members, the offenses commonly benefited a criminal street gang, and the common benefit of the offense is more than reputational . . . ." (§ 186.22, subds. (e), (g).)  The list of qualifying offenses is found in section 186.22, subdivision (e)(1)(A)–(Z) and includes robbery (§ 186.22, subd. (e)(1)(B).)  Notably, section 186.22 as modified by Assembly Bill No. 333 provides that, unlike before the modification, "[t]he currently charged offense shall not be used to establish the pattern of criminal activity." (§ 186.22, subd. (e)(2); see *People v. Tran* (2011) 51 Cal.4th 1040, 1046 [discussing the law prior to the statute's recent modification].)

As we will discuss, several parts of section 186.22 that we have outlined above became effective only as of January 1, 2022, as a result of the enactment of Assembly Bill No. 333 and modified certain aspects of the old section 186.22 that were in effect at the time of defendants' trial. Understandably, the trial court's jury instructions did not incorporate these not yet enacted modifications, but they nonetheless apply retroactively to defendants' cases under *Estrada*.

In their supplemental briefing, defendants contend that the trial court's failure to instruct on the subsequently modified section 186.22, amounts to instructional error that is prejudicial under *Chapman*, *supra*, 386 U.S. at pages 23-24.  The People agree that, to the extent the court did not instruct on the subsequently modified section 186.22, we must determine whether the error is harmless, but they argue that the state standard for error applies under *People v. Watson, supra,* 46 Cal.2d 818, 836 without citing any other authority.

123

As we discussed in part II of the Discussion section, *ante,* in analyzing the instructional error resulting from the retroactive application of amendments adding elements to a crime, we apply the *Chapman* standard.

## 2. *The Law Regarding Gang Expert Testimony*

Gang expert testimony has long played an important role in prosecution efforts to establish the commission of gang-related crimes. "Expert testimony is admissible to establish the existence, composition, culture, habits, and activities of street gangs; a defendant's membership in a gang; . . . the 'motivation for a particular crime, generally retaliation or intimidation'; and 'whether and how a crime was committed to benefit or promote a gang.' " (*People v. Hill* (2011) 191 Cal.App.4th 1104, 1120.)

Prior to *Crawford* and *Sanchez*, testifying gang experts, often police officers engaged in gang investigations in the community in which an incident occurred, were able to testify about a wide range of facts and circumstances culled from police investigations and reports that went beyond the expert's personal knowledge. Case law held such evidence was not offered for its truth, but only to identify the foundational basis for the expert's testimony. (See, e.g., *People v. Thomas* (2005) 130 Cal.App.4th 1202, 1210.) *Crawford* and *Sanchez* significantly restricted the use of gang expert testimony predicated on hearsay.

*Crawford*, *supra*, 541 U.S. 36, did not involve gang expert testimony, but is significant in defining its parameters. As we have already indicated, in *Crawford*, the United States Supreme Court held that the Sixth Amendment bars the introduction of a witness's "testimonial hearsay" statements at trial unless the witness is unavailable and the defendant has had an opportunity to cross-examine the witness. (*Crawford*, at pp. 68-69.) " '*Crawford* did not define the term "testimonial," but it mentioned several *possible* definitions,

124

by several sources, of statements that are testimonial in nature, including " 'extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,' [citation]; [and] 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial . . .' [citation]." (*Id.* at pp. 51-52.)' " (*People v. Pearson* (2013) 56 Cal.4th 393, 462 (*Pearson*.)

Since *Crawford*, our Supreme Court has construed information contained in police reports as testimonial because such reports "relate hearsay information gathered during an official investigation of a completed crime." (*Sanchez, supra*, 63 Cal.4th at p. 694.) Thus, a statement about a completed crime made to an investigating officer by a nontestifying declarant is generally testimonial unless an exception applies. (*Ibid.*)

In *Sanchez*, our Supreme Court specifically addressed gang expert testimony and limited the parameters of permissible testimony based both on *Crawford*'s confrontation clause ruling and on hearsay principles. We explained the significance of *Sanchez* in *People v. Anthony* (2019) 32 Cal.App.5th 1102 (*Anthony*): "In *Sanchez*, . . . the [California] Supreme Court . . . created a new paradigm for the presentation of gang expert testimony. (*Sanchez, supra*, 63 Cal.4th at p. 679.) Before *Sanchez*, an expert was given the latitude to testify both about general background information and about case-specific out-of-court statements in order to explain the basis for his or her expert opinion, and the court typically would instruct the jury to consider the information for that purpose only, and not for its truth. (*Id.* at p. 683, citing *People v. Gardeley* (1996)14 Cal.4th 605.) In *Sanchez*, the court eliminated this latitude with respect to case-specific facts, which it defined as facts 'relating to the particular events and participants alleged to have been

125

involved in the case being tried.' (*Id.* at p. 676.) It reasoned that when no other and competent evidence of those facts is offered, 'there is no denying' that the hearsay statements relayed by the expert are being offered for their truth. (*Id.* at p. 684.) Indeed, the jury in *Sanchez* had been instructed that, in assessing the believability of the expert, it ' "must decide whether information on which the expert relied was true and accurate." ' (*Id.* at p. 684; CALCRIM No. 332.) While the jury had also been instructed that the hearsay statements on which the expert relied should not be considered ' "proof that the information contained in those statements was true," ' that instruction was in conflict with the first one and could not logically have been applied. '[The jury] cannot decide whether the information relied on by the expert "was true and accurate" without considering whether the specific evidence identified by the instruction, and upon which the expert based his opinion, was also true.' (*Sanchez*, at p. 684.) The state law evidentiary rule established in *Sanchez*, simply stated, is that out-of-court statements about case-specific facts may not be relayed by an expert witness unless they fall within an exception to the hearsay rule. Absent an exception, the case-specific facts must be established by competent (non-hearsay) evidence presented by other witnesses and the expert's opinion may be based on a hypothetical question that assumes those facts. (*Ibid.*)

"In *Sanchez*, the court also addressed the Sixth Amendment's confrontation clause, as interpreted by the United States Supreme Court in *Crawford* and its progeny. (*Sanchez*, *supra*, 63 Cal.4th at pp. 685-686.) Admission through an expert of hearsay statements concerning case-specific facts, the court opined, violates the Evidence Code and, if the hearsay statements were testimonial and *Crawford*'s exceptions do not apply, also violates the Sixth Amendment. (*Sanchez*, at p. 685.) A 'testimonial'

statement is one made when the circumstances objectively indicate there is no ongoing emergency, and the 'primary purpose' of the interrogation or other conversation ' "is to establish or prove past events potentially relevant to later criminal prosecution." ' (*Ohio v. Clark* (2015) 576 U.S. [237] [135 S.Ct. 2173, 2179-2180].)

"The *Sanchez* court established a two-step analysis for determining the admissibility of out-of-court statements. 'The first step is a traditional hearsay inquiry: Is the statement one made out of court; is it offered to prove the truth of the facts it asserts; and does it fall under a hearsay exception? If a hearsay statement is being offered by the prosecution in a criminal case, and the *Crawford* requirements of unavailability, as well as cross-examination or forfeiture, are not satisfied, a second analytical step is required. Admission of such a statement violates the right to confrontation if the statement is *testimonial hearsay*, as the high court defines that term.' (*Sanchez*, *supra*, 63 Cal.4th at p. 680.)

"The *Sanchez* court's hearsay analysis focused on an expert's testimony about the truth of case-specific facts, and not on the expert's reliance on these facts to form his or her expert opinion. The court emphasized that an expert 'may still *rely* on hearsay in forming an opinion and may tell the jury *in general terms* that he did so.' (*Sanchez*, *supra*, 63 Cal.4th at p. 685.) 'What an expert *cannot* do is relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception.' (*Id.* at p. 686.)" (*Anthony*, *supra*, 32 Cal.App.5th at pp. 1129-1131, fn. omitted.)

Although the *Sanchez* court held that an expert may not relate *case-specific* facts as true, it reaffirmed "the long-standing rule that expert witnesses have greater latitude than lay witnesses to testify about 'generally

127

accepted background information' ([*Sanchez, supra,* 63 Cal.4th]*,* at p. 676), even when that information is based on hearsay: 'In addition to matters within their own personal knowledge, experts may relate information acquired through their training and experience, even though that information may have been derived from conversations with others, lectures, study of learned treatises, etc.' (*Id*. at p. 675.) 'An expert may . . . testify about more generalized information to help jurors understand the significance of . . . case-specific facts.' (*Id*. at p. 676.)" (*Anthony*, *supra*, 32 Cal.App.5th at p. 1131.)

Recently, in *People v. Valencia* (2021) 11 Cal.5th 818, 831 (*Valencia*), our Supreme Court further distinguished between testimony that relates mere background information and testimony that relates case-specific facts. The issue in that case was whether testimony about predicate offenses fell on the case-specific or general background side of the line. The court held that predicate offense testimony is the kind of case-specific fact about which an expert cannot testify based on hearsay. "Hallmarks of background facts," the court said, "are that they are generally accepted by experts in their field of expertise, and that they will usually be applicable to all similar cases." (*Id*. at p. 836.) Testimony about such facts may concern " 'background information regarding [the expert's] knowledge and expertise and *premises generally accepted in his field*." (*Id*. at p. 835.) Thus, a physician may " 'relate generally accepted medical knowledge that will assist the jury' " without " 'personally replica[ting] all medical experiments dating back to the time of Galen.' " (*Id*. at p. 836.) Another example the court drew was from its recent decision in *People v. Veamatahau* (2020) 9 Cal.5th 16, in which it held an expert's testimony about an FDA requirement that pills containing controlled substances bear distinct markings and a database relied on by

experts in the field to determine the controlled substances in pills bearing particular markings. (*Valencia,* at pp. 836-838.) The court also reiterated statements it had made in *Sanchez* that "general testimony about a gang's behavior, history, territory, and general operations is usually admissible," as is also the case regarding "the gang's name, symbols, and colors." (*Valencia,* at p. 838.) The court added a caveat that such information "can be admitted through an expert's testimony, even if hearsay, *if there is evidence that it is considered reliable and accurate by experts on the gang*." (*Ibid.*, italics added.)

The court contrasted with these types of information "information regarding the commission of a particular offense on a specific occasion" and held that experts with no personal knowledge of that information and "who do not rely on other admissible evidence" cannot relay that information to a jury. (*Valencia, supra,* 11 Cal.5th at p. 838.) Only if "independent admissible evidence of the particulars of the predicate offenses" is offered may an expert testify about them. (*Ibid.*)

The admission of testimonial hearsay regarding case-specific facts is reviewed for prejudice under the "harmless beyond a reasonable doubt" federal standard for error established in *Chapman*, *supra*, 386 U.S. at pages 23-24. (See *Valencia, supra*, 11 Cal.5th at p. 840.) The admission of nontestimonial hearsay is reviewed for prejudice under the less stringent "reasonably probable" state standard for error established in *People v. Watson, supra*, 46 Cal.2d at p. 836. When there is a combination of federal and state law errors, we apply the *Chapman* standard. (See *Sanchez, supra,* 63 Cal.4th at p. 698 [applying the federal standard because "much of the hearsay was testimonial"]; *People v. Martinez* (2018) 19 Cal.App.5th 853, 861

["Because the instant case involves a mix of testimonial and nontestimonial hearsay, we will apply the federal standard"].)

## C. Relevant Pre-Trial Proceedings

Prior to trial, the prosecution moved in limine to introduce gang evidence through the testimony of its gang expert, San Francisco Police Sergeant Derrick Jackson. Defendants opposed the motion based in part on hearsay objections. The court held a hearing under Evidence Code section 402 to consider the prosecution's proffer and heard argument from the parties.[49]

The prosecutor sought to use Molina's and Jones's association with purported members of the Double Rock criminal street gang to prove the gang charges brought against them. In doing so, he sought to introduce Jackson's testimony about gang "validation sheets" and other documents used by San Francisco police to identify gang members other than the defendants. Defense counsel specifically objected to testimony regarding the contents of validation sheets and field identifications. Jackson testified at the section 402 hearing that the information recorded on the validation sheets "comes directly from incident reports generated by patrol officer[s]. [¶] It comes from investigations from other investigative units. [¶] It comes from my own investigation in response to incidents and crimes. [¶] And it can also come from outside agencies." The prosecutor did not seek admission of the validation sheets themselves but sought, in essence, to convey their content to the jury through Jackson's testimony. The court ruled that Jackson could testify regarding certain non-defendants, including from information

---

[49] The main focus of the hearing, which took place before our Supreme Court issued *Sanchez* and the Legislature modified section 186.22 via Assembly Bill No. 333, was on the admissibility of the proffered evidence under Evidence Code section 352.

130

garnered from validation sheets and similar documents, to establish that those individuals were gang members.

## D. The Gang Evidence Presented at Trial

### 1. *The Testimony of the Prosecution's Gang Expert, Sergeant Jackson*

Sergeant Jackson testified that he had patrolled Double Rock from 2000 to around 2002 or 2003, after which he became a member of a gang task force and was responsible for directly monitoring the Double Rock gang. He had both spoken to Double Rock gang members and investigated Double Rock gang crimes hundreds of times. He agreed he was "the expert in terms of gang activity" at Double Rock and had created the first validation sheets for members of the Double Rock gang.

### a. Jackson's Testimony About the Double Rock Gang

According to Jackson, the Horseshoe was in the Double Rock gang's territory. The primary purposes of the gang included illegal possession of weapons, narcotics, assaults, burglaries and robberies. There was no specific initiation process, but someone became a member of the gang by hanging out with the gang, committing increasingly serious crimes and remaining silent when arrested with other gang members. Committing murder elevated a member's status in the gang. Jackson identified photographs he took in 2005, and other photographs taken in 2008, of gang graffiti in the area, including graffitied lyrics Jackson said were labelled "murder music." Jackson also testified about a sketch, stipulated as having been found in the residence of someone associated with the Double Rock gang, of a skeleton holding a gun, with the slogan "[L]ive by the gun" and referring to "rock" and "RS." He testified that the sketch supported his opinion that one of the primary purposes of the gang was the illegal possession and use of guns. He could not say how many crimes committed in Double Rock between 2004 and

131

2009 were gang related. Jackson also testified that Double Rock gang members used a "2 Rock" hand sign, which consisted of "showing two fingers, the pinky finger and the ring finger."

### b. Jackson's Testimony About Double Rock Gang Members

As we have discussed, the prosecution sought to prove its gang allegations against defendants largely through their associations with non-defendants whom Jackson identified as members of or affiliated with the Double Rock gang. Much of Jackson's testimony was regarding what he considered to be gang-related activities, associations and displays by non-defendants and, in turn, their associations with the defendants. This testimony was derived in large part from his review of validation sheets, police reports and other documents. He discussed his reliance on the department's gang validation sheets, which listed 11 criteria, of which two needed to be satisfied in order for an individual to be classified as a gang member; these criteria included self-admission of gang membership, tattoos, crimes of a gang character, association with other gang members and observed presence in gang territory. Jackson indicated that his determination of whether a person met these criteria included his reading and reviewing incident reports. Jackson also referred to "field identifications" and "field interviews." He said, "field identifications" were "computer generated reports for officers' conduct with subjects in the field."[50] Asked the purpose of field identifications, he said they were "a way of tracking the behavior and contacts with individuals, where they were, what time, who they were with, was there any criminal activity that was being committed during the contact."

---

[50] Considering this statement in its context, it may be that Jackson actually said "contact" instead of "conduct."

In our summary of these aspects of Jackson's testimony, we will indicate when he stated he was relying on personal knowledge; otherwise, it appears he was relying on hearsay.

First, Jackson identified numerous non-defendants as Double Rock gang members:

Darius Perkins, deceased, was a "validated" Double Rock gang member that Jackson had investigated numerous times in his career. Perkins had a gang moniker and felony convictions for two burglaries. In an interview with Jackson, Perkins admitted he was a gang member. Jackson identified in photographs of Perkins that he had a "Rock Solid" and a "Double Rock" tattoo, which were gang tattoos. Jackson said a printout of a "field interview contact" shown to him at trial indicated that Perkins was contacted in the company of Carl Bradley and Lance Molina, and a May 2007 field contact found Perkins in the company of a documented gang member. Jackson believed Perkins was a gang member based on "his contacts and his criminal activity in the area combined with his convictions which are the predicate crimes and established by the tattoos that he's documented himself as being a member of that gang."

Jackson had numerous personal contacts and interviews with Damon Grayson, investigated him and executed a search warrant of Grayson's home, where he had collected indicia of gang membership, including photographs. Also, a March 20, 2008 parole search by other officers found Double Rock gang members, including Lonnel Howard and D'Angelo Winston, in Grayson's home and evidence of firearms, narcotics and other contraband. Grayson was a Double Rock gang member, based on the validation sheet Jackson created for him, which was based on Grayson's criminal history, his convictions and his association with Double Rock members.

133

Delvon Lewis was a Double Rock gang member, based on Jackson's review of validation sheets and Lewis's documented contacts, criminal activity, photographs in which he displayed "the Double Rock gang hand sign," and his conviction for possession of cocaine, a predicate crime.

Marquez Benson, also deceased, was a member of the Double Rock gang, based on Jackson's review of Benson's validation sheet, his associations "with the gang itself" and Benson's conviction for unlawful possession of a pistol.

Paul Belazain was a Double Rock gang member, based on Jackson's own investigation, including Belazain's criminal activity in gang territory, his association with other gang members and his convictions of predicate crimes. Jackson was shown an abstract of conviction for Belazain that was later admitted into evidence, for possession of a concealed firearm in a vehicle. Jackson described other officers' encounter with Belazain that led to this conviction. Also, in August 2005, Jackson responded to a scene, where he saw a car upside down with damage from a high-powered rifle. Jackson investigated and found a semiautomatic pistol and assault rifle in a vehicle that contained Belazain's coat and identification.

Roland Black was a "documented" Double Rock gang member who Jackson had contacted, investigated and arrested numerous times in his career. Jackson was shown an abstract of conviction for Black that was later admitted into evidence, for assault on a police officer.

Jackson was shown an abstract of conviction for Anthony Mims that was later admitted into evidence, for possession of an assault pistol. Also, in August 2004, Mims was stopped in the company of Benson, and arrested for possession of marijuana. A rifle scope, a bullet resistant vest and a black facemask were found in the vehicle. In January 2006, Mims, Benson and a

134

third individual were investigated for burglary, and Mims was identified by a witness as having attempted to enter a residence. In June 2008, Mims was in the company of Benson and several others; he was searched and found to be in possession of a "remote" to a vehicle that police then searched, and in which they found a semiautomatic pistol; Mims pleaded guilty to a firearms charge. Mims was a Double Rock gang member.

Carl Bradley was found with Black and Lewis on December 22, 2007, in the course of a traffic stop for a stolen vehicle. Bradley was arrested in February 2008 for negligent discharge of a firearm, in March 2008 for residential burglary, and in April 2008 for residential burglary and possession of stolen property, and he was convicted of possession of stolen property. Based on these incidents, Jackson concluded that Bradley was a Double Rock gang member.

Jovan Marshall fought officers and discarded cocaine base in an incident, and as a result was convicted of possession of cocaine base for sale and battery on a peace officer. Jackson saw Marshall at the station house and observed several tattoos on Marshall's body "that represented Double Rock." In April 2005, Marshall was found in the company of Grayson, Black and Mims, and Mims and Black were arrested for possession of marijuana for sale. Jackson relied on these facts to conclude that Marshall was a Double Rock gang member.

Photographs of Jamal Butler, Durrell Samuels and Albert Marlborough showed they had gang tattoos; Butler's stated, "Rock Solid"; Samuels's included "Rock" and "Double," and Marlborough's stated, "2 Rock." Butler was a "document[ed]" Double Rock gang member.

According to Jackson, Arnold Biggins and Quentin Simonton, whose testimony we have discussed, were associates of the Double Rock gang in

135

October 2009, which is when the incident occurred.  Biggins had at some point also been a member of another gang but was more affiliated with the Double Rock gang.

Jackson also testified about field interviews conducted by San Francisco police with non-defendants who were noted to be Double Rock street gang members, including Bradley and Grayson.  Another field interview indicated that Mims was arrested with a bulletproof vest.

Lige had a "Rock in Peace" tattoo on his forearm in a photograph and was known to associate with Double Rock gang members.  These, and the absence of a relevant conviction, indicated he was an associate but not a member of the Double Rock gang.

A photograph showed that Molina had a "Rock in Peace" gang tattoo.  It supported Jackson's conclusion that Molina was a member of the Double Rock gang.  On cross-examination, however, Jackson acknowledged that below that tattoo was the name "J-Ray" and three basketballs and that a 16-year-old girl by that name, who was not a gang member, had been shot to death.  He nonetheless testified that Molina's "Rock in Peace" tattoo, with its use of the word "rock" instead of "rest" was "indicative of gang behavior and gang culture."

Jackson also testified about photographs taken in 2009 of a list of names painted on a wall behind 37 Cameron Way in Double Rock.  He testified that "this wall with all the names is basically an official roster of who has been associated with Double Rock past and present.  It also is their wall of fame.  It describes 'Double Rock for Life.'  It has the gang's graffiti 'Rock Solid' on it again, and it contains the names of persons we spoke of today."  Jackson acknowledged, however, that in 2009 he did not seek to

interview the wall's creator who, he had since learned, was not a gang member.

### c. Jackson's Testimony About Gang Members Associating with Each Other

Jackson also testified about other incidents in which individuals he identified as Double Rock gang members were found with each other (other than defendants Molina and Jones, discussed *post*), including:

An April 2005 incident involving Benson and Mims and a June 2008 incident involving Mims, Benson and others, in which Mims was arrested and pled guilty to possession of a semiautomatic pistol;

A July 2008 incident in which Grayson, Marshall and Lige were found together at a traffic stop, and Grayson was in possession of powder cocaine;

An instance in which Grayson and Lige displayed a gang sign next to Jovan Marshall, which was depicted in a photograph obtained from the warranted search of Grayson's home; and

A November 2008 incident in which Grayson, Marshall, Bradley and Lige were together, and Grayson was found to be in possession of marijuana.

### d. Jackson's Testimony About Other Gang Member Convictions

Jackson further testified about other convictions suffered by individuals he identified as gang members. Belazain had pleaded guilty to possession of an assault rifle. Mims had pleaded guilty to possession of a semiautomatic pistol. Howard had been convicted in 2002 of possession of cocaine base rock for sale. Black had been convicted in 2004 and 2005 of possession of cocaine base rock for sale. Mims had been convicted in 2006 of burglary and in 2008 of a firearms offense. Belazain had been convicted of possession of a concealed firearm in a vehicle after a guilty plea.

137

### e. Jackson's Testimony About Defendants' Associations with Gang Members

Jackson also testified about one or more of the defendants associating with individuals he identified as gang members:

A San Francisco police officer (other than Jackson) testified that on December 20, 2007, he arrested Molina, along with Bradley, Lewis and Jones, after he saw Jones drop a handgun and a phone on the street. Jackson testified that as a result of this incident, Jones pleaded guilty to a firearm charge, which Jackson said was a predicate offense; although the record is not entirely clear, it appears Jackson was shown an abstract of conviction for Jones that was later admitted into evidence. He further testified that Jones was a Double Rock gang member as of October 2009.

Another San Francisco police officer testified that during a traffic stop at about 1:00 a.m. on September 29, 2008, he found Molina, Lewis, and Albert Marlborough, along with an assault rifle, in a car. Jackson testified that this incident showed Molina's association with Double Rock gang members, and he cited it as support for his view that Molina was a Double Rock gang member.

Photographs showed Molina, with his "Rock in Peace" gang tattoo, and Marshall and others throwing Double Rock gang signs (the pinky and ring finger extended to indicate "2 Rock") in a photo with Jones, Howard and Lewis. Another photograph showed Marshall, Lewis and Jones showing hand gang signs, with Molina also in the photograph.

Field identifications indicated Molina was in the company of Perkins and Bradley in June 2007, Marlborough and Grayson in November 2008, and Bradley, Jones and another individual in January 2009.

Photographs shown to Jackson showed Jones with Lewis, who was displaying a gang sign; Jones with Lewis and another person who had a

138

"Solid" tattoo; and Jones displaying a gang sign in the company of Marshall and Lewis.

On October 4, 2009, a lanyard was found in Jones's home with a picture of Marquez Benson, deceased, which showed association with the Double Rock gang. Jackson said the lanyard was a "memorial lanyard commonly worn by gang members to respect and honor the deceased gang member."

In February 2005, Jackson responded to a report of a shooting. Perkins was identified as a suspect, and Jones was present according to the police report.

### f. Jackson's Conclusions Regarding Defendants

As we have mentioned, Jackson opined that Molina was a Double Rock gang member, which designation Jackson changed from associate as a result of the incident in the present case. Along with Molina's tattoo and the photographs of Molina displaying gang signs, Jackson relied on Molina's "consistent" associations with Double Rock gang members, associations that Jackson based on his review of field interviews and validation sheets. However, Jackson conceded that at the time of trial Molina had no relevant conviction.

Jackson testified that, based on the "totality of the circumstances," he believed Jones was a member.

The prosecutor asked Jackson about a hypothetical that closely tracked the events of the October 4, 2009 incident (except that the prosecutor referred to the victims as "unknown gang members") and assumed the perpetrators were gang members and associates. Jackson testified that the robbery/murder benefited the gang because "it advertises the gang's strength and its power," "shows that the gang has the capacity and ability to commit murder," and "shows that the other gang members are willing to take part in support of the gang." The killing of one of the victims "basically advertised

[the gang's] strength and its power in the community" and "will intimidate the community." The robbery benefits the gang "by money, jewelry and whatever they can generate from the victim," which can be "sold rapidly to generate income." One member giving orders creates a cohesive unit, and those who help rob the victims are aiding and abetting the gang in the completion of the crime.

## 2. *The Defense Gang Expert's Testimony*

Mark Harrison, a police practices expert, testified that criminal street gang members may commit crimes that are not for the benefit of their gang. There has to be a group of some cohesive nature that uses its resources to facilitate crimes for the betterment of the group, which is different from merely individuals engaging in criminal behavior. There are recognized comprehensive methodologies for determining whether a gang exists, whether criminal activity is gang-related and whether individuals are gang members. Those methods are designed to prevent misidentifications. Harrison thought the San Francisco Police Department's validation sheet approach with its 11 criteria was useful but, pointing out that validation under that approach could be based on activity occurring in one day, testified that validation should occur based on "an ongoing pattern of criminal activity evaluation, not just the one day."

Harrison further testified that there are consistent ways to define gang members that should be used in order to avoid using capricious and arbitrary methods to reach a predetermined result. Harrison did not think consistent methods were used in the present case to validate Double Rock gang members, "[j]ust inconsistent or . . . capricious and arbitrary methods." Harrison thought, for example, that it was "a leap to a conclusion" to say that Molina's "Rock in Peace" tattoo was gang related. He also found it significant

140

that there was no evidence of Double Rock gang crime convictions between 2004 and 2009.

Harrison further testified that people often identify with where they grew up, but that did not necessarily mean that if they commit a crime that identification turns them into a gang member. There was evidence that people who live in Double Rock, a multigenerational community, identified strongly with their neighborhood, which he had seen in his own experience there prior to 2004.

Harrison acknowledged that he was not saying the Double Rock gang did not exist as of 2009. Also, he agreed that someone working in the neighborhood from 2004 to 2009 had sufficient time to conclude whether or not the Double Rock gang existed. A person flashing gang hand signs in a photograph was "something important for validation." Possession of a memorial lanyard could be evidence of gang membership but did not establish membership by itself. Location of a crime was not a critical factor. A gang member stating a gang name during a crime committed with gang members and associates would give Harrison a "high index of suspicion" that it was a gang-related crime.

### 3. *Ben Molina's Testimony*

Molina's uncle, Ben Molina (Ben),[51] testified that he was 62 years old and had lived at Double Rock since 1963, a year after it opened, and that the housing project was known as "2 Rock" or "Double Rock." He lived at 37 Cameron Way with family and had lived there for "[q]uite a few years." He put a basketball court up behind his residence in 1994 or 1995, and neighborhood kids came to play there. There was a retaining wall there as

---

[51] We refer to Ben Molina by his first name for clarity's sake and mean no disrespect by doing so.

141

well, on which he put names of people in order "to keep kids from painting on the wall there." The only requirement for kids to get their names on the wall is to be in high school. He also put on the wall, "no alcohol, no drugs, no fighting" in four-inch red letters so it could be seen. "Rock solid hardheads," which he also painted on the wall, was the name of the first group of kids he had invited to play basketball there, and likewise "school of hard knocks since 1963" referred to basketball only. Defendant Molina's name was on the wall because he graduated from high school. The names of females and several community leaders were on the wall as well.

Ben also testified that "rock solid" had been a term used by many people to describe being a part of Double Rock, and it also referred to playing basketball, as in " 'pass me the rock.' "

Ben further testified that "J Ray" was on the wall, and that she was very fond of playing basketball, including with defendant Molina. Shown a photograph, Ben said it was taken on her birthday after she died, when the entire community came together. The photo showed Ben making a hand sign with two fingers, which he said could have been "a peace sign or Double Rock sign."

### 4. *The Prosecutor's Concession in Closing Argument*

In closing argument, the prosecutor implicitly conceded that the wall of names at 37 Cameron Way was not a roster of Double Rock gang members. The prosecutor stated: "So we're proud of Mr. [Ben] Molina for the names he puts on the wall. That's important. And if we had more people like him in the community this crime wouldn't have happened. [¶] But when certain individuals wear the tattoos and flash the signs and are committing crimes, there's a difference. It takes them out of the realm of people who are on the wall for going to high school and doing well. Because a lot of them are on that wall, and it takes them into the realm of criminality."

142

### E. Analysis

#### 1. *Given the Retroactive Application of Assembly Bill No. 333, the Trial Court Committed Multiple Instructional Errors.*

As we have already discussed, when a statutory enactment is retroactive to cases that are not yet final on appeal, an instruction that did not include elements required by the new statute is treated as instructional error. (*People v. Sek* (2022) 74 Cal.App.5th 657, 669 (*Sek*); see *People v. Wright* (2006) 40 Cal.4th 81, 98-99 (*Wright*); *Ramos*, *supra*, 244 Cal.App.4th 99, 102-104.) We conclude, based on the retroactive application of Assembly Bill No. 333 to their cases, there were multiple instructional errors.

As we have discussed, a criminal street gang is defined in section 186.22 as "an ongoing, organized association or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in subdivision (e), having a common name or common identifying sign or symbol, and whose members collectively engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f).) However, the trial court did not instruct the jury that a criminal street gang was an "an ongoing, *organized* association or group of three or more persons" because the italicized term was not made an element of proving the existence of a criminal street gang under section 186.22, subdivision (b) until the enactment of Assembly Bill No. 333. It may be that, as suggested by the *Prunty* court's discussion of similar language in a prior version of subdivision section 186.22, subdivision (f), that this amended language does not differ in a material respect from that which preceded it. Nonetheless the jury was not given the opportunity to consider this amended language and we cannot confidently determine what decisions it would have made if it had, as

143

there was little admissible evidence presented by the prosecution that the Double Rock gang was "organized."

We add that, although defendants do not note it, the trial court also did not instruct the jury that it was required to find that the gang's "members *collectively* engage in or have engaged in a pattern of criminal conduct" under this same subdivision because the phrase in effect at the time of trial only required that the gang's "members *individually or collectively* engage in or have engaged in a pattern of criminal gang activity." (Stats. 2013, ch. 508 § 1, italics added.)

The trial court failed to instruct the jury that it could *not* include a defendant's present offenses in considering whether, regarding that defendant, gang members had committed the two or more predicate offenses necessary to establish a pattern of criminal activity, another limitation that did not go into effect until January 1, 2022 as part of the enactment of Assembly Bill No. 333. (See § 186.22, subd. (e)(2).) Instead, the jury was allowed to consider defendants' current offenses in determining whether two or more predicate offenses had been committed by gang members, as was the law at the time of their trial. (See *People v. Tran*, *supra,* 51 Cal.4th 1040, 1046.) The People argue that, regardless of this recent modification to section 186.22, subdivision (e)(2), Molina's presently charged offenses *could* be considered as predicate offenses with regard to Jones, and vice versa. (See *People v. Loeun* (1997) 17 Cal.4th 1, 10 ["when the prosecution chooses to establish the requisite 'pattern' by evidence of 'two or more' predicate offenses committed on a single occasion by 'two or more persons,' it can, as here, rely on evidence of the defendant's commission of the charged offense and the contemporaneous commission of a second predicate offense by a fellow gang member"].) We will assume for the sake of argument that this is the case

144

without deciding the issue because, as we will discuss, it will not matter in our analysis.

Finally, the trial court failed to instruct the jury that, in evaluating if these predicate offenses were committed for the common benefit of a criminal street gang, this benefit had to be more than reputational, a limitation that also did not go into effect until January 1, 2022, as part of the enactment of Assembly Bill No. 333. (See § 186.22, subds. (e), (g).)

Under *Sek, Wright* and *Ramos,* the court's failure to instruct on these retroactively applied elements was error. The People do not seriously contest this error occurred. Instead, they argue any error was harmless. We turn now to a discussion of this issue.

## 2. *Significant Evidentiary Errors Were Made.*

As our extensive summary of Jackson's testimony demonstrates, in establishing that predicate crimes were committed by gang members and that Molina and Jones associated with those individuals—case-specific facts that cannot be proven by hearsay under *Sanchez* and *Valencia*—Jackson relied extensively on evidence that was hearsay, much of it testimonial, and for those reasons was inadmissible under *Crawford, Sanchez* and *Valencia.* Jackson testified about facts derived from such hearsay sources as validation sheets, field interviews, field contacts, police reports and out-of-court statements, the kind of information that frequently contains testimonial hearsay.[52] He also testified about other out-of-court sources that he was not asked to, and did not, identify, and relied on facts from such sources to assert that many individuals were gang members who committed predicate offenses,

---

[52] See *Sanchez, supra,* 63 Cal.4th at pp. 694-695 (police reports); cf. *id.* at pp. 672, 696-698 (STEP-notice and possibly field identification or "FI" cards); *Pearson, supra,* 56 Cal.4th at p. 462, quoting *Crawford, supra,* 541 U.S. at pp. 51-52.

engaged in violence, and associated with each other and with Molina and Jones.

Further, the trial court erred by allowing the jury to consider each of defendants' charged crimes as predicate offenses in determining whether *that* defendant was liable for the gang offenses and enhancements, which is now prohibited. Also, the jury was allowed to consider the testimony by Jackson that Double Rock gang members committed crimes for reputational reasons, such as to elevate a member's individual status in the gang or, in the case of defendants' alleged offenses, to advertise "the gang's strength and its power." The court should not have allowed the jury to consider any of this evidence under the recently modified section 186.22.

### 3. *The Court's Errors Were Prejudicial.*

We conclude the court's instructional and evidentiary errors were prejudicial under *Chapman*.

The prosecution had no reason to present, and did not focus on presenting, evidence that there was an "organized" Double Rock street gang whose members "collectively" engaged in a pattern of criminal conduct as shown by predicate offenses that did not include those charged in this case and which were undertaken for the gang's common benefit beyond the reputational, elements only added recently by Assembly Bill No. 333. Given the voluminous amount of criminal activity that Jackson alluded to in his testimony, some of which may have been committed by multiple individuals together, all of whom Jackson identified as gang members, the prosecution may well have been able to establish these elements if it had focused on them—provided that they also complied with the confrontation and hearsay requirements imposed by *Crawford*, *Sanchez* and *Valencia*. However, the prosecution did not comply with these requirements, either.

146

When we put aside the inadmissible testimony given by Jackson, we are left with a relatively sparse amount of evidence to determine whether the number of gang members and predicate crimes necessary to establish the existence of the Double Rock street gang were proven and whether Molina and Jones were affiliated with the gang. There is admissible evidence that several non-defendants (such as Marshall, Marlborough, Perkins and Grayson) displayed what Jackson identified as gang tattoos in photographs and that Lige and Molina had "Rock in Peace" tattoos that Jackson testified were gang tattoos. Jackson testified that numerous people committed predicate offenses, but the only admissible evidence of them were abstracts of convictions for Belazain, Black, Mims and Jones; of these, there was admissible evidence only of Jones's gang affiliation. This evidence consisted of photographs in which Jones was making, or was with others who were making, gang signs, and the circumstances surrounding the robberies alleged in the present case (but not the alleged murder, since we have vacated defendants' murder convictions), including the gunman's identification of "Double Rock" at the beginning of the attack, the shooter's reference to "Double Rock" after shooting Bailey and the multiple participants. Thus, the only predicate offense established by admissible evidence—other than the robberies that occurred in the present case—was Jones's conviction for a firearm offense.

The evidence of Jones's gang affiliation, besides the predicate offense (at which Molina was present), consisted of the photographs and the nature of the alleged crimes in the present case committed by Molina, that he was present in 2005 at a shooting incident in which Perkins was a suspect and that he was depicted in one photograph with a person bearing a "solid" tattoo.

The evidence of Molina's gang affiliation, besides his presence when Jones was arrested, his "Rock in Peace" tattoo and the nature of the crimes alleged in the present case against Jones, consisted of photographs of him making, or with others making, gang signs, including one with Marshall, and that he was found in a car with Marlborough and an assault rifle.

Arguably, this evidence is substantial enough to support the jury's gang findings and convictions under the old version of section 186.22, or even under the recently modified version. But that is not the question we must answer here. Given the instructional errors and the improper admission of hearsay and testimonial hearsay evidence here, we must determine whether there is sufficient evidence to render these federal constitutional errors harmless. As we have discussed in part II of the Discussion section, *ante*, the People, as the beneficiary of these errors, must "prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman*, *supra*, 386 U.S. at p. 24.) Reversal is required if there is a " 'reasonable possibility' " that the errors " 'might have contributed to the conviction.' " (*Id.* at p. 23.) In other words, we must determine whether the errors influenced the jury's determinations. (See *People v. Pettie* (2017) 16 Cal.App.5th 23, 65.) "The test is not whether a hypothetical jury, no matter how reasonable or rational, would render the same verdict in the absence of the error, but whether there is any reasonable possibility that the error might have contributed to the [verdicts] in this case." (*People v. Lewis* (2006) 139 Cal.App.4th 874, 887; accord, *Pearson*, *supra*, 56 Cal.4th 393, 463.)

The People have not provided us with this level of certainty for three reasons. As we have indicated, Sergeant Jackson testified to an overwhelming amount of hearsay and testimonial hearsay evidence that, if believed, established an extensive and disturbing web over several years of

148

violent weapons offenses and other offenses committed by numerous Double Rock members and associates who were often associating with one another, including Molina and Jones. In our view, it very likely this evidence influenced the jury's determinations.

Further, while the circumstances of the crimes alleged against Molina and Jones indicate they may have been gang crimes, the admissible evidence does not indicate that any other gang members participated in them (given that Lige was not convicted of any of the charges against him). Nor does the admissible evidence (other than Jackson's own opinion) make clear that Molina or Jones acted in these crimes to benefit the Double Rock gang.

For these reasons, we conclude the court's instructional errors, along with the improper admission of significant amounts of hearsay and testimonial hearsay evidence, require that we vacate the gang enhancement findings and the gang convictions for Molina and Jones.

### 4. *The People Are Not Barred from Retrying Defendants for the Alleged Gang Offenses and Enhancements.*

In his initial briefing, Jones argues, based on the old version of section 186.22 and *People v. Prunty*, *supra*, 63 Cal.4th 59, that the prosecution did not present sufficient evidence of the existence of a criminal street gang. The argument was based on all the evidence, including the evidence we now hold was inadmissible under *Crawford* and *Sanchez*. Presumably, Jones makes this contention in order to argue below that the prosecution cannot renew its gang charges and allegations because of Jones's constitutional protection against double jeopardy. (See *Lockhart v. Nelson* (1988) 488 U.S. 33, 34 "[W]here the evidence offered by the State and admitted by the trial court—whether erroneously or not—would have been sufficient to sustain a guilty verdict, the Double Jeopardy Clause does not preclude retrial"]; accord, *People v. Story* (2009) 45 Cal.4th 1282, 1296-1297;

149

see also *People v. Lara* (2017) 9 Cal.App.5th 296, 328, fn. 17, 335-337 [appellate court must consider all evidence presented, including improperly admitted testimonial hearsay, in deciding whether evidence was sufficient to support gang enhancement findings].)

We disagree. Jones's arguments in effect ask us to reweigh the evidence and reconsider Jackson's credibility, which are inappropriate under a substantial evidence standard of review. (E.g., *People v. Nelson* (2011) 51 Cal.4th 198, 210; *People v. Jennings* (2010) 50 Cal.4th 616, 638.) Jones ignores or challenges much of Jackson's testimony, including references to such relevant matters as Perkins's admission that he was a member of the Double Rock gang; that gang members displayed distinctive tattoos and hand signs signifying their gang membership in various photographs; that gang members or associates repeatedly associated with each other; and that gang members and associates, together and separately, committed multiple predicate offenses and engaged in patterns of activity indicative of a criminal street gang.

In their supplemental briefing, Jones and the People agree that the People did not have reason to submit evidence to prove the recently added elements to section 186.22 that we have discussed and, therefore, are entitled to retry the gang offenses and enhancements to prove these elements. Molina does not address the issue. We agree with Jones and the People.

In short, we conclude that defendants' constitutional protections against double jeopardy do not bar the People from retrying Jones and Molina regarding the alleged gang offenses and enhancements.

### *Molina's Upper-Term Sentences for Counts II, III and IV Must Be Vacated Because of the Recent Amendment of Section 1170.*

Molina next argues that the Legislature's amendment of section 1170, subdivision (b) in Senate Bill No. 567 (2021-2022 Reg. Sess.), effective January 1, 2022, requires us to vacate the upper term sentences he received for counts II (conspiracy to commit robbery), III (the robbery of Bailey) and IV (the robbery of Green) and remand these counts to the trial court for resentencing.[53]  The People agree.  Molina is correct.

### A.  Molina's Sentences

As we have outlined in part III of the Background section, *ante*, the trial court sentenced Molina to a total state prison term of 44 years and 4 months to life, comprised of 25 years to life for the first degree murder of Bailey (count I) and 19 years and 4 months to life for the remainder of his convictions.  Among the determinate sentences, the trial court imposed the following, for which the parties agree the amendment to section 1170, subdivision (b) is relevant:

(1)  An upper term of five years for count II, conspiracy to commit robbery, which the court stayed under section 654.[54]  In imposing this upper

---

[53]  Molina further argues that the amendment of section 1170, subdivision (b) requires that we vacate the sentences he received for the gang enhancements included in counts III and IV as well as his count X conviction (gang participation).  Because we have already vacated the jury's gang-related findings and convictions in part IV of this section, *ante*, for both defendants, we do not address these issues here.

[54]  Section 654 states in relevant part:  "(a)  An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision."

term, the court indicated that there was "an aggravation stated in the presentencing report."[55]

(2)  An upper term of five years for count III (the robbery of Bailey), which the court also stayed.  The court imposed this upper term based on its finding that the robbery involved great violence and the threat of great violence.

(3)  An upper term of five years for count IV (the robbery of Green) based on its finding that "the victim was particularly vulnerable."  The court did not stay this sentence, which was to run consecutive to the other sentences imposed.

**B.  Section 1170, Subdivision (b) As Amended**

At the time of Molina's sentencing, section 1170, subdivision (b) provided in relevant part:  "When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the court shall order imposition of the middle term, unless there are circumstances in aggravation or mitigation of the crime."  (Stats. 2013, ch. 32, § 6.)

As a result of the Legislature's enactment of Senate Bill No. 567, section 1170, subdivision (b) now provides in relevant part:

"(1)  When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the court shall, in its sound discretion,

---

[55]  That report, relying on California Rules of Court, rule 4.421, which outlines circumstances in aggravation, states the following aggravating factors:  (1) the victim was particularly vulnerable; (2) the defendant engaged in violent conduct that indicates a serious danger to society; (3) the crime involved great violence, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness; (4) the crime involved an attempted or actual taking or damage of great monetary value; and (5) the defendant's prior performance on probation and/or parole was unsatisfactory.

order imposition of a sentence not to exceed the middle term, except as otherwise provided in paragraph (2).

"(2) The court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial."

As amended, Section 1170, subdivision (b) further provides:

"(6) Notwithstanding paragraph (1), and unless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense:

"(A) The person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence.

"(B) The person is a youth, or was a youth as defined under subdivision (b) of Section 1016.7 at the time of the commission of the offense.

"(C) Prior to the instant offense, or at the time of the commission of the offense, the person is or was a victim of intimate partner violence or human trafficking.

"(7) Paragraph (6) does not preclude the court from imposing the lower term even if there is no evidence of those circumstances listed in paragraph (6) present."

153

Section 1016.7, incorporated into section 1170, subdivision (b)(6)(B) above, provides: "A 'youth' for purposes of this section includes any person under 26 years of age on the date of the offense committed."[56]

**C. Analysis**

The Legislature's recent amendment of Section 1170, subdivision (b) requires us to vacate the upper terms imposed for counts II, III and IV.

The amendment of section 1170, subdivision (b) is ameliorative, and Molina's case was not final as of the effective date of the new law, January 1, 2022. We agree with the parties that Molina is entitled to the benefit of this amendment because there are no indications that the Legislature intended to prevent the retroactive application of this amendment. (*Estrada*, *supra*,

---

[56] Molina was 22 years old at the time of the incident. We need not address Molina's further argument that we should remand these sentencing matters to the trial court to consider his age under Assembly Bill No. 124, also passed in 2021.

"During the 2021-2022 legislative term, three bills proposing changes to section 1170 in a variety of ways were introduced. They were Assembly Bill No. 124 (Stats. 2021, ch. 695, § 5), Assembly Bill No. 1540 (Stats. 2021, ch. 719, § 2), and Senate Bill No. 567 (Stats. 2021, ch. 731, § 1.3). All three bills were passed by the Legislature in September 2021, and approved by the Governor and filed with the Secretary of State on October 8, 2021. Senate Bill No. 567 bears the highest chapter number and is presumed to be the last of the three approved by the Governor. (Gov. Code, § 9510.) As such, Senate Bill No. 567 prevails over Assembly Bill No. 124. (Gov. Code, § 9605, subd. (b).) To the extent there are conflicts between the three bills, Senate Bill No. 567 takes precedence. (*In re Thierry S.* (1977) 19 Cal.3d 727, 738-739.) As to subdivision (b)(6)(A) of section 1170, however, the substantive language in Assembly Bill No. 124, Senate Bill No. 1540, and Senate Bill No. 567 are not in conflict. For ease of discussion, I refer to Assembly Bill No. 124 rather than Senate Bill No. 567." (*People v. Banner* (2022) 77 Cal.App.5th 226, 243, fn. 2 ( conc & dis. opn. of Detjen, Acting P.J.).)

154

63 Cal.2d 740, 745; *People v. Conley, supra*, 63 Cal.4th 646, 657; *People v. Frahs, supra,* 9 Cal.5th 618, 628-629; *People v. Superior Court* (*Lara*)*, supra*, 4 Cal.5th 299, 308-309.)

Given the retroactive application of this amendment, the trial court did not properly consider all that was necessary to determine the sentences for the above counts.  The aggravating factors that the court cited in imposing upper terms, i.e., great violence (count III), the threat of great violence (also count III) and victim vulnerability (count IV), were neither stipulated to by Molina nor presented to the jury, and the record does not indicate the jury made any findings regarding them.  The same is true for the factors listed in the presentencing report (see footnote 55, *ante,* p. 152), which the court cited in imposing an upper term for count II.  Therefore, under any standard for the evaluation of error, Molina has been prejudiced.  The upper terms imposed for counts II, III and IV are vacated and the case is remanded to the trial court for  resentencing consistent with this opinion.

## VI.

### *Jones's Claims Regarding the Firearm Enhancement Sentence That Accompanies His Conspiracy Conviction*

Jones next makes two claims regarding the jury's finding that, in participating in the robbery conspiracy (count II), he personally used a firearm in violation of section 12022.5, subdivision (a), for which the trial court imposed a stayed sentence of four years.  Jones argues that this allegation should be reversed because it cannot as a matter of law be attached to a conspiracy charge.  This is incorrect.  However, we agree with Jones that we must vacate the sentence for this enhancement and remand for the trial court to exercise its newly authorized discretion under section 1170 to strike or dismiss this enhancement.

155

## A. The Firearm Enhancement Was Properly Included in the Conspiracy to Commit Robbery Count.

In supplemental briefing, Jones argues that section 12022.5, subdivision (a), which allows this firearm enhancement to accompany convictions for felonies and attempted felonies, does not include conspiracy within its ambit.

Section 12022.5, subdivision (a) states in relevant part: "[A]ny person who personally uses a firearm in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for 3, 4, or 10 years, unless use of a firearm is an element of that offense."

Under the conspiracy statute, section 182, two or more persons who conspire to commit a felony generally are "punishable in the same manner and to the same extent as is provided for the punishment of that felony." (§ 182, subd. (a).) Our Supreme Court recently addressed the question " 'to what extent a court can attach a special penal provision' [enhancing the penalty for a crime] 'to conspiracy rather than to the underlying crime itself.' " (*People v. Lopez* (2022) 12 Cal.5th 957, 962 (*Lopez*).) In *Lopez*, the court opined that courts should "look[] beyond" section 182 to the special sentencing statute to ascertain what the Legislature intended in enacting *that* statute. (*Lopez*, at p. 967.)

The sentencing statute in *Lopez* was a provision of the California Street Terrorism Enforcement and Prevention (STEP) Act. The STEP Act had been amended by initiative to add a sentencing provision imposing an indeterminate life term on a person convicted of one of several enumerated felonies, with the minimum term of years dependent on the underlying felony. (*Lopez, supra,* 12 Cal.5th at p. 970; § 186.22, subd. (b)(4)(B).)

156

The court declined to adopt a bright-line rule based solely on the statute because it did not spell out that conspiracy crimes were either excluded or included. It rejected the "general rule" urged by the People "that section 182 [, subd.] (a) embraces enhancements and other similar penalty provisions" unless the statute expressly *excludes* them. (*Lopez, supra,* 12 Cal.5th at pp. 967-968.) It likewise rejected the defendant's argument that the sentencing statute's failure to expressly *include* conspiracy crimes should end the analysis and dictate that conspiracy crimes were not encompassed by the law. (*Id.* at pp. 971-972.) Rather, the court held the appropriate course was to apply "the usual tools of statutory interpretation" to ascertain legislative intent. (*Id.* at pp. 968-969.).

The court looked at the context of the sentencing provision, as part of a broader measure (Proposition 21 (Primary Elec. (Mar. 7, 2000))) (Proposition 21) and considered that measure as whole. (*Lopez, supra,* 12 Cal.5th at pp. 972-973.) In Proposition 21, it found "particular reason to believe that when voters authorized indeterminate life terms as alternative penalties for convictions of certain enumerated offenses found to be gang-related, they did not intend to sweep in conspiracy convictions as well." (*Lopez,* at pp. 971-972.) Specifically, other provisions of the initiative Proposition 21 expressly referred to conspiracy, including one that imposed enhancements of two to five years for a conspiracy to commit certain gang-related crimes. (*Lopez,* at p. 972.) The court identified other provisions specifically addressing the law of conspiracy. (*Id.* at pp. 972-973.) While voters had addressed conspiracy law, including providing specific term enhancements, "they did not adopt any comparable provision with respect to the alternate life penalties prescribed in section 186.22 [,subd.] (b)(4)." (*Id.* at p. 972.) "Under ordinary principles of statutory interpretation, [the court]

157

presume[d] this was an intentional choice." (*Ibid*., citing *In re Jennings* (2004) 34 Cal.4th 254, 273 "[' "where a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject is significant to show that a different legislative intent existed with reference to the different statutes" '].")

The court also considered the "practical considerations" of the law, observing that applying the indeterminate life term to all gang-related conspiracies would sweep in a broad range of conduct, including merely benefiting from a conspiracy without participating in the underlying crimes at all. (*Lopez, supra,* 12 Cal.5th at p. 974.) Those who actively participated in the underlying crime, on the other hand, would be subject to a term-of-years enhancement, a much less drastic punishment. (See *ibid*.) Finally, doubting that the voters intended such a result, the court looked to the legislative history of Proposition 21 and found nothing in that history to support the application of the indeterminate life term enhancement to gang-related conspiracies. (*Lopez,* at pp. 974-975.) And, it observed, excluding such crimes from that enhancement would not contravene the purpose of the statute, since conspirators in gang-crimes would remain subject to serious penalties, including a term-of-years enhancement. (*Id.* at p. 975.)

The language of section 12022.5, like the sentencing provision in *Lopez*, neither expressly includes nor expressly excludes crimes of conspiracy. It applies to use of a firearm *in the commission of a felony or attempted felony*, excepting those for which *use* of a firearm is an element of the offense.[57]

---

[57] There are two exceptions to the exception. Section 12022.5 subdivision (d) provides, "Notwithstanding the limitation in subdivision (a) relating to being an element of the offense, the additional term provided by this section shall be imposed for any violation of Section 245 [assault with deadly weapon or force likely to cause great bodily injury] if a firearm is used,

(§ 12022.5, subd. (a).) Robbery is a felony (see §§ 17 [felony is crime punishable by imprisonment in state prison], 213(a)(1)(A)&(B) [robbery, with certain exceptions, is punishable by imprisonment in state prison for three to six years]) as is a conspiracy to commit robbery. (See § 182, subd. (a) [persons who conspire to commit most felonies shall be punished "in the same manner and to the same extent as is provided for the punishment of that felony"].) Thus, the language of section 12022.5 is broad enough to include conspiracy to commit robbery. However, under the approach articulated in *Lopez*, we apply the "ordinary principles of statutory interpretation" to that statute.

The gun enhancement statutes currently in effect, including sections 12022 and 12022.5, have their roots in the Deadly Weapons Act that was first enacted in 1917 and reenacted and amended repeatedly thereafter. (*People v. McDaniels* (1972) 25 Cal.App.3d 708, 712 (*McDaniels*).) "The provision for an additional period of imprisonment upon conviction of a felony while *armed* with a deadly weapon [now contained in section 12022] first appear[ed] in the 1923 version of the act" and "has remained a part of our penal law since that date." (*Id.* at p. 713, italics added.) Its " 'obvious legislative purpose' " was " 'to discourage the use of guns and similar deadly weapons in the commission of crimes to minimize the risk of death or serious physical injury to the victim; an armed felon is far more dangerous than an unarmed one.' " (*Ibid.*)

Section 12022.5, the statute providing a sentence enhancement for *use* of a gun, was enacted in 1969. (*McDaniels*, *supra*, 25 Cal.App.3d at p. 714.) It was enacted in part to overcome the limitation imposed by the California

or for murder if the killing is perpetrated by means of shooting a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict great bodily injury or death."

159

Supreme Court on the gun *arming* enhancement by interpreting it not to apply to offenses, such as first degree robbery and assault with a deadly weapon, for which arming was an element of the offense. (*McDaniels,* at pp. 713-714; see *People v. Chambers* (1972) 7 Cal.3d 666, 672 (*Chambers*).) Early on, section 12022.5 provided that "use" of a firearm in the commission of six specified felonies, including robbery and assault with a deadly weapon, would give rise to a sentence enhancement " 'even in those cases where the use of a weapon is an element of the offense.' " (*McDaniels,* at pp. 714-715; see also *Chambers*, at pp. 671-672.) The broad purpose of section 12022.5 was similar to that which motivated the enactment of section 12022 several decades earlier. The Legislature sought "to overcome in part the problem [created by the Court's interpretation of section 12022]") and to create an even "greater deterrent upon those who resort to the use of a firearm in the commission of specified crimes, including robbery." (*Chambers*, at p. 672.) The Legislature and the public witnessed an alarming "increase in recent years in the number of crimes in which a firearm was used." (*McDaniels,* at p. 714.)

While section 12022.5 has been amended in various other respects along the way, for example, to broaden the crimes subject to the gun use enhancement from the six originally specified to "a felony or attempted felony," increase the number of years added to a sentence by the enhancement,[58] prohibit trial courts from dismissing, and then afford trial

---

[58] Compare § 12022.5, subds. (a) & (b) (3, 4 or 10 years for use of firearm and 5, 6 or 10 years for use of assault weapon or machine gun) with Stats. 1993, ch.611, § 31.5, quoted in *In re Tameka C.* (2000) 22 Cal.4th 190, 193 ( 3, 4 or 5 years for use of firearm).

courts discretion to dismiss, the enhancement,[59] its fundamental purpose of deterring use of guns in crimes has not changed. "At its core [section 12022.5] addresses the pervasive and inherent escalation of danger which arises from the *defendant's act* of deployment. By merely bringing a gun 'into play,' the defendant removes impediments to its actual discharge and thus enhances the danger of violent injury not only through an intentional act by the victim or a third party, but through an impulsive or inadvertent act by the defendant. It requires no statistical study to know that a gun is far more likely to go off while held in the hand than while resting in a pocket, holster, or waistband." (*People v. Granado* (1996) 49 Cal.App.4th 317, 326-327.) This purpose of deterrence and the underlying concerns about the risk of death and serious injury posed by criminals' using of guns in connection with criminal activity, have led the courts to construe the gun use enhancement broadly. (*Chambers*, *supra*, 7 Cal.3d at p. 672 [although "use" of firearm connotes more than bare potential for use, there need not be conduct which actually produces harm but only conduct which produces fear of harm or force]; *People v. King* (1993) 5 Cal.4th 59, 78-79 [section 12022.5 permits multiple enhancements for multiple uses of firearm on single occasion]; *In re Tameka C.*, *supra,* 22 Cal.4th at pp. 191-192, 196 [multiple use enhancements applied to defendant who shot at police officers and missed them where same shot hit and injured nearby child].) The same considerations support the interpretation of section 12022.5 to apply to conspiracy offenses here.

---

[59] See Assembly Bill No. 1023 (2011-2012 Reg. Sess.), Stats. 2011, ch. 296, § 22.5 (§ 12022.5, subd. (c)); Senate Bill No. 620 (2017-2018 Reg. Sess.) (Senate Bill No. 620), Stats. 2017, ch. 682, § 1 (§ 12022.5, subd. (c)).

Other principles of statutory construction further support the conclusion that the Legislature intended to include felony conspiracies among those to which the gun use enhancement of section 12022.5 applies. One is that we construe statutes in pari materia. "It is a basic canon of statutory construction that statutes in pari materia should be construed together so that all parts of the statutory scheme are given effect. [Citations.] Two ' "[s]tatutes are considered to be in pari materia when they relate to the same person or thing, to the same class of person[s or] things, or have the same purpose or object." ' " (*Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1090-1091.) Sections 12022 and 12022.5 both address sentence enhancements relating to guns used or carried during the commission of felonies. They share the same purpose of deterring the presence and use of guns and the violence, injury and death that may easily result when they are brought to or used during criminal activities. Section 12022.5 was adopted to broaden the gun enhancement laws in response to a judicial construction of section 12022 viewed as too limited. In short, sections 12022 and 12022.5 are in pari materia. (*McDaniels*, *supra*, 25 Cal.App.3d at p. 712.)

More than two decades ago, the Court of Appeal construed section 12022 to encompass crimes of conspiracy. In *People v. Becker* (2000) 83 Cal.App.4th 294 (*Becker*), the Fourth District held the arming enhancement applied to a defendant convicted of conspiracy to commit robbery and burglary. Not only is section 12022.5 in pari materia with section 12022, its language is parallel to that of section 12022; both enhancements apply when a defendant is either armed with, or uses, a firearm "in the commission of a felony or attempted felony." [60] In *Becker*, the

---

[60] Jones bases his argument primarily on *People v. Mares* (1975) 51 Cal.App.3d 1013 (*Mares*), a case which considers a previous version of

court rejected the defendant's argument that a conspiracy was akin to solicitation, as to which the Second District had previously held the arming enhancement did not apply. (*Becker*, at pp. 297-298; see *People v. Miley* (1984) 158 Cal.App.3d 25, 32-33.) The defendant in *Miley* was convicted of soliciting three murders and had a firearm when the solicitation occurred. The Second District held "[a] person is 'armed' within the meaning of section 12022, subdivision (a) when he carries a weapon as an instrument of offense or defense at the time of the commission of the felony" and held that Miley did not carry the gun for offense or defense at the time of the solicitation of the crime for which he provided the weapon to the person he solicited. (*Miley,* at p. 32.) *Becker* distinguished *Miley*, observing that, unlike solicitation, conspiracy is "the classic example of a continuing offense because by its nature it lasts until the final overt act is complete" and that "the period during which the arming enhancement may attach to such an offense is very

---

section 12022.5, subdivision (a). This previous version applied to persons who personally used a firearm in the commission of certain *specified* felonies that did not include any conspiracies. (*Mares,* at p. 1017; see *People v. Strickland* (1974) 11 Cal.3d 946, 959 [section 12022.5 "applies only with respect to the six felonies specifically enumerated therein," i.e., robbery, assault with a deadly weapon, murder, rape, burglary, or kidnaping]; *People v. Lee* (2003) 31 Cal.4th 613, 625 [former section 12022.5 applied to "any one of several specified felonies"].) The *Mares* court concluded that the defendant's conspiracy to commit robbery conviction "cannot be held subject to the provisions of Penal Code section 12022.5 because conspiracy is not one of the crimes enumerated therein." (*Mares*, at p. 1023.) As we have indicated, section 12022.5 now applies to all felonies and attempted felonies, not to a list of specific crimes. Hence, *Mares* is no longer apposite.

The same is true of other cases Jones cites for the proposition that the absence of a specific reference to conspiracy in section 12022.5, subdivision (a) means the Legislature intended its exclusion. Like *Mares*, these cases address statutory language referring to specific crimes.

broad:  So long as the defendant has a weapon for use at any point during the course of a continuing offense, his sentence may be enhanced for being armed." (*Becker,* at pp. 297-298.)

By the same logic, a use allegation can attach to a conspiracy if a defendant uses a weapon at any point during the course of that continuing offense.  Under the in pari materia doctrine and because the relevant language of the arming and use enhancements is identical, we interpret section 12022.5 in light of *Becker*'s interpretation of section 12022.  Interpretation of section 12022 to encompass conspiracy crimes supports the same construction of section 12022.5.

Our conclusion is further enforced by the presumption that the Legislature is aware of decisions interpreting statutes when it adopts or amends related statutes.  The Legislature has amended sections 12022 and 12022.5 multiple times since *Becker* was decided.  (See, e.g.,  Stats. 2010, ch. 711, § 5 (Senate Bill No. 1080 (2009-2010 Reg. Sess.)); Stats. 2011, ch. 296, §§ 224, 225 (Assembly Bill No. 1023 (2011-2012 Reg. Sess.)); Stats. 2011, ch. 15, §§ 506, 508 (Assembly Bill No. 109 (2011-2012 Reg. Sess.)); Stats. 2011, ch. 39, §§ 58, 60 (Assembly Bill No. 117 (2011-2012 Reg. Sess.)); Stats. 2013, ch. 76, § 166 (Assembly Bill No. 383 (2013-2014 Reg. Sess.)); Stats. 2017, ch. 682, § 1 (Senate Bill No. 620).)  Yet neither statute has been narrowed in a way that would limit its reach to exclude crimes of conspiracy.  Surely if the Legislature did not intend one or both of the statutes to cover conspiracy crimes, it would have so amended it.

Finally, unlike in the special sentencing statute involved in *Lopez*, section 12022.5 does not involve an indeterminate life sentence.  Nor has the Legislature specifically referred to conspiracy in any other provisions of the gun enhancement laws contained in part 4, title 2 of the Penal Code.  (See §§ 12001, 12022.5, 12022-12022.95.)

164

For these reasons, we reject Jones's argument that the gun use enhancement applied to his conviction for conspiracy to commit robbery cannot stand.

**B. Remand Is Necessary Regarding the Conspiracy Firearm Enhancement Sentence.**

Jones also requests remand for the trial court to consider, under post-trial changes to sections 12022.5 and 12022.53 made by Senate Bill No. 620, effective January 1, 2018, whether to exercise its newly authorized discretion to strike or dismiss the firearm enhancements found true by the jury. When we exclude those enhancement findings and sentences that we have already ordered vacated in parts II and IV of the Discussion section, *ante*, Jones's request is relevant to the enhancement allegation finding attached to his count II conviction for conspiracy to commit robbery. The People address only Jones's section 12022.53 enhancements and do not address section 12022.5. They agree that section 12022.53 as amended by Senate Bill No. 620 applies retroactively to Jones, but argue remand is unnecessary because the trial record indicates the trial court would not have dismissed the firearm enhancements if it had had the discretion to do so. Presumably, the People hold the same position regarding section 12022.5 as amended under the same statute, Senate Bill No. 620.

Prior to Senate Bill No. 620, section 12022.5, subdivision (c) prohibited courts from striking section 12022.53 enhancements. (Stats. 2017, ch. 682, § 1.) Senate Bill No. 620 amended section 12022.5, subdivision (c) to read in relevant part: "The court may, in the interest of justice pursuant to Section 1385 at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section." (Stats. 2017, ch. 682, § 1.) As both the People and Jones assert, Senate Bill No. 620's amendments apply

to Jones because his case is not final.  (*Estrada, supra,* 63 Cal.2d at pp. 747-748.)

The People do not address the count II firearm enhancement allegation under section 12022.5 that the jury found to be true against Jones. Regarding the section 12022.53 enhancement allegations that the jury found to be true against Jones, the People, among other things, cite *People v. McDaniels* (2018) 22 Cal.App.5th 420.  In *People v. McDaniels*, our colleagues in Division One of this court concluded that remand to a trial court for that court to determine whether to exercise its new discretion after the passage of Senate Bill No. 620 " ' "would be an idle act and is not required" ' " if " ' "the record shows that the trial court would not have exercised its discretion even if it believed it could do so." ' "  (*People v. McDaniels,* at p. 425.)

The People argue generally that the trial court would not have exercised its discretion to strike or dismiss any enhancement because it very carefully made its sentencing decisions in an effort to be fair.  We disagree in that we cannot determine with any certainty whether the court would have exercised its sentencing discretion regarding the count II enhancement. Therefore, remand is appropriate.  (See *People v. McDaniels, supra,* 22 Cal.App.5th at p. 425 [remand required "unless the record shows that the trial court clearly indicated when it originally sentenced the defendant that it would not in any event have stricken a firearm enhancement"].)  We will remand Jones's case to the trial court to consider whether to strike or dismiss the count II firearm enhancement allegation under section 12022.5 that the jury found to be true against Jones.

# VII.

## *Jones's Arguments Regarding Other Enhancement Sentences*

In supplemental briefing, Jones argues that the trial court's imposition of enhancement sentences was erroneous in four respects. An unauthorized sentence "is subject to correction by the reviewing court despite the absence of an objection by either party in the trial court." (*In re Sheena K.* (2007) 40 Cal.4th 875, 882, fn. 3; see also, e.g., *In re Harris* (1993) 5 Cal.4th 813, 842, disapproved on another ground in *Shalabi v. City of Fontana* (2021) 11 Cal.5th 842.) The People agree with three of Jones's four claims. We address each claim separately.

### A. Jones's 10-Year Enhancement Sentences Under Section 186.22, Subdivision (b)(1)(C) for His Robbery Convictions Were Improper.

Jones first argues that we must strike the 10-year enhancement sentences the trial court imposed under section 186.22, subdivision (b)(1)(C) for his robbery convictions (counts III, IV and V) as prohibited under section 12022.53, subdivision (e)(2) in the absence of a jury finding that he personally used or discharged a firearm in the robberies. The People agree. We have already vacated these enhancement sentences in part IV of the Discussion section, *ante,* because they are gang related. Nonetheless, we address this claim to instruct the trial court in any resentencing. We agree with the parties that these sentences under section 186, subdivision (b)(1)(C) were improper.

For each of Jones's three robbery convictions, the trial court imposed both a 10-year enhancement sentence under section 12022.53, subdivisions (b) and (e) for a principal's use of a firearm for the benefit of a criminal street gang, which we have also vacated as gang-related in part IV of the Discussion section, *ante*, and a 10-year enhancement sentence under

167

section 186.22, subdivision (b)(1)(C) for the commission of a violent felony for the benefit of a criminal street gang.  The court ordered the section 186.22 enhancement sentence for count III to be stayed, the sentence for count IV to run consecutively, and the sentence for count V to run concurrently.

Section 12022.53, subdivision (e)(2) provides in relevant part:  "An enhancement for participation in a criminal street gang pursuant to Chapter 11 (commencing with Section 186.20) of Title 7 of Part 1 *shall not be imposed on a person in addition to an enhancement imposed pursuant to this subdivision, unless the person personally used or personally discharged a firearm in the commission of the offense*."  (Italics added.)

The jury found that Jones personally used a firearm under section 12022.5, subdivision (a) in participating in the robbery conspiracy (count II) and found that a *principal* personally used a firearm for the benefit of a criminal street gang under section 12022.53, subdivisions (b) and (e) in the three robberies.  It was not asked to consider whether, and it did not find that, Jones personally used a firearm in committing the robberies, and it found it was not true that he personally discharged a firearm.  In the absence of any jury finding that Jones personally used or discharged a firearm in committing the three robberies, the 10-year enhancement sentences imposed under section 186.22, subdivision (b)(1)(C) for Jones's robbery convictions were improper because they were prohibited by section 12022.53, subdivision (e)(2).  If the People retry the gang-related enhancement allegations and they are found to be true, the court should not reimpose these section 186.22 sentences if it also reimposes the enhancement sentences under section 12022.53, subdivisions (b) and (e).

## B. Jones's Stayed, One-Year Enhancement Sentence Under Section 12022 for Count III Must Be Vacated.

Jones next argues that we should strike another sentence the trial court imposed with regard to count III, the stayed, one-year enhancement sentence under section 12022, subdivision (a)(1) for being armed with a firearm in the commission of a felony.  Jones rightly points out that the trial court's imposition of this sentence, in addition to the 10-year sentence it imposed under section 12022.53 that we have just ordered stricken, violates section 12022.53, subdivision (f).  That section provides in relevant part:  "An enhancement involving a firearm specified in Section . . . 12022 . . . shall not be imposed on a person in addition to an enhancement imposed pursuant to this section."  The People concede the court was in error.

We vacate this one-year sentence because the court imposed it improperly.  We do not mean to imply, however, that the trial court is barred from reimposing this sentence upon resentencing if doing so is consistent with this opinion.

## C. Jones's Stayed, 10-Year Enhancement Sentence Under Section 186.22 for Count VII Must Be Stricken.

Jones next argues regarding his conviction for assault with a pistol of Green (count VII) that the trial court erred by imposing a stayed, 10-year enhancement sentence "on the allegation 186.22" in addition to a stayed, four-year enhancement sentence under section 186.22, subdivision (b)(1)(A) for committing a felony for the benefit of a criminal street gang.

The court did not further state the basis for this 10-year enhancement sentence under section 186.22, but presumably it is for the only enhancement allegation the jury found true—the same gang allegation for which the court imposed the four-year enhancement—making this 10-year sentence erroneously duplicative.  In any event, as the People acknowledge, the court

169

could not impose a 10-year sentence because Jones's assault conviction is not the violent felony required for imposition of such a sentence under section 186.22, subdivision (b)(1)(C) and section 667, subdivision (c). Therefore, we order that this 10-year enhancement sentence be stricken and not reimposed in resentencing.

### D.  Jones Has Forfeited His Section 1385 Claim.

Finally, Jones, in one sentence, argues that the trial court violated section 1385, subdivision (c)(3)(B) to (c)(3)(C).  Section 1385, subdivision (c), effective January 1, 2022, instructs trial courts, in exercising their sentencing discretion, to consider and afford great weight in favor of the dismissal of enhancements that are beyond a single enhancement or which application will result in a sentence of over 20 years, unless the court finds that dismissal endangers public safety.  (§ 1385, subds. (c)(2), (c)(3)(B) & (C).)

The retroactive application of these newly adopted section 1385 provisions to Jones's case is in doubt, however, because, unlike the other recent statutory amendments that we have discussed, section 1385, subdivision (c)(7) provides:  "This subdivision shall apply to sentencings occurring after the effective date of the act that added this subdivision."  Jones fails to address this provision and indeed, fails to provide a reasoned argument at all.  An appellant has the burden "to support claims of error with meaningful argument and citation to authority.  [Citations.]  When legal argument with citation to authority is not furnished on a particular point, we may treat the point as forfeited and pass it without consideration. . . .  We are not required to examine undeveloped claims or supply arguments for the litigants."  (*Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52.)  Accordingly, we disregard Jones's section 1385 argument as forfeited.  That

said, this does not mean that on resentencing after any retrial the court will not be bound by this section as amended.[61]

## DISPOSITION

The judgments are affirmed, except that we:

(1) vacate defendants' first degree murder convictions as discussed in part II of the Discussion section, *ante,* and remand for resentencing or retrial;

(2) vacate the gang enhancement allegation findings and convictions discussed in subpart IV.A of the Discussion section, *ante,* which include:

(a) the enhancement allegations found to be true under section 186.22, subdivision (b)(1) regarding Molina and Jones and the related sentences,

(b) the enhancement allegations found to be true under section 12022.53, subdivisions (b) and (e)(1) regarding Jones and related the sentences, and

(c) the count X convictions under section 186.22, subdivision (a) regarding Molina and Jones, and the related sentences; and

(3) vacate Molina's upper-term sentences for counts II, III and IV as discussed in part V of the Discussion section, *ante*;

(4) remand Jones's firearm enhancement sentence attached to his robbery conspiracy conviction (count II), as discussed in subpart VI.B of the Discussion section, *ante*;

(5) instruct the trial court that Jones's 10-year enhancement sentences under section 186.22, subdivision (b)(1)(C) that are part of his robbery

---

[61] Jones also argues separate from these sentencing issues that the cumulative errors below require that we reverse his convictions, arguing in particular that the combination of errors regarding Biggins's preliminary hearing testimony and the gang expert testimony was highly prejudicial. In light of our conclusion that Biggins's testimony was properly admitted at trial, we conclude his cumulative error argument lacks merit.

convictions (counts III, IV and V), which we have vacated as gang-related under part IV of the Discussion section, *ante*, were improper, as discussed in subpart VII.A of the Discussion section, *ante*;

(6)  vacate Jones's stayed, one-year enhancement sentence under section 12022 that is a part of his count III robbery conviction, as discussed in subpart VII.B of the Discussion section, *ante*; and

(7)  strike Jones's stayed, 10-year enhancement sentence under section 186.22 for count VII and order that it not be reimposed in any resentencing, as discussed in subpart VII.C of the Discussion section, *ante*.

We remand this case to the trial court for retrial if the district attorney chooses to retry any of the reversed charges or enhancements and resentencing consistent with this opinion.  Upon resentencing, the court should prepare amended abstracts of judgment that accurately reflect all of Jones's and Molina's sentences and provide a copy of these amended abstracts of judgment to the California Department of Corrections and Rehabilitation.

_____
STEWART, J.

We concur.

_____
RICHMAN, Acting P.J.

_____
MILLER, J.

*People v. Molina, People v. Jones* (A147875, A147925)

173